UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| YOTAM MAROM, MIRIAM ROCEK, and DON FITZGERALD,<br><br>                                      Plaintiffs,<br><br>            -v-<br><br>THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT ("NYPD") CHIEF OF DEPARTMENT JOSEPH ESPOSITO, NYPD DEPUTY INSPECTOR EDWARD WINSKI, NYPD LIEUTENANT FRANK VIVIANO, NYPD SERGEANT FIOR BLANCO, NYPD LEGAL BUREAU OFFICER OLEG CHARNYAVSKY, NYPD OFFICER MICHAEL GALGANO, SHIELD NO. 2671, NYPD OFFICER CYNTHIA BOYLE, SHIELD 06663, NYPD OFFICER STEVEN VALENTINE, SHIELD 13585, and NYPD OFFICERS JOHN and JANE DOE # 1 - 15 (The names being fictitious, as the true names and shield numbers are not presently known), in their individual and official capacities,<br><br>                                      Defendants. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Index No. 15-CV-2017 (PKC)(MHD)**<br><br>**ECF CASE** |

---

Plaintiffs, by their counsel, GIDEON ORION OLIVER, as and for their Complaint against defendants, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988 for violations of their civil rights, as secured by said statutes and the Constitution of the United States and the Constitution and laws of the State of New York.

2.      On March 17, 2012, plaintiffs participated in a First Amendment Assembly on the six-month anniversary of Occupy Wall Street ("OWS") in Zuccotti Park, also known as Liberty

Plaza.

3.      Without lawful authority or justification, and acting pursuant to a policy, practice, and/or custom of unlawfully limiting First Amendment assemblies and other lawful and constitutionally protected activities perceived to be associated with OWS, including such activities in Liberty Plaza, and the other unconstitutional policies and practices complained of herein, defendants attacked the First Amendment Assembly and plaintiffs, and arrested plaintiffs, used excessive force against plaintiffs, detained plaintiffs for an excessive period of time, maliciously abused process against, created and forwarded false evidence against, and otherwise injured plaintiffs.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

5.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

6.      Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiffs' claims arose in the Southern District of New York.

## PARTIES

7.      At all times relevant to this action, plaintiff YOTAM MAROM was a resident of New York State.

8.      At all times relevant to this action, plaintiff MIRIAM ROCEK was a resident of New York State.

9.      At all times relevant to this action, plaintiff DON FITZGERALD was a resident of New York State.

10.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

11.     Defendant City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

12.     At all times relevant herein, defendant JOSEPH ESPOSITO was the NYPD's Chief of Department, defendant EDWARD WINSKI was a NYPD Deputy Inspector, and defendant FRANK VIVIANO was a NYPD Lieutenant, defendant FIOR BLANCO was a NYPD SERGEANT, defendant OLEG CHARNYAVSKY was a NYPD LEGAL BUREAU attorney, and these defendants were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving plaintiffs of their rights and/or in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein. Defendants ESPOSITO, WINSKI, and VIVIANO, BLANCO, and CHARNYAVSKY were personally involved in designing and implementing the policies and practices complained of herein, and were personally involved in directing, supervising, and/or assisting in plaintiffs' arrests and/or arrest processing and/or failed to intervene to prevent injuries to plaintiffs.

13.     Defendants NYPD OFFICER MICHAEL GALGANO, SHIELD NO. 2671, NYPD OFFICER CYNTHIA BOYLE, SHIELD 06663, and NYPD OFFICER STEVEN VALENTINE, SHIELD 13585 were at all times herein officers, employees, and agents of the NYPD and who were personally involved in depriving plaintiffs of their rights and in

implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

14.     As described more fully below, defendants Esposito, Winski, Viviano, Blanco, and Charnyavsky (the "Supervisory Defendants") were each supervisors ranging in rank from Chief of Department wto Sergeant ho directed and/or supervised and/or participated in the mass arrests in which plaintiffs were swept up and as the result of which plaintiffs were seized, forcefully arrested, subjected to excessive force, including through the application of plastic flex-cuffs that were excessively tight and/or kept on for unreasonably long periods of time, subjected to unnecessarily lengthy mass arrest processing and detentions, maliciously prosecuted, and otherwise injured, and/or failed to intervene.

15.     Defendants Viviano, Blanco, and Charnyavsky ordered, directed, and supervised those named defendants who were not Supervisory Defendants in creating false statements related to plaintiffs and other arrestees what were forwarded to prosecutors.

16.     The remaining defendants were each either personally involved in detaining and/or arresting plaintiffs, including in using force on them, and/or in processing plaintiffs' arrests, including in the creation of false statements related to plaintiffs that were forwarded to prosecutors, and/or failed to intervene.

17.     The individually named defendants "JOHN AND JANE DOES NOS. 1 THROUGH 15" are NYPD officers whose real names are not yet known to plaintiffs and who were personally involved in depriving plaintiffs of their rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

4

18.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

19.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by the defendant City.

20.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by the defendant City.

21.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

22.     At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

23.     Each individual defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

24.     NYPD Chief of Department is the highest-ranking uniformed police officer.

25.     Defendant Esposito was promoted to the rank of NYPD Chief of Department in around 2000 and served in that capacity until 2013.

26.     Defendants' mass arrest-related policies and practices applied in connection with plaintiffs' arrests, arrest processing, and prosecutions employed tactics developed and modified over the course of many years by defendant Esposito and other defendant City policymakers at

and in connection with other demonstrations in the City dating back to around 2000 and

continuing through the date of the incident and including events related to OWS in 2011-2012,

such as, but not limited to, the policies, practices, customs, and usages complained of herein, and

also described and/or litigated in the following cases in which the defendant City was also a

defendant:

- *Mandal, et al. v. City of New York, et al.,* 02 Civ. 1234 (SDNY) (WHP)(FM) and the

  related cases challenging NYPD written and unwritten policies and practices enacted

  after the police shooting of Amadou Diallo in 1999 and formalized in writing as early

  as 2001 as a result of which the NYPD began detaining and fully processing through

  the system persons arrested for non-criminal violations who were otherwise eligible

  to be processed and released with Desk Appearance Tickets ("DATs") (*see, e.g.,*

  *"Mandal I,"* 2006 WL 2950235 (Oct. 17, 2006) (denying summary judgment to

  defendants on plaintiffs' First Amendment claims (that the policies "constituted facial

  violations of [Plaintiffs'] First Amendment rights because they were denied DATs or

  summonses based on the fact that they participated in demonstrations" at *4-6) and

  Fourteenth Amendment – Equal Protection-based claims (at *6-7); 2007 WL 3376897

  (Nov. 13, 2007) (noting that approximately 38 *Mandel* plaintiffs prevailed at trial on

  claims that "the City had an unconstitutional written policy of denying persons

  arrested at demonstrations individual consideration for summonses and DATs" at *2);

- *Burley, et al. v. City of New York, et al.*, 03 Civ. 2915 (SDNY) (WHP)(FM) (class

  action arising from mass arrests of over 200 demonstrators made during 2002 World

  Economic Forum in New York City ("WEF") challenging, *inter alia*, (1) NYPD

  police of detaining perceived protesters who were otherwise eligible to be released

earlier with DATs for excessive periods of time and denying them for consideration

for DAT release on the grounds of their perceived participation in protests; and (2)

policy and practice of using plastic flex cuffs "was unreasonable and excessive

because of the 'manner in which the handcuffs were applied and the length of time in

which'" they were handcuffed, *quoting Burley*, 2005 WL 668789 at *8 (March 23,

2005));

- *Allen v. City of Ne York,* 03 Civ. 2829 (SDNY) (JMW)(GWG) (challenging mass

  arrests made in February 2002 related to the WEF alleging, *inter alia*, that "the police

  deliberately held them in custody for an unnecessarily long period of time in order to

  delay their arraignment in Criminal Court," *quoting* 466 F.Supp.2d 545 (Dec. 22,

  2006);

- *Haus, et al. v. City of New York, et al.,* 03 Civ. 4915  (SDNY) (RWS)(MHD) (class

  action challenging arrests, detentions, and prosecutions of around 300 people in

  connection with February 15, 2003 anti-war protests involving contentions "that the

  arrests were made without probable cause and pursuant to a Police Department

  directive to engage in pre-emptive mass arrests and to subject arrestees to delayed and

  arduous post-arrest processing"  involving detentions, according to plaintiffs, "on the

  basis of identically worded allegations and [where] the charging documents were

  signed by officers or supervisors who had no knowledge of the facts pertinent to the

  charges" - "tactics . . . designed to discourage protesters from vigorously expressing

  their political views," at *1, 2006 WL 1148680 (April 24, 2006));  *Kunstler, et al. v.*

  *City of New York*, 04 Civ. 1145 (SDNY) (RWS)(MHD), and other related cases

  brought in the United States District Court for the Southern District of New York

arising from purportedly false and retaliatory arrests in connection with police

responses to protests in 2003 containing *Monell* and other claims similar and related

to the policies and practices complained of herein;

- *MacNamara, et al. v. City of New York*, 04 Civ. 9216 (SDNY) (RJS) (JCF), *Abdell, et al. v. City of New York*, 05-CV-8453 (SDNY) (RJS) (JCF), *Schiller, et al. v. City of New York, et al.*, 04 Civ. 7922 (SDNY) (RJS) (JCF), *Dinler, et al. v. City of New York, et al.*, 04 Civ. 7921 (SDNY) (RJS)(JCS), *Kyne, et al. v. Wolfowitz, et al.,* 06-CV-2041 (SDNY)(RJS)(JCF), and the dozens of other cases consolidated for discovery purposes before Hon. Richard J. Sullivan in the Southern District of New York arising from arrests made, and policies related to, the Republican National Convention in New York City in 2004 (the "RNC") (individual and class actions brought on behalf of over 1,800 RNC-related arrestees in which the plaintiffs raised *Monell* and other claims similar and related to the policies and practices complained of herein) (*see, e.g., Schiller*, 2008 WL 200021 at *2-5 (January 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the City's alleged policy of creating false sworn statements supporting the arrests" and various members of the NYPD Legal Bureau alleged to be responsible for the systematic creation of perjured sworn statements" as well as "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara,* 275 F.R.D. 125, 154 (May 19, 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class, comprising of all RNC arrestees who were processed pursuant to the" RNC

Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs…..");

- *Callaghan, et al. v. City of New York, et al.,* 07-CV-9611 (SDNY) (PKC)(JLC) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading almost all of the *Monell* claims pleaded herein) (settled); *Long v. City of New York*, 09-CV-6099 (SDNY) (AKH); *People v. Pogan,* 06416-2008 (Sup. Ct., N.Y. Co.) (NYPD officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, *to wit*, riding in a Critical Mass bicycle ride, when he was assaulted by the officer); and other litigation related to defendant City's police responses to Critical Mass and other group bicycle rides beginning with the 2004 RNC;

- The at least sixty 1983 actions filed in the SDNY arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-Civ-5253 (SDNY) (LTS) (Dkt. No. 13) at Paragraph 89 (listing by caption and docket number many OWS-related cases as of March 13, 2015), and including those OWS cases in which the *Marom* defendants are named as defendants or have testified as a witness; and

- The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication entitled Suppressing Protest: Human Rights Violations in

the U.S. Response to Occupy Wall Street, published July 25, 2015, available online at

http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf

(last checked June 22, 2015).

27.     Beginning as early as he was appointed as Chief of Department, defendant

Esposito has played a central role in the NYPD's responses to perceived protest activities, and in

designing and implementing the policies, practices, and procedures complained of herein.

28.     For example, on May 1, 2001, the NYPD adopted a written policy of denying

arrested protesters Desk Appearance Ticket ("DAT") release, which stated, in pertinent part:

"Effective immediately, a Universal Summons returnable to Criminal Court or a Desk

Appearance Ticket may not be issued for any offense committed at or in connection with a

demonstration or similar event at which more than twenty people are participating. All persons

arrested at such events must be processed on-line." *Mandal I* at *3. In defending the written

policy, the defendants argued that defendant Esposito had adopted the written policy and

defendant Esposito testified related to the policy and its adoption in depositions on October 14,

2003 and July 20, 2004. *Mandal I* at *3.

29.     In the period before the 2004 RNC beginning in early 2003, defendant Esposito

was among the high-level NYPD policymaking officials on the NYPD's Executive Committee

who were personally involved in planning for aspects of the NYPD's response to the 2004 RNC,

including the NYPD's responses to anticipated mass protests, mass arrests, and mass arrest

processing in connection with the RNC.

30.     Defendant Esposito attended meetings at which planning for anticipated mass

protests, mass arrests, and mass arrest processing were discussed, and/or sent representatives to

such meetings, who reported back to him, including such meetings with then-NYPD
Commissioner Raymond Kelly, and other high-level NYPD officials.

31.    The NYPD's final RNC mass arrest processing plans included an additional arrest
processing procedure, not usually followed in other arrest situations, during which each
"arresting officer" would meet with a supervisor from the NYPD's Legal Bureau.

32.    The NYPD's final mass arrest processing plan (the "RNC MAPP") included an
additional arrest processing procedure, not usually followed in other arrest situations, during
which each "arresting officer" would meet with a supervisor from the NYPD's CJB.

33.    The City adopted a "no-summons" policy with respect to RNC-related arrestees.

34.    Defendant Esposito was personally involved in the NYPD's decisions to enact the
RNC MAPP.

35.    Defendant Esposito was personally involved in the NYPD's decision to enact a
"no-summons" policy with respect to RNC-related arrestees.

36.    Between August 27, 2004 and September 2, 2004, there were over 1,800 RNC-
related arrests.

37.    As a result of the City's and the NYPD's crowd and disorder control planning, the
NYPD engaged in mass arrests during the 2004 RNC.

38.    As a result of the City's and the NYPD's crowd and disorder control planning, the
NYPD failed to make individualized determinations of probable cause in connection with many
RNC-related arrests.

39.    As a result of the City's and the NYPD's mass arrest and mass arrest processing
plans with respect to RNC-related arrestees, excessive force was used against many arrestees
without any NYPD documentation.

40.     As a result of the City's and the NYPD's mass arrest policies and practices, the no-summons policy, and the RNC MAPP, RNC-related arrestees' arrest-to-release time vastly exceeded the time it would have taken them to be released with a summons, and in many cases doubled and otherwise far exceeded non-RNC-related arrestees' arrest-to-arraignment times.

41.     As a result of the City's and the NYPD's mass arrest plans and the RNC MAPP, NYPD officers who had not in fact witnessed the conduct leading up to a person's arrest filled out NYPD paperwork and in a significant number of cases swore out criminal court complaints swearing that they had seen conduct they had not in fact seen.

42.     As a result of the NYPD's RNC-related conduct, the defendant City and defendant Esposito were defendants in dozens of lawsuits challenging, among other things, the City's disorder control, mass arrest, use of force, and mass arrest processing polices, procedures, customs, and practices.

43.     After around a decade of discovery and litigation, during the course of which defendant Esposito himself gave more than five days of deposition testimony, much of which is relevant to Plaintiffs' *Monell* claims herein, the bulk of the RNC cases settled, and all of the RNC-related cases have since been resolved.

44.     Upon information and belief, at all times relevant herein, the NYPD's CJB regularly provided reports that went to defendant Esposito, the Police Commissioner, and other defendant City policymakers, including information about mass arrests tracking the arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, and other information.

45.     Despite decades of litigation over the recurring problems framed by plaintiffs' *Monell* claims herein, defendant City and the Supervisory Defendants, including specifically

defendant Esposito, failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with, those policies and practices.

46.     At all times relevant herein, plaintiffs were each participants in OWS.

47.     On September 17, 2011, OWS began a 24-hour occupation of Zuccotti Park, a privately owned public space in lower Manhattan also known as Liberty Plaza.

48.     Zuccotti Park/Liberty Plaza is a Privately Owned Public Space ("POPS") that was created via a Special Permit issued by the New York City Planning Commission ("CPC") in 1986 pursuant to the New York City Zoning Resolution ("ZR" or "Zoning Resolution").

49.     Under the Special Permit, Liberty Plaza is defined as a "permanent open park" for the "public benefit."

50.     Under the relevant provisions of the ZR, at least 50% of the sidewalk frontage of such a POPS must be free of obstruction, and circulation paths must connect to each of the street frontages. *See* ZR 37-721; 37-723; 37-726.

51.     Any proposed modifications to Liberty Plaza's design must first go through a City approval process. *See, e.g.,* ZR 37-62, et seq.; 37-38; 74-91.

52.     The CPC is precluded by statute from authorizing changes to such a POPS' physical design unless the changes will improve compliance with the applicable public accessibility standards. *See* ZR 37-625.

53.     Under the ZR, any prohibition on conduct in such a POPS must be clearly posted in writing. *See* ZR 37-73, *et seq.*

54.     By long-standing City practice, any such prohibitions must be reasonable.

55.     City law requires that "public plazas shall be accessible to the public at all times, except where the CPC has authorized a nighttime closing." *See* ZR 37-727.

56.     Between September 17, 2011 and November 15, 2011, the OWS movement physically occupied Liberty Plaza.

57.     Beginning in around at least September of 2011, defendant City became aware of OWS.

58.     Beginning in around at least September of 2011, defendant Esposito became aware of OWS.

59.     Beginning on or shortly after September 17, 2011, defendant Esposito was personally involved in planning for the NYPD's police responses to OWS.

60.     Between September 17, 2011 and March 17, 2012, defendant Esposito, defendant Winski, and other defendant City policymakers routinely received information related to OWS from the NYPD's Intelligence Division and other NYPD sources.

61.     Between September 17, 2011 and March 17, 2012, defendant Esposito was personally involved in planning for policing and/or policing OWS on a near-daily basis, and for designing and implementing the NYPD's police responses to OWS.

62.     During the relevant time period, defendant Esposito would routinely stop by the OWS encampment at Zuccotti Park on his way home from work.

63.     During the relevant time period, defendant Esposito met with the then-NYPD Commissioner at least three times a week and regularly discussed OWS at those meetings as well as during extra meetings specifically related to OWS.

64.     During those meetings, defendant City refined and adopted an unconstitutional policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses (the "No-Summons Policy").

65.     During the relevant time period, defendant City refined and ultimately adopted an unconstitutional policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information, all as part of an unreasonably lengthy and punitive mass arrest processing plan (the "MAPP").

66.     The No-Summons Policy and the MAPP were directed at and targeted political demonstrations.

67.     The No-Summons Policy and the MAPP were directed at and targeted political demonstrations perceived to be associated with OWS.

68.     Plaintiffs were ultimately targeted out and subjected to the No-Summons Policy and the MAPP because the NYPD believed they had participated in political protest related to OWS.

69.     According to NYPD procedures codified in the NYPD's Patrol Guide in effect at the time of the incident, which reflected the NYPD's official policies and practices, persons detained or arrested for non-criminal violations such as those for which plaintiffs were presumably detained, as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, are normally eligible for individualized determinations of eligibility for release with a Universal Summons or DAT rather than being held in custody for arraignment.

70.     At all times relevant herein, detainees released with a summons were typically in NYPD custody for an average of between around two to four hours.

71.     At all times relevant herein, detainees released with a DAT were typically in NYPD custody for an average of between around four and twelve hours.

72.     At all times relevant herein, detainees held for arraignment were typically in custody for an average of between twenty and twenty-four hours.

73.     In sum and substance, as a result of the No-Summons Policy, plaintiffs did not received individualized consideration for summonses, but instead were held in custody for longer based on the police perception that they had participated in a demonstration associated with OWS.

74.     As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs were handcuffed and held in custody for longer than similarly situated "non-OWS related" arrestees would have been.

75.     The No-Summons policy and the MAPP were adopted and applied to plaintiffs, but not others similarly situated, based on malicious, bad faith intent to inhibit or punish plaintiffs' exercise of their rights protected under the First Amendment of the United States Constitution, among other rights.

76.     As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs were detained for an unreasonable length of time.

77.     As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, plaintiffs' releases were delayed for the purpose of gathering additional evidence to justify the arrest.

78.     As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, defendants delayed plaintiffs' releases based on ill-will toward their perceived association with OWS.

79.     As a result of the application of the No-Summons Policy to plaintiffs, defendants delayed plaintiffs' releases for delay's sake, and/or to punish them for their perceived association with OWS.

80.     As a result of the application of the No-Summons Policy and the MAPP to plaintiffs, defendants delayed plaintiffs' releases to deter and/or prevent them from participating in further OWS-related demonstrations.

81.     The application of the No-Summons Policy and the MAPP to plaintiffs violated plaintiffs' First, Fourth, Sixth, and Fourteenth Amendment rights.

82.     Upon information and belief, between September 17, 2011 and November 15, 2011, defendant Esposito and/or his subordinate NYPD officers or agents acting under his direction and supervision communicated with representatives of Brookfield Office Properties, Inc. regarding OWS and the occupation of Zuccotti Park, sharing information back-and-forth and planning to evict the occupation from Zuccotti Park.

83.     Upon information and belief, defendant Esposito was personally involved in developing plans to evict the occupation from Zuccotti Park in November of 2011.

84.     Upon information and belief, defendant Esposito supervised the mass eviction of Zuccotti Park on November 15, 2011.

85.     On the early hours of November 15, 2011, the NYPD raided Liberty Plaza and forcefully cleared it, arresting scores of occupiers for purported violations of the New York State Penal Law's non-criminal prohibitions on simple trespass and Disorderly Conduct.

86.     As a result of the NYPD's early morning raid on Liberty Plaza, there were mass arrests, extreme uses of force, and property destruction.

87. For example, the NYPD and/or other City agencies destroyed The People's Library, a collection of books and other materials belonging to OWS. Plaintiffs incorporate by reference the allegations contained in the Complaint in *Occupy Wall Street, et al. v. The City of New York, et al.*, 12-cv-04129 (GBD).

88. During the relevant time period in 2011 and 2012, the Supervisory Defendants ordered, supervised, and participated in hundreds of arrests related to OWS.

89. For example, defendant Esposito personally ordered and supervised the mass arrests of around 700 people on the Brooklyn Bridge in connection with an OWS-related event on October 1, 2011.

90. For example, defendant Esposito was personally involved in the October 15, 2011 arrest and subsequent prosecution of the plaintiff in *Dekuyper v. City of New York, et al.*, 14-cv-8294 (SDNY)(DLC).

91. For example, defendant Esposito was also personally involved in the November 17, 2011 arrests of the plaintiffs in *Case, et al. v. City of New York, et al.*, 14 CV 9148 (SDNY) (AT).

92. Each of the Supervisory Defendants had also been personally involved in other mass arrests related to OWS prior to and on the date of the incident, including by supervising mass arrests and mass arrest processing related to OWS.

93. Beginning on November 15, 2011, and for significant periods of time thereafter leading up to and including on March 17, 2012, the NYPD erected metal barricades around Liberty Plaza, and members of the public were subject to searches of their personal belongings by security personnel as a condition of entering Liberty Plaza.

94.     The NYPD also ratified and enforced arbitrary and shifting criteria determining who could enter the park, at what times they could enter, and what behavior they could engage in within Liberty Plaza.

95.     During the relevant time period beginning in September of 2011, agents of the defendant City, including agents of the New York City Law Department, the CPC, and the Real Estate Board of New York met, advised, and conferred related to defendant City's efforts to advise and influence POPS owners to adopt rules and prohibitions in response to OWS, to target conduct perceived to be associated with OWS.

96.     In connection with those efforts, defendant City representatives, including representatives of the CPC, sought the advice of the City's main expert in POPS, Harvard Professor Jerold S. Kayden,

97.     Professor Kayden concluded in a document dated October 18, 2011, *inter alia*, that "no matter what the space [Zuccotti Park] is, it must be open at all times."

98.     As a result of the City's efforts to advise and influence POPS owners to adopt rules and prohibitions in response to OWS, to target conduct perceived to be associated with OWS, in around September of 2011, Brookfield Properties, Inc. came up with rules prohibiting four types of conduct.

99.     Between September of 2011 and March of 2012, numerous defendants, including, but not limited to, defendants Esposito and Winski, participated in the development of, and enforced, written and unwritten rules of conduct that were not among the types of prohibited conduct specifically enumerated by Brookfield beginning in around September of 2011.

100.    No CPC permission was sought or granted to change the physical layout of Liberty Plaza.

101.    No CPC permission was sought or granted to change the rules of conduct within Liberty Plaza.

102.    The shifting rules regarding entry and conduct enforced by defendants to limit First Amendment and other protected activity within Liberty Plaza were not lawfully imposed.

103.    Those actions, as well as the actions taken against plaintiffs complained of herein, violated the terms of the Special Permit related to Liberty Plaza.

104.    Those actions, as well as the actions taken against plaintiffs complained of herein, violated the terms of the ZR related to Liberty Plaza.

105.    Defendants City and the Supervisory Defendants knew or should have known that the NYPD's plans for policing and mass arrest processing in connection OWS protests would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, fabrication of evidence, and other unlawful conduct that would lead to constitutional rights violations, including those complained of herein.

106.    Based on his vast experience as NYPD Chief of Department since around 2000, and based on the other Supervisory Defendants' individual experiences, defendants Esposito and the Supervisory Defendants knew or should have known that their crowd control tactics would result in purported "dispersal orders" that were not lawful, not clearly communicated, and/or impossible to comply with, as well as mass arrests without appropriate individualized determinations of probable cause.

107.    On March 17, 2012, defendant Esposito was the highest ranking NYPD officer in the vicinity of plaintiffs' arrests.

108.    On March 17, 2012, defendnat Winski was the second-highest-ranking NYPD officer in the vicinity of Plaintiffs' arrests.

20

109.    On March 17, 2012, defendant Esposito was the NYPD Incident Commander in the vicinity of plaintiffs' arrests and was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene.

110.    Alternately, on March 17, 2012, defendant Esposito was the NYPD Incident Commander in the vicinity of plaintiffs' arrests and was actually responsible for making command and control decisions as well as all supervisory decisions with respect to all fellow officers on the scene.

111.    Upon information and belief, according to NYPD policy and procedure, as Incident Commander, either defendant Esposito or defendant Winski or both, had a responsibility to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was effected.

112.    Upon information and belief, at all times relevant herein on March 17, 2012, defendant Viviano was a NYPD supervisor whose responsibility it was, among others, according to NYPD policy and procedure, to ensure the accuracy of defendants Galgano's, Boyle's, and Valentine's arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

113.    Upon information and belief, at all times relevant herein on March 17, 2012, defendant Blanco was a NYPD supervisor whose responsibility it was, among others, according to NYPD policy and procedure, to ensure the accuracy of defendants Galgano's, Boyle's, and Valentine's arrest processing paperwork, as well as the accuracy of other arrest processing paperwork related to the incident.

114.    On March 17, 2012, at the NYPD's Midtown South Precinct, defendants Blanco

and Charnyavsky met with and supervised defendants Galgano, Boyle, and Valentine, along with

all other approximately eight assigned arresting officers from the NYPD's Midtown South

Precinct, gathered together and conferred with each other about what they had observed and

what the charges were.

115.    Defendant Blanco instructed defendants Galgano, Boyle, and Valentine, along

with all other approximately eight assigned arresting officers from the NYPD's Midtown South

Precinct, regarding what to write in their NYPD arrest processing paperwork related to plaintiffs'

and other purportedly related arrests.

116.    Defendant Charnyavsky instructed defendants Galgano, Boyle, and Valentine,

along with all other approximately eight assigned arresting officers from the NYPD's Midtown

South Precinct, regarding what to write in their NYPD arrest processing paperwork related to

plaintiffs' and other purportedly related arrests.

117.    As a result of that process, defendants Blanco and Charnyavsky instructed and

assisted defendants Galgano, Boyle, and Valentine, as well as other defendants under their

command, in creating false narratives in their NYPD arrest processing paperwork.

118.    As a result, DANY declined to prosecute a high number of the arrests defendant

City agents brought to DANY for prosecution.

119.    Upon information and belief, at all times relevant herein on March 17, 2012,

defendant Charnyavsky was a NYPD supervisor whose responsibility it was, among others,

according to NYPD policy and procedure, to ensure that NYPD officers could articulate properly

what they saw leading up to the defendant's arrest and so that people who had not committed

offenses could be released during arrest processing.

120.     Defendants Esposito, Winski, Viviano, Charnyavsky, and/or Blanco suggested, endorsed, ratified, or enacted a policy, practice, or procedure on March 17, 2012 of not issuing summonses for Disorderly Conduct, Trespass, and other summons-eligible offenses in connection with planned OWS-associated protests.

121.     Defendants Esposito, Winski, Viviano, Charnyavsky, and/or Blanco suggested, endorsed, ratified, or enacted a policy, practice, or procedure on March 17, 2012 of having assigned arresting officers speak with NYPD Legal Bureau as part of the mass arrest processing procedures.

122.     Defendants Esposito, Winski, Viviano, Charnyavsky, and/or Blanco knew or should have known that processing the anticipated mass arrests as DAT's or otherwise at a Mass Arrest Processing Center ("MAPC") would unnecessarily increase their arrest to release time.

123.     In plaintiffs' cases, their arrest to release time was well more than double that of summons-eligible people.

124.     Upon information and belief, defendants Esposito, Winski, Viviano, Charnyavsky, and/or Blanco and other unidentified NYPD supervisors enacted the no-summons policy, and the other mass arrest-related policies and practices complained of herein, in order to shut down Plaintiffs' participation in or proximity to lawful, protected activity.

125.     Defendants Esposito, Winski, Viviano, Charnyavsky, and/or Blanco knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations.

126.     On March 17, 2012, Defendants Galgano, Boyle, and Valentine were all NYPD

Officers under the command and supervision of Defendants Esposito, Winski, Viviano, Blanco,

and Charnyavsky.

127.     Upon information and belief, Defendants Galgano, Boyle, and Valentine met with

defendant Blanco in connection with processing plaintiffs' arrests.

128.     Upon information and belief, Defendants Galgano, Boyle, and Valentine met with

defendant Charnyavsky in connection with processing plaintiffs' arrests.

129.     On March 17, 2012, all other Defendants were under defendant Esposito in the

chain of command.

130.     On March 17, 2012, defendants Esposito, Winski, Viviano, Blanco, and

Charnyavsky ordered defendants Galgano, Boyle, and Valentine to process numerous arrests

made on March 17, 2012 in connection with the incident, including plaintiffs' arrests.

131.     At the time they were ordered to process arrestees, defendants Galgano, Boyle,

and Valentine had not observed any plaintiff engage in any conduct.

132.     Defendant Galgano never saw Mr. Marom in Liberty Plaza.

133.     The first time defendant Galgano saw Mr. Marom was in the vicinity of the

NYPD's Midtown South Precinct.

134.     Upon information and belief, defendant Boyle never saw Ms. Rocek in Liberty

Plaza.

135.     Upon information and belief, defendant, the first time defendant Boyle saw Ms.

Rocek was in the vicinity of the NYPD's Midtown South Precinct.

136.     Upon information and belief, Defendant Valentine never saw Mr. Fitzgerald in

Liberty Plaza.

137.    Upon information and belief, the first time defendant Valentine saw Mr. Fitzgerald was in the vicinity of the NYPD's Midtown South Precinct.

138.    Upon information and belief, defendants Charnyavsky and Blanco supervised defendants in filling out their NYPD paperwork.

139.    Upon information and belief, defendant Galgano filled out NYPD paperwork stating that he had seen Mr. Marom engage in certain conduct when he had in fact not done so.

140.    Upon information and belief, defendant Boyle filled out NYPD paperwork stating that he had seen Ms. Rocek engage in certain conduct when he had in fact not done so.

141.    Upon information and belief, defendant Valentine filled out NYPD paperwork stating that he had seen Mr. Fitzgerald engage in certain conduct when he had in fact not done so.

142.    As a result of defendants' decisions to arrest plaintiffs, and not to issue summonses to plaintiffs, and to subject them to the MAPP, plaintiffs were detained for an excessively long, and unreasonable, period of time.

143.    As a result of the Defendants' mass arrest processing policies, procedures, and practices, Defendants Galgano, Boyle, and Valentine provided false and misleading information to DANY, as a result of which plaintiffs were prosecuted.

144.    For example, in an accusatory instrument, defendant Galgano specifically swore he saw Mr. Marom and another person in Zuccotti Park, when he had not.

145.    Similarly, in an accusatory instrument, defendant Boyle specifically swore that she saw certain conduct that she did not.

146.    Similarly, in an accusatory instrument, defendant Valentine specifically swore that he saw certain conduct that he did not.

147.    Based on those false statements, Plaintiffs were prosecuted for criminal offenses.

148.    Although the defendants aside from defendants Galgano, Boyle, and Valentine knew or should have known that their acts and omissions on March 17, 2012 would lead to plaintiffs' false arrests and their other injuries, none of them intervened to prevent or remediate the injuries.

149.    March 17, 2012 was St. Patrick's Day and the six month anniversary of OWS.

150.    In the early afternoon of March 17, 2012, at least defendants Winski and Viviano were personally involved in OWS-related false arrests in the vicinity of Liberty Plaza and related constitutional violations, including, but not limited to, through the acts and omissions described in the operative pleadings in *Mary Tardif v. City of New York, et al*, 13-cv-4506 (KMW) (SDNY) and the cases the Court has accepted as related to *Marom*, *Caravalho v. City of New York*, *et al.,* 13-cv-4174 (PKC)(MHD), *Pesola v. City of New York*, 15-cv-1917, (PKC)(MHD), and *Allen v. City of New York*, e*t al.,* 15-cv-1918 (PKC) (MHD).

151.    On the evening of March 17, 2012, each plaintiff was lawfully present in Liberty Plaza.

152.    On the evening of March 17, 2012, defendant NYPD agents raided Liberty Plaza and effected mass arrests.

153.    Defendant NYPD agents then caused each plaintiffs to be transported to an NYPD precinct for mass arrest processing.

154.    After mass arrest processing at the precinct, where plaintiffs were subjected to the No Summons Policy and the MAPP, each plaintiff was brought to 100 Centre Street, and eventually appeared before a New York City Criminal Court judge.

155.     Each plaintiff was subsequently released on their own recognizance and prosecuted in New York City Criminal Court.

156.     Each plaintiff eventually accepted an ACD to resolve the criminal case against them.

## PLAINTIFF YOTAM MAROM

157.     On the evening of March 17, 2012, Mr. Marom was lawfully present in Liberty Plaza in connection with the six month anniversary of the OWS movement.

158.     Mr. Marom eventually saw a large number of police officers enter the park.

159.     Mr. Marom was violently arrested.

160.     Mr. Marom was not arrested by defendant Galgano.

161.     Mr. Marom was then forcibly escorted to a NYPD-arranged holding area on the street.

162.     Mr. Marom was eventually loaded onto a MTA bus.

163.     Mr. Marom was eventually transported to the NYPD's Midtown South Precinct.

164.     At or near the NYPD's Midtown South Precinct, defendant Galgano saw Mr. Marom for the first time.

165.     Mr. Marom's cuffs were tight on his wrists. They remained on for several hours.

166.     Mr. Marom was eventually transported to 100 Centre Street.

167.     Approximately 40 or more hours after his arrest, at or after around on March 19, 2012, Mr. Marom was arraigned before a New York City Criminal Court Judge.

168.     As a result of his arrest, Mr. Marom missed the opportunity to participate on a planned panel on March 18, 2012 at the Left Forum at Pace University.

169.     During his deposition in *Caraval*

170.     During defendant Galgano's deposition in *Caravalho*, he testified, in sum and substance, in pertinent parts:

a.  He did not make any arrests;

b.  Defendant Winski instructed officers defendant Galgano was with to "remain on the Broadway side" while he ordered other NYPD officers to make arrests;

c.  Defendant Galgano was later assigned to five arrests;

d.  "When everything had calmed down and some order was restored, Lieutenant Viviano came over and said there was some kind of a mixup and we had a New York City MTA bus that the NYPD was using to hold prisoners, prisoners without arresting officers, and that Manhattan South Task Force would be assigned those arrests. . . . Somehow, some way, arrests were made but the arresting officers were either separated from the prisoners or did not realize that they were the arresting officers";

e.  Defendant Viviano told them they would be assigned and that was according to defendant Winski's instructions;

f.  "The bus left Zuccotti Park and we were told we were being removed to Midtown South Precinct Stationhouse to process the arrests";

g.  When he met with a prosecutor, he and the other officers "described what went on in Zuccotti Park and how we made the arrests";

h.  "An affidavit was typed up based on what was said" and he reviewed it;

i.  He did not sign it;

j.  "Apparently there was a meeting among the DA's and they said they were not going to go any further with the arrest, that they were going to decline prosecution";

k.  He decided to write what he put in OLBS sheet because he "conferred with a member of the NYPD Legal Division";

l.  That person told him what to write on his NYPD online booking system paperwork; and

m.  The officer told him word-for-word what to write down.

171.     Contrary to his deposition testimony, defendant Galgano did swear out an accusatory instrument charging Mr. Marom and another person with various offenses based on

28

false allegations that he had allegedly observed the defendants "inside [the] park" and that he observed dispersal orders given to the defendants and that they thereafter refused to leave and resisted arrest by sitting down on the ground, interlocking their arms with "several separately charged defendants," and refusing to place their arms behind their backs.

172.    As defendant Galgano admitted in his *Caravalho* deposition, he did not observe those things.

173.    Mr. Marom eventually accepted an ACD to resolve the case.

174.    As a result of this incident, Mr. Marom suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

**PLAINTIFF MIRIAM ROCEK**

175.    On the evening of March 17, 2012, Ms. Rocek was lawfully present in Liberty Plaza acting as a volunteer street medic in connection with the six-month anniversary of the OWS movement.

176.    Ms. Rocek eventually saw a large number of police officers enter the park.

177.    The first contact Ms. Rocek had with the police was when an unidentified NYPD supervisor pointed at her and stated, "Get her first, she's number one."

178.    Within less than a few seconds, two apparently male NYPD officers grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground.

179.    As she was face-down on the ground, Ms. Rocek was not resisting.

180.    Nevertheless, an NYPD officer kept repeating, "Stop resisting."

181.    The officer also said, "Just relax."

182.   In response, Ms. Rocek said words to the effect of, "Fuck you, don't tell me to relax."

183.    The officer then said words to the effect of, "Fine, fuck you then," and twisted her arm up her back as he placed plastic flexcuffs on her.

184.   The officer then yelled at her, "Get up," although she could not because she was cuffed.

185.   She was then dragged by NYPD officers by her hair and pulled up onto her feet.

186.   She was then forcibly escorted to a NYPD Prisoner Transport Vehicle, where she was turned over to other NYPD officers.

187.   In the course of her arrest, the NYPD officers who grabbed her and threw her to the ground ripped Ms. Rocek's jacket.

188.   Ms. Rocek was eventually transported to the NYPD's Midtown South Precinct, where she was turned over to other NYPD officers.

189.   Upon information and belief, at or near the NYPD's Midtown South Precinct, defendant Boyle saw Ms. Rocek for the first time.

190.   Ms. Rocek's cuffs were tight on her wrists. They remained on for approximately four hours.

191.   No apparently female NYPD officers were personally involved in Ms. Rocek's arrest.

192.   Ms. Rocek was eventually transported to 100 Centre Street.

193.   Approximately 24 hours after her arrest, at or after around 12:00AM on March 19, 2012, Ms. Rocek was arraigned before a New York City Criminal Court Judge.

194.    After numerous court appearances, in November of 2012, Ms. Rocek eventually accepted an ACD to resolve the case.

195.    As a result of ther incident, Ms. Rocek suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## PLAINTIFF DON FITZGERALD

196.    On the evening of March 17, 2012, Mr. Fitzgerald was lawfully present in Liberty Plaza in connection with the six month anniversary of the OWS movement.

197.    Mr. Fitzgerald eventually saw a large number of police officers enter the park.

198.    NYPD Officers then grabbed Mr. Fitzgerald violently and threw him face-down on the ground.

199.    While he was down on the ground, an unidentified NYPD officer hit him at least ten times in the face while saying, "Stop resisting!"

200.    Mr. Fitzgerald was eventually loaded onto an NYPD Prisoner Transport Vehicle ("PTV").

201.    Mr. Fitzgerald was eventually transported to the NYPD's Midtown South Precinct.

202.    Upon information and belief, at the NYPD's Midtown South Precinct, defendant Valentine saw Mr. Fitzgerald for the first time.

203.    Mr. Fitzgerald's cuffs were tight on his wrists. They remained on for several hours.

204.    Mr. Fitzgerald was eventually transported to 100 Centre Street.

205.    Approximately 30 or more hours after his arrest, Mr. Fitzgerald was arraigned before a New York City Criminal Court Judge.

206.     Mr. Fitzgerald's face was swollen and painful for around a week.

207.     Upon information and belief, after numerous court appearances, Mr. Fitzgerald

eventually accepted an ACD to resolve the case.

208.     As a result of this incident, Mr. Fitzgerald suffered physical, psychological and

emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

### FIRST CLAIM

**AGAINST ALL DEFENDANTS, EXCEPT AS OTHERWISE LIMITED
ELSEWHERE HEREIN, FOR DEPRIVATION OF RIGHTS UNDER THE
UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

209.     Plaintiffs incorporate by reference the allegations set forth in all preceding and

subsequent paragraphs as if fully set forth herein.

210.     By their conduct and actions and/or omissions in depriving plaintiffs of their

freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy their property, in

seizing them, in falsely arresting them, in assaulting and battering them, in detaining them for

excessive periods of time, in creating false evidence against them, in maliciously abusing process

against them, in retaliating against them for the exercise of constitutionally protected rights, in

inflicting emotional distress upon them, in violating their rights to due process and equal

protection, and/or for failing to remedy the aforementioned violations after having witnessed

them or having been informed of them by report or appeal, and/or by failing properly to train,

supervise, or discipline employees of the defendant City under their supervision, defendants,

acting under color of law and without lawful justification, intentionally, maliciously, and/or with

a deliberate indifference to or a reckless disregard for the natural and probable consequences of

their acts, deprived plaintiffs of the equal protection of the laws and/or of equal privileges and

immunities under the laws, and thereby caused injury and damage in violation of plaintiffs'

constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments.

211.    By the conduct described above, defendants, under color of state law, subjected Plaintiffs to the foregoing acts and omissions without due process of law and in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983, thereby depriving plaintiffs of their rights, privileges and immunities, including, without limitation, deprivation of the following constitutional rights:

a.  Freedom to engage in protected speech, expression and association, without undue constraint or governmental retaliation;

b.  Freedom from unreasonable seizures of their persons, including but not limited to the excessive use of force;

c.  Freedom from arrest without probable cause;

d.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiffs were aware and did not consent;

e.  Freedom from deprivation of liberty and property without due process of law;

f.  Freedom from excessive detention;

g.  Freedom from charges falsely lodged, or "evidence" falsely created, against them by police officers;

h.  Freedom from malicious abuse of process;

i.  The enjoyment of equal protection, privileges and immunities under the laws.

212.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**SECOND CLAIM**

**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

**ON BEHALF OF ALL PLAINTIFFS AGAINST DEFENDANT CITY AND THE
SUPERVISORY DEFENDANTS**

213.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

214.    By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries as set forth elsewhere herein, defendant City and the Supervisory Defendants caused damage and injury in violation of plaintiffs' rights guaranteed under the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments, through 42 U.S.C. §1983.

215.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

**THIRD CLAIM**

**FAILURE TO INTERVENE**

**ON BEHALF OF EACH PLAINTIFF AGAINST EACH NON-MUNICIPAL
DEFENDANT WHO DID NOT DIRECTLY PARTICIPATE IN, BUT KNEW OR
SHOULD HAVE KNOWN ABOUT, EACH CONSTITUTIONAL VIOLATION
PLAINTIFF COMPLAINS OF HEREIN, INCLUDING, BUT NOT LIMITED TO:**

**ON BEHALF OF PLAINTIFF MAROM AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANTS BOYLE AND VALENTINE;**

**ON BEHALF OF PLAINTIFF ROCEK AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANTS GALGANO AND
VALENTINE; AND**

**ON BEHALF OF PLAINTIFF FITZGERALD AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANTS GALGANO AND BOYLE.**

216.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

217.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

218.    Defendants were present for the above-described incident and witnessed other defendants unlawfully arrest the Plaintiffs.

219.    Defendants' use of force against plaintiffs was obviously excessive and unjustified under the circumstances yet defendants who were not involved in the obviously unlawful uses of force failed to take any action or make any effort to intervene, halt or protect the plaintiffs from being subjected to excessive force by other defendants.

220.    Additionally, as discussed elsewhere herein, defendants were present for and participated in mass arrest processing, including plaintiffs' excessive detentions, and/or criminal prosecutions related to the incident.

221.    Plaintiffs' arrests and the initiation of criminal charges against them were clearly without probable cause or other legal justification, and were based on facts alleged by defendants, which defendants knew to be false, yet defendants failed to take any action or make any effort to intervene, halt or protect plaintiffs from being unlawfully and wrongfully arrested, detained, and prosecuted.

222.    As a result of defendants' violations of plaintiffs' constitutional rights by failing to intervene in other defendants' clearly unconstitutional uses of force and plaintiffs'

unconstitutional arrests and prosecutions, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## FOURTH CLAIM

## FALSE ARREST

### ON BEHALF OF PLAINTIFF MAROM AGAINST
### THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;

### ON BEHALF OF PLAINTIFF ROCEK AGAINST
### THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND

### ON BEHALF OF PLAINTIFF FITZGERALD AGAINST
### THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.

223.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

224.    As a result of defendants' conduct as described above, plaintiffs were subjected to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

225.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## FIFTH CLAIM

## EXCESSIVE USE OF FORCE

### ON BEHALF OF PLAINTIFF MAROM AGAINST
### THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;

36

**ON BEHALF OF PLAINTIFF ROCEK AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND**

**ON BEHALF OF PLAINTIFF FITZGERALD AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.**

226.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

227.    The level of force employed by defendants was objectively unreasonable and in violation of plaintiffs' constitutional rights.

228.    As discussed elsewhere herein, defendants City and Esposito designed and/or implemented policies and practices pursuant to which those defendants who used force against plaintiffs subjected plaintiffs to excessive force, including in the form of applying unreasonably and even dangerously tight plastic flex-cuffs for excessive periods of time, as well as policies and practices pursuant to which such uses of force were not reported and/or documented.

229.    Plaintiffs were handcuffed with plastic manacles behind their backs, not the metal handcuffs normally used by the NYPD, which results in tighter cuffing and as a result more physical pain to the person cuffed.

230.    As a result of decades of litigation and related complaints and reports of excessive use of force in connection with the use of plastic flex-cuffs in connection with mass arrests.

231.    Plaintiffs remained handcuffed after they were transported from the scene of their arrests to the mass arrest processing center.

232.    Plaintiffs remained handcuffed for hours, including for an excessive period of time while waiting on an MTA bus adjacent to Zuccotti Park and outside the mass arrest processing center.

233.     The excessive handcuffing operated along with the other policies and practices articulated to penalize and deter perceived participation in OWS-related demonstrations.

234.     As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, and were otherwise damaged and injured.

## SIXTH CLAIM

## FIRST AMENDMENT

### ON BEHALF OF PLAINTIFF MAROM AGAINST THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;

### ON BEHALF OF PLAINTIFF ROCEK AGAINST THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND

### ON BEHALF OF PLAINTIFF FITZGERALD AGAINST THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.

235.     Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

236.     In detaining, assaulting, and arresting plaintiffs, in prosecuting plaintiffs, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or customs punishing peaceful protest, defendants violated plaintiffs' rights to speak, assemble, associate, and petition the government for redress of grievances peaceably.

237.     Defendants engaged in the acts and omissions complained of herein with ill will and/or actual malice.

238.     Defendants engaged in the acts and omissions complained of herein in retaliation for plaintiffs' protected conduct and/or speech.

239.     Defendants engaged in the acts and omissions complained of herein in order to prevent plaintiffs from continuing to engage in protected conduct.

240.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage plaintiffs from engaging in similar protected conduct in the future.

241.    Each plaintiff was actually chilled in that each plaintiff was prevented and /or deterred from participating in protected conduct on the date of and on numerous dates after the incident as a result of defendants' violations of their rights as complained of herein.

242.    In addition to being retaliatory, the restrictions imposed by defendants on plaintiffs' First Amendment rights complained of herein were:

      a.   Not content-neutral and lacked narrowly tailored to promote a compelling government interest;

      b.   Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression;

      c.   Afforded defendants unbridled discretion to limit or deny plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns); and/or

      d.   Amounted to the imposition of strict liability on plaintiffs for participating in protected conduct.

243.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

**SEVENTH CLAIM**

## MALICIOUS ABUSE OF PROCESS

**ON BEHALF OF PLAINTIFF MAROM AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;**

**ON BEHALF OF PLAINTIFF ROCEK AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND**

**ON BEHALF OF PLAINTIFF FITZGERALD AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.**

244.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

245.    Defendants issued legal process in the form of police records and sworn statements in criminal court complaints against plaintiffs to detain and prosecute plaintiffs.

246.    Defendants arrested plaintiffs in order to obtain a collateral objective and/or collateral objectives outside the legitimate ends of the legal process.

247.    Defendants created false NYPD paperwork related to plaintiffs' arrests and forwarded false information to DANY as a result of which plaintiffs were prosecuted in order to obtain a collateral objective and/or collateral objectives outside the legitimate ends of the legal process.

248.    For example, defendants' arrests and prosecutions of plaintiffs furthered the collateral objectives of detaining plaintiffs for an excessively long period of time in order to fabricate evidence against them and/or in retaliation for their protected conduct and/or to prevent and/or deter them from returning to the streets to protest.

249.    For example, the No Summons Policy furthered the collateral objective of detaining plaintiffs for an excessively long period of time in order to fabricate evidence against them and/or in retaliation for their protected conduct and/or to prevent and/or deter them from returning to the streets to protest.

250.    Defendants acted with malicious intent to do harm to plaintiffs without excuse or justification.

251.    Each plaintiff suffered significant post-arraignment deprivations of liberty.

252.    After each plaintiff's arraignment, each plaintiff was required to return to court.

253.    After each plaintiff's arraignment, the ongoing criminal cases imposed other restrictions were imposed on plaintiffs' abilities to travel.

254.    For example, each plaintiff was released on their own recognizance, and as such each plaintiff was subjected at all times to the orders and processes of the court.

255.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## EIGHTH CLAIM

### EQUAL PROTECTION / SELECTIVE ENFORCEMENT

**ON BEHALF OF PLAINTIFF MAROM AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;**

**ON BEHALF OF PLAINTIFF ROCEK AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND**

**ON BEHALF OF PLAINTIFF FITZGERALD AGAINST
THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.**

256.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

257.    By the acts and omission complained of herein, defendants have deprived plaintiffs of their rights, remedies, privileges and immunities guaranteed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

258.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## NINTH CLAIM

## EXCESSIVE DETENTION

**ON BEHALF OF PLAINTIFF MAROM AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;**

**ON BEHALF OF PLAINTIFF ROCEK AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND**

**ON BEHALF OF PLAINTIFF FITZGERALD AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.**

259.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

260.    As a result of the defendants' acts and omissions complained of herein, plaintiffs were detained without lawful excuse or justification for an unreasonable period of time.

261.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

## TENTH CLAIM

### DEPRIVATION OF FAIR TRIAL RIGHTS

**ON BEHALF OF PLAINTIFF MAROM AGAINST**

**THE SUPERVISORY DEFENDANTS AND DEFENDANT GALGANO;**

**ON BEHALF OF PLAINTIFF ROCEK AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT BOYLE; AND**

**ON BEHALF OF PLAINTIFF FITZGERALD AGAINST**
**THE SUPERVISORY DEFENDANTS AND DEFENDANT VALENTINE.**

262.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

263.    Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which each plaintiff suffered deprivations of liberty.

264.    As a result of the foregoing, plaintiffs were deprived of their liberty and property and Sixth Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and were otherwise damaged and injured.

**ELEVENTH CLAIM**

***MONELL* CLAIMS AGAINST DEFENDANT CITY THROUGH 42 U.S.C. § 1983**

265.    Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

266.    All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to policies and practices of defendant City that were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the NYPD.

267.   Defendant City and the NYPD, by their policy-making agents, servants and employees, including, but not limited to, the Supervisory Defendants, authorized, sanctioned and/or ratified the individual police Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

268.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the defendant City and the NYPD, all under the supervision of ranking officers of the NYPD.

269.   The aforementioned customs, practices, procedures and rules of the Defendant City and the NYPD include, but are not limited to:

    a.   The policy and practice of unreasonably restricting protected activities in Liberty Plaza between September of 2011 and the incident;

    b.   The policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies;

    c.   The NYPD's use of force and use of force reporting policies and practices;

    d.   The policy and practice of treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit";

e.  The policy and practice of applying the prohibition in the New York State Penal Law ("PL") on violation-level Trespass in circumstances where there is no lawful authority to arrest or detain perceived "groups" of people;

f.  The policy and practice of applying PL § 240.20 (6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in circumstances where neither lawful dispersal orders, nor meaningful opportunities to disperse, were in fact given;

g.  The use of arrests and full-blown arrest processing in lieu of issuing summonses for summons-eligible offenses, discussed elsewhere herein as the "No-Summons Policy";

h.  The policy and practice of assigning "arrest teams" of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to "process" the arrests of multiple arrestees, including by filling out NYPD paperwork and swearing out accusatory instruments containing false information; and

i.  The policy and practice of inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact designed to give the impression that assigned arresting officers witnessed or knew things they had not, in fact, witnessed or known of.

270.   As a result of the foregoing, plaintiffs were deprived of their liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and were otherwise damaged and injured.

## JURY DEMAND

271.    Plaintiffs demand a trial by jury in this action of all issues pursuant to Fed. R. Civ.

P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.    Compensatory damages against the defendants jointly and severally; and

B.    Punitive damages against the individual defendants; and

C.    Attorney's fees and costs pursuant to 42 USC §1988; and

D.    Such other and further relief as the Court deems just and proper.


DATED:        Queens, New York
              July 20, 2015


                              Respectfully submitted,

                                  /S/
                              _____
                              Gideon Orion Oliver
                              *Attorney for Plaintiffs*
                              277 Broadway, Suite 1501
                              New York, NY  10007
                              646-263-3495