UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
YOTAM MAROM, MIRIAM ROCEK, and DON
FITZGERALD

                     Plaintiffs,                          15-cv-2017 (PKC)

        -against-                                MEMORANDUM
                                                   AND ORDER

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") CHIEF OF
DEPARTMENT JOSEPH ESPOSITO, NYPD
DEPUTY INSPECTOR EDWARD WINSKI,
NYPD LIEUTENANT FRANK VIVIANO,
NYPD SERGEANT FIOR BLANCO, NYPD
LEGAL BUREAU OFFICER OLEG
CHARNYAVSKY, NYPD OFFICER MICHAEL
GALGANO, SHIELD NO. 2671, NYPD
OFFICER CYNTHIA BOYLE, SHIELD NO.
6663, NYPD OFFICER STEVEN VALENTINE,
SHIELD NO. 13585, and NYPD OFFICERS
JOHN and JANE DOE #1-15,

                     Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

         Plaintiffs Yotam Marom, Miriam Rocek, and Don Fitzgerald bring this action

against the City of New York, eight named individual defendants employed by the New York

City Police Department ("NYPD"), specifically Chief of Department Joseph Esposito, Deputy

Inspector Edward Winski, Lieutenant Frank Viviano, Sergeant Fior Blanco, Legal Bureau

attorney Oleg Charnyavsky, Officer Michael Galgano (Shield No. 2671), Officer Cynthia Boyle

(Shield No. 6663), and Officer Steven Valentine (Shield No. 13585), and 15 unnamed individual

NYPD Officers (Officers John and Jane Doe #1-15), asserting nine claims under 42 U.S.C §

1983 and the First, Fourth, Sixth, and Fourteenth Amendments.  Plaintiffs claim that, while

participating in a protest in Zuccotti Park marking the six-month anniversary of the Occupy Wall Street ("OWS") movement, or in the aftermath of the protest, they were denied certain protected rights.  They maintain that they were falsely arrested, subjected to excessive use of force, excessive detention, and malicious abuse of process, prevented from exercising their First Amendment rights, deprived of their rights to a fair trial, and denied the equal protection of the laws.  The defendants now move to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  For reasons that will be explained, the motion is granted as to all claims except for: (1) Yotam Marom's and Miriam Rocek's false arrest, First Amendment retaliation, and certain failure to intervene claims; and, (2) Don Fitzgerald's claim of excessive force.

THE FACTS ALLEGED

For the purposes of defendants' motion, all non-conclusory factual allegations set forth in plaintiffs' First Amended Complaint (the "FAC") are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiffs as the non-movants, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

Plaintiffs bring their claims against three categories of defendants.  First, plaintiffs allege that the City of New York, through its agents in the NYPD, adopted policies aimed at depriving OWS protestors of their constitutional rights.  (FAC ¶¶ 11, 105).  Second, plaintiffs allege that Chief of Department Esposito, Deputy Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky, whom the plaintiffs call "supervisory defendants," were personally involved in designing and supervising policies that caused the deprivation of their constitutional rights.  (FAC ¶¶ 12, 14-15).  Third, plaintiffs allege that Officers Galgano, Boyle, and Valentine, as well as the remaining unnamed defendants, were

personally involved in depriving plaintiffs of their rights by implementing the allegedly unconstitutional policies designed by the City and the supervisory defendants.  (FAC ¶¶ 13, 16).

I.     Events of March 17, 2012.

On March 17, 2012, plaintiffs Marom, Rocek, and Fitzgerald allege that they were "lawfully present" in Zuccotti Park (also known as Liberty Plaza) in connection with the six month anniversary of the OWS movement.  (FAC ¶¶ 157, 175, 196).  That same evening, the NYPD "raided Liberty Plaza" and arrested many OWS protestors, including the three plaintiffs. (FAC ¶¶ 151-52).

A.  Yotam Marom.

Plaintiffs claim that NYPD Officers "violently arrested" Marom, "forcibly escorted" him to an NYPD-arranged holding area and eventually transported him to NYPD's Midtown South Precinct.  (FAC ¶ 159, 161, 163).  Marom alleges that he was handcuffed tightly for several hours in connection with his arrest.  (FAC ¶ 165).  According to the FAC, the police sent Marom to 100 Centre Street where he was arraigned before a New York City Criminal Court Judge "approximately 40 or more hours after his arrest."  (FAC ¶¶ 166-67).  The FAC also claims that Officer Galgano swore out "an accusatory instrument charging Mr. Marom and another person with various offenses based on false allegations," including that Galgano observed Marom inside Zuccotti Park resisting arrest by sitting down, interlocking arms with other protestors, and refusing to place his arms behind his back after the police gave dispersal orders.  (FAC ¶ 171).  Marom alleges that Officer Galgano did not actually observe those things himself.  (FAC ¶ 172).

B.  Miriam Rocek.

Rocek was allegedly working as a "volunteer street medic" during the March 17, 2012 OWS protest.  (FAC ¶ 175).  She claims that an unidentified NYPD supervisor specifically targeted her for arrest and said "get her first, she's number one."  (FAC ¶ 177).  Two male NYPD officers then "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground."  (FAC ¶ 178).  The officers allegedly ripped her jacket during the process.  (FAC ¶ 187).  Even though Rocek was not resisting arrest, officers were telling her to stop resisting and to just relax.  (FAC ¶¶ 179-81).  Rocek then said "[f]uck you, don't tell me to relax" to the officers, to which an officer allegedly said "[f]ine, fuck you then," "twisted her arm back as he placed plastic flexcuffs on her," and told her to "[g]et up."  (FAC ¶¶ 182-84).  The flexcuffs were tight on Rocek's wrist and remained on her for approximately four hours.  (FAC ¶ 190).  Rocek alleges that the police dragged her by her hair and pulled her up on to her feet because she was unable to get up on her own.  (FAC ¶ 185).  The police transported Rocek to 100 Centre Street where she was arraigned approximately 24 hours after her arrest.  (FAC ¶ 193).  The FAC asserts that Officer Boyle "filled out NYPD paperwork stating that he [sic] had seen Ms. Rocek engage in certain conduct when he [sic] had in fact not done so."  (FAC ¶ 140).

C.  Don Fitzgerald.

Don Fitzgerald alleges that NYPD officers grabbed him and threw him face-down on the ground while arresting him during the March 17, 2012 "raid" on Zuccotti Park.  (FAC ¶ 198).  While on the ground, an unidentified NYPD officer allegedly hit Fitzgerald "at least ten times in the face while saying, '[s]top resisting!'"  (FAC ¶ 199).  The police handcuffed Fitzgerald tightly and transported him to the Midtown South Precinct.  (FAC ¶¶ 201, 203).

- 4 -

Approximately 30 hours after the police arrested Fitzgerald, they transported him to 100 Centre Street where he was arraigned in New York City Criminal Court.  (FAC ¶¶ 204-05).  Fitzgerald claims that his face was swollen and painful for around a week after his arrest.  (FAC ¶ 206).  He also claims that Officer Valentine "filled out NYPD paperwork stating that he had seen Mr. Fitzgerald engage in certain conduct when he had in fact not done so."  (FAC ¶ 141).

> D.   Processing of Plaintiffs' Arrests.

Plaintiffs allege that after NYPD officers removed them from Zuccotti Park and brought them to the Midtown South Precinct, defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to falsify arrest paperwork.  (FAC ¶ 117).  While at the NYPD's Midtown South Precinct, Blanco and Charnyavsky allegedly "met with and supervised Galgano, Boyle, and Valentine, along with all other approximately eight assigned arresting officers." (FAC ¶ 114).  Blanco and Charnyavsky instructed Galgano, Boyle, Valentine, and the others "regarding what to write in their NYPD arrest processing paperwork related to plaintiffs' and other purportedly related arrests."  (FAC ¶ 115).  According to plaintiffs, this process resulted in Blanco and Charnyavsky instructing and assisting Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park.  (FAC ¶ 117).  Plaintiffs claim that Galgano, Boyle, and Valentine—who filled out paperwork allegedly swearing they saw plaintiffs engage in certain conduct—never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day.  (FAC ¶¶ 132, 134, 136).  Plaintiffs claim they were prosecuted for criminal offenses based on those statements, which they allege were false, (FAC ¶ 147), and that

each plaintiff eventually accepted an Adjournment in Contemplation of Dismissal (an "ACD") to resolve the cases stemming from their arrests.  (FAC ¶¶ 173, 194, 207).[1]

II.      NYPD Policies and Practices.

Plaintiffs further allege that their unlawful treatment by the NYPD on March 17, 2012 occurred because of two specific policies concerning mass protests that the City of New York, through individual defendant Esposito and others, adopted during a series of meetings leading up to the "raid" on Zuccotti Park.  First, the City and supervisory defendants refined and adopted a "policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," which plaintiffs label the "No-Summons Policy."  (FAC ¶¶ 59-64).  Second, the City and supervisory defendants refined and adopted a "policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information," which plaintiffs claim was part of "an unreasonably lengthy and punitive mass arrest processing plan" they call "MAPP."  (FAC ¶ 65).  According to plaintiffs, the No-Summons Policy and MAPP were specifically directed at OWS protestors.  (FAC ¶ 67).

They allege that those two policies differ drastically from the standard policing procedures codified in the NYPD Patrol Guide.  (FAC ¶ 69).  The standard procedures, according to plaintiffs, call for persons "detained and arrested for non-criminal violations . . . as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, [to be given] individualized determinations of eligibility for release

---

[1] Plaintiffs' memorandum of law in opposition, however, states that Fitzgerald's charges were actually resolved with a guilty plea to a disorderly conduct, which, under New York Law is not a crime but a "violation."  (Memorandum of Law in Opposition, 4).

with a Universal Summons or [Desk Appearance Ticket ("DAT")]."  (FAC ¶ 69).  The plaintiffs

allege that the substitution of the No-Summons Policy and MAPP in place of the standard

procedures resulted in longer detainment periods for OWS protestors.  (FAC ¶¶ 70-73).

Plaintiffs claim that these policies derived from "ill-will toward [protestors'] perceived

association with OWS," (FAC ¶ 78), and defendants' desire to "deter and/or prevent [protestors]

from participating in further OWS-related demonstrations," (FAC ¶ 80).

       Plaintiffs also claim that the City utilized similar policies and practices against

protestors during the 2004 Republican National Convention (the "RNC").  (FAC ¶¶ 29-31).

According to plaintiffs, the City's RNC policies led to unconstitutional results including the

widespread failure to make individualized determinations of probable cause, (FAC ¶ 38); the use

of excessive force by police officers, (FAC ¶ 39); and, unnecessarily long pre-arraignment

detention periods for arrestees, (FAC ¶ 40).  The City subsequently "failed to develop and

implement adequate training in connection with, and to supervise and/or discipline their

subordinates in connection with," mass protest activities, "despite decades of litigation" spurred

by the RNC policies, among others.  (FAC ¶¶ 45, 26).

       On that basis, plaintiffs claim that the City and the "supervisory defendants" knew

or should have known that the "NYPD's plans for policing and mass arrest processing" used in

connection with the March 17, 2012 OWS protest "would result in unlawful arrests, excessive

use of force, excessive detentions, malicious abuse of process, fabrication of evidence, and other

unlawful conduct that would lead to constitutional rights violations."  (FAC ¶ 105).  And, despite

that knowledge, the supervisory defendants failed to intervene to prevent or remediate the

injuries suffered by the plaintiffs, (FAC ¶ 148), which included "physical, psychological and

emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages,"
(FAC ¶¶ 174, 195, 208).

DISCUSSION

I.    Legal Standard.

      "To survive a motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S.
at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged." Id.  "The plausibility standard
. . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id.  Legal
conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to
any presumption of truth.  Id.

II.    Plaintiffs' Section 1983 Claims.

      To state a claim under section 1983, a plaintiff must allege that state officials,
acting under color of state law, deprived her of a right guaranteed to her by the Constitution or
federal law.  42 U.S.C. § 1983; see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Here,
plaintiffs' claims are predicated on allegations that they were: (a) falsely arrested, (b) subjected
to excessive force, (c) subjected to excessive detention, (d) victims of malicious abuse of
process, (e) deprived of their rights to a fair trial under the Sixth Amendment, (f) deprived of
their rights under the First Amendment, and, (g) deprived of the equal protection of the laws
under the Fourteenth Amendment.  Plaintiffs also allege that the named individual defendants
were personally involved in, and failed to intervene to protect plaintiffs from, the deprivation of
their rights, see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), and that the City of New

York is liable for the alleged constitutional violations, see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978).  The Court will examine each of these claims in turn.

A.   False Arrest Claim.

As an initial matter, plaintiff Don Fitzgerald withdraws his false arrest claim because his arrest was not actually resolved with an ACD, as originally pled, but rather with a guilty plea to disorderly conduct, which is a "violation" and not a crime.  (Plaintiffs' Memorandum of Law in Opposition, 4); see N.Y. Penal Law § 240.20.[2]  Even if he had not withdrawn his false arrest claim, a "plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested."  Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986); see Sealey v. Fishkin, 96 cv 6303 (RR), 1998 WL 1021470, at *4 (E.D.N.Y. Dec. 2, 1998) (granting summary judgment dismissing false arrest claim on the basis that plaintiff was convicted, on his own guilty plea, to disorderly conduct, a "violation" rather than a crime).

Marom's and Rocek's false arrest claims remain.  Claims for false arrest brought under section 1983 "are 'substantially the same' as claims for false arrest . . . under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003).  "To state a claim for false arrest under New York law, plaintiffs must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'"  Savino v. City of New

---

[2] The Certificate of Disposition for Fitzgerald states that he pled guilty to N.Y. Penal Law § 240.20, which prohibits various acts as "disorderly conduct."  It is a "violation" rather than a crime.  (Declaration of Lamar Winslow in Support of Defendant's Motion to Dismiss ("Winslow Decl."), Ex. C).  It is appropriate for the Court to consider the Certificates of Disposition at this stage because plaintiffs repeatedly reference that their cases were disposed of on ACDs, (see FAC ¶¶ 173, 194, 207), and thus the Certificates of Disposition setting forth the disposition of their arrests are incorporated by reference in, and are integral to, the FAC.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that district court could properly consider the text of contracts on motion to dismiss because Amended Complaint was "replete with references to the contracts" and the content of the contracts was integral to the Amended Complaint); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 809 (2d Cir. 1996).

York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)).  Defendants argue that plaintiffs have not adequately pled facts showing that the arrests of the plaintiffs "was not otherwise privileged," and, alternatively, that defendants had probable cause to arrest Marom and Rocek.  In response, plaintiffs contend that there was no probable cause to arrest or that the alleged basis for probable cause is improper because the arresting officers did not personally observe plaintiffs' conduct.

In order to state a claim for false arrest, plaintiffs "must show that . . . [their] confinement was not otherwise privileged." Savino, 331 at 75.  Essentially, this element amounts to determining whether there was legal justification for the challenged arrest—in most cases, whether there was probable cause.  See Benjamin v. United States, 554 F. Supp. 82, 85 (E.D.N.Y. 1982).  The FAC includes no factual content regarding the arrests aside from the assertion that, prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196).

Defendants argue that plaintiffs' assertion that they were "lawfully present" is a legal conclusion and not a statement of fact upon which a claim for relief can be based.  They also argue that the FAC does not state a plausible false arrest claim because it fails to describe any of the surrounding circumstances leading to the arrest.  Defendants assert that, because showing that an arrest was "not otherwise privileged" is an element of a prima facie claim for false arrest, plaintiffs must actually allege sufficient factual content to permit the Court to reasonably infer that the arrest was unjustified.  And, the federal pleading standards would seem to require plaintiffs, at a minimum, to do just that.  See Iqbal, 556 U.S. at 678 ("The plausibility

standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.")  On

that basis, defendants argue that plaintiffs' false arrest claim cannot survive a motion to dismiss.

        Claims in federal court are governed by federal pleading standards; in the case of

section 1983 claims alleging false arrests, state law supplies the elements of the claim.  The New

York Court of Appeals has held that plaintiffs need not allege "want of probable cause" when

stating a false arrest claim based on a warrantless arrest.  Broughton v. State, 37 N.Y.2d 451, 458

(1975).  This is because, as a matter of substantive law, there is a presumption that "[w]henever

there has been an arrest and imprisonment without a warrant" the arrest is unlawful.  Id.; Jenkins

v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) ("Where an officer makes an arrest without

a warrant, the presumption arises that the plaintiff's arrest was unlawful.").  In such cases, it is

defendants who bear the burden "of proving that probable cause existed for the plaintiff's arrest"

as an affirmative defense.  Savino, 331 F.3d at 76 (citing Broughton, 37 N.Y.2d at 458).  Thus,

the requirement that plaintiffs "show that . . . [their] confinement was not otherwise privileged"

is satisfied simply by alleging that the arrest was made without a warrant.  Because it is

reasonable to infer from the FAC that plaintiffs were arrested without a warrant, plaintiffs

Marom and Rocek have stated a plausible claim for false arrest despite the paucity of facts

alleged in the FAC.

        Given the lack of factual content alleged in the FAC, it is impossible for the Court

to determine, as a matter of law, that there was probable cause to arrest.  This also precludes the

Court from being able to determine, at this stage, whether defendants are protected from liability

by the doctrine of qualified immunity.  See Savino, 331 F.3d at 71 (quoting Mandell v. Cty. of

Suffolk, 316 F.3d 368, 385 (2d Cir. 2003)) ("[U]nder the doctrine of qualified immunity, a

government official performing discretionary functions is shielded from liability for civil

damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights.")

B. Excessive Force Claim.

A claim of excessive use of force during an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, the plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Marom alleges that he was "violently arrested," (FAC ¶ 159), and that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). Rocek alleges that officers "grabbed [her] by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground," (FAC ¶ 178); that officers ripped her jacket, (FAC ¶ 187); that an officer "twisted her arm back as he placed plastic flexcuffs on her," (FAC ¶ 183); that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185); and, that her flexcuffs were tight and remained fastened for approximately four hours, (FAC ¶ 190). Fitzgerald alleges that officers grabbed him and threw him face-down on the ground, (FAC ¶ 198), that an unidentified NYPD officer hit him "at least ten times in the face" (FAC ¶ 199), and that the police handcuffed him tightly, (FAC ¶ 203). Fitzgerald also claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). The Court will first address plaintiffs' excessive force claims regarding the use of handcuffs and then will address the balance of plaintiffs' excessive force claims.

"Although handcuffs must be reasonably tight to be effective, [], overly tight handcuffing can constitute excessive force." Lynch ex rel. Lynch v. City of Mount Vernon, 567

F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*." Id. (quoting Esmont v. City of New York, 371 F.Supp.2d 202, 215 (E.D.N.Y. 2005)) (emphasis in original). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); see also Lynch, 567 F. Supp. at 468-69 (collecting cases).

While the FAC alleges that all three plaintiffs were handcuffed tightly, there are no allegations that any of the three ever complained to law enforcement about their handcuffs and that defendants ignored those complaints, and there are no allegations that any plaintiff experienced injuries because of the handcuffs. Marom and Fitzgerald do claim they were handcuffed for "several hours," (FAC ¶¶ 165, 203), and Rocek claims she was handcuffed for "four hours," (FAC ¶ 190), but courts in this district have held other claims alleging similar periods of handcuffing insufficient to state a claim for excessive force. See, e.g., Higginbotham v. City of New York, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (three hours); Omor, 2015 WL 857587, at *7 (four to five hours); Bender v. City of N.Y., 09 cv 3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (fourteen hours). Because the FAC only contains allegations that plaintiffs were handcuffed tightly for several hours, it fails to state a plausible excessive force claim based on defendants' use of handcuffs.

With regard to the remaining allegations of excessive force alleged to have been used by defendants, "the right to make an arrest or investigatory stop necessarily carries with it

the right to use some degree of physical coercion or threat thereof to effect it."  Graham, 490

U.S. at 396.  "'Not every push or shove, even if it may later seem unnecessary in the peace of a

judge's chambers,' [], violates the Fourth Amendment."  Id. (quoting Johnson v. Glick, 481 F.2d

1028, 1033 (2d Cir. 1973)) (internal citation omitted).  Courts in this district have regularly held

that a plaintiff must have sustained some injury to maintain a claim of excessive force.  See, e.g.,

Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26,

2012); Wims v. New York City Police Dep't, 10 cv 6128 (PKC), 2011 WL 2946369, at *4-5

(S.D.N.Y. July 20, 2011).  That injury, however, need not be severe.  See Robison v. Via, 821

F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where

plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

        In the case of Marom, the FAC fails to state a claim for excessive force.  Marom

alleges only that he was "violently arrested."  The FAC does not explain what specific acts the

unidentified officers took against Marom on March 17, 2012 or whether Marom suffered any

injuries as a result of the arrest.  In the absence of more detailed allegations, Marom has failed to

plausibly allege an excessive force claim.  See, e.g., Bender, 2011 WL 4344203, at *6

(dismissing excessive force claim where plaintiff claimed only that she was "turn [ed] [] upside

down, handcuff[ed] [] multiple times, [and] physically assault[ed]") (alterations in original).

        The FAC also fails to state a plausible excessive force claim with respect to

Rocek.  The most severe of Rocek's excessive force allegations are that officers "grabbed Ms.

Rocek by her arms, pulled her by her arms, and threw her onto the ground," (FAC ¶ 178), and

that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185).  The FAC

does not, however, allege that Rocek sustained any injuries.  Because Rocek does not assert that

defendants injured her, allegations that defendants used this minimal amount of force during an

arrest are not sufficient to defeat a motion to dismiss.  See, e.g., Acosta, 2012 WL 1506954, at

*10 (dismissing excessive force claim where plaintiff alleged that an officer "pushed his wrist

into his pocket, punched him in the chest, threw him to the ground face first, forcibly handcuffed

his left arm, and attempted to manipulate his right arm into handcuffs as well"); Wims, 2011 WL

2946369, at *4 (dismissing excessive force claim where plaintiff asserted that "he was pulled out

of his car and 'thrown flat on [his] face unto the filthy ground'")

            Conversely, Fitzgerald does allege a plausible claim for excessive use of force.

Fitzgerald asserts that an unidentified NYPD officer hit him "at least ten times in the face,"

(FAC ¶ 199), and that, as a result, his face was swollen and painful for around a week.  (FAC ¶

206).  In contrast to Marom's and Rocek's claims, Fitzgerald alleges that he was injured during

his arrest.  While his injuries were slight, a plaintiff need not suffer severe injuries to make out a

plausible claim for excessive use of force.  See Robison, 821 F.2d at 924.  In the present case, the

combination of the amount of force allegedly used—ten hits to the face—with the injuries

allegedly sustained—a swollen and painful face for about a week—permit Fitzgerald's excessive

force claim to survive a motion to dismiss.

            In sum, the only excessive force claim that survives defendants' motion to dismiss

is Fitzgerald's claim arising out of an unidentified officers' repeated hits to his face.

   C.  Excessive Detention Claim.

            The Fourth Amendment also "governs the procedures applied during some period

following an arrest."  Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005).  Again, the

Fourth Amendment's reasonableness test is one of "objective reasonableness," meaning that the

subjective motivations of individual officers have no bearing on whether a seizure was

reasonable under the Fourth Amendment.  Id.  "In the context of pretrial detention, the Supreme

Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention." Id.; see Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). The Supreme Court subsequently clarified what it meant by "prompt" judicial determination of probable cause and held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."). In New York, because probable cause determinations are made at arraignments, the Fourth Amendment requires that an arrestee be arraigned within 48 hours. See Bryant, 404 F.3d at 138.[3]

   Plaintiffs have failed to plead a plausible claim for excessive detention. According to the FAC, Marom was detained for "40 hours or more" prior to being arraigned, (FAC ¶ 167); Rocek was detained for 24 hours, (FAC ¶ 193); and Fitzgerald was detained for "30 or more hours," (FAC ¶ 205). Because plaintiffs' pre-arraignment detention did not exceed 48 hours, their detention period was presumptively reasonable.

---

[3] Plaintiffs argue that under New York law and the New York State Constitution "a delay in arraignment of anything over 24 hours is presumptively unreasonable." (Plaintiffs' Memorandum of Law in Opposition, 35). Even assuming arguendo that plaintiffs' understanding of the requirements of New York's law and constitution is correct, plaintiffs' present claims are brought pursuant to section 1983, which provides a remedy for the deprivation of federal or US Constitutional rights. See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).

Moreover, plaintiffs has failed to make any plausible, non-conclusory allegations showing that the length of their detention resulted from "extraordinary circumstances." McLaughlin, 500 U.S. at 56.  The FAC alleges that plaintiffs' were detained "for the purpose of gathering additional evidence to justify the arrest," (FAC ¶ 77), "for delay's sake," (FAC ¶ 79), and "based on malicious, bad faith intent to inhibit or punish" them, (FAC ¶ 75), but those allegations are entirely conclusory and simply parrot the bases for finding "extraordinary circumstances."  The fact that each plaintiff was arraigned on charges of resisting arrest, (N.Y. Penal Law § 205.30), second-degree obstruction of governmental administration, (N.Y. Penal Law § 195.05), disorderly conduct violation, (N.Y. Penal Law § 240.2), and trespass violation, (N.Y. Penal Law 140.05), undermines the plausibility of the assertion that plaintiffs were held longer in order for police to gather evidence of those charges.  (Winslow Decl., Ex. C).  And, the fact that each plaintiff was detained for a substantially different period of time undermines the plausibility of the assertion that they were detained because of defendants' systemic ill-will towards OWS protestors.  For all of the foregoing reasons, plaintiffs' excessive detention claims are dismissed.

D.   Malicious Abuse of Process Claim.

State law provides the elements of a section 1983 claim based on malicious abuse of process.  See Savino, 331 F.3d at 76.  "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994).  To establish that a defendant employed legal process "in order to obtain a collateral objective that is outside the legitimate ends of the process," a plaintiff

- 17 -

must show more than just a malicious motive.  Savino, 331 F.3d at 77; see also Curiano v. Suozzi, 63 N.Y.2d 113, 117 (1984) ("A malicious motive alone, however, does not give rise to a cause of action for abuse of process.").  "A plaintiff must establish that the defendants had an improper *purpose* in instigating the action."  Savino, 331 F.3d at 77 (emphasis in original).

   While plaintiffs allege, albeit in a conclusory fashion, that a number of defendants conspired to falsify arresting documents against plaintiffs, (FAC ¶ 117), and that plaintiffs were prosecuted on the basis of those false documents, (FAC ¶ 147), they do not allege any facts permitting a plausible inference that defendants did so "in order to obtain a collateral objective that is outside the legitimate ends of the process."  Sheldon, 41 F.3d at 80.  Plaintiffs do not identify any possible collateral objective.  The allegation that defendants falsified documents permits the Court to infer that defendants intended to do plaintiffs harm, but, an evil motive is not enough to sustain a claim for malicious abuse of process.  See Savino, 331 F.3d at 77-78 (holding that plaintiff failed to state a malicious abuse of process claim where he alleged that his investigation and arrest by the defendants was motivated by the defendants' desire to seek vindication for embarrassment the plaintiff caused the City of New York).  Plaintiffs' claims for malicious abuse of process will be dismissed.

  E.   Right to a Fair Trial Claim.

   "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial."  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015).  A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial.  See Ricciuti, 124 F.3d at 127 (plaintiffs bringing a section 1983 claim for right to a fair

trial had their criminal charges dismissed pre-trial); <u>Canario v. City of New York</u>, 5 cv 9343 (LBS), 2006 WL 2015651, at *1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial).

As described above, plaintiffs allege that defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to create, and created, false arresting documents against plaintiffs. (FAC ¶ 117). Specifically, plaintiffs claim that defendants Blanco and Charnyavsky instructed and assisted Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). They claim that Galgano, Boyle, and Valentine—who filled out arresting paperwork allegedly swearing they saw plaintiffs engage in certain conduct—never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs assert that "[b]ased on those false statements, Plaintiffs were prosecuted for criminal offenses." (FAC ¶ 147).

Those assertions, however, are not sufficient to plausibly allege a fair trial claim. Critically, plaintiffs fail to assert how, in what way, or to what effect, the defendants specifically falsified their arrest processing paperwork. A fair trial claim cannot survive a motion to dismiss based only on broad and conclusory allegations the officers created "false narratives" about what they saw. See <u>Abdul-Rahman v. City of New York</u>, 10 cv 2778 (ILG), 2012 WL 1077762, at *12 (E.D.N.Y. Mar. 30, 2012) (dismissing a plaintiff's fair trial claim "because he has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false or even in what material respect the charges against him were false").

The claim that the false reports were "likely to influence a jury's decision" is also entirely speculative. See <u>Ricciuti</u>, 124 F.3d at 130. The Officers would have had to testify to the

purportedly false statements included in the arresting paperwork in court, as the arrest reports, if they included inculpatory evidence against plaintiffs, would have been inadmissible on their own on Confrontation Clause grounds.  See Crawford v. Washington, 541 U.S. 36, 59 (2004) (stating Confrontation Clause rule applicable to "[t]estimonial statements of witnesses absent from trial"); See also United States v. Garcia, 282 F. App'x 14, 24 (2d Cir. 2008) (permitting two officers to read from arrest reports and holding that there was no Confrontation Clause violation "because both police officers were witnesses subject to cross-examination by the defendants testifying about their own prior recollection of events").  This kind of speculative chain of events does not suffice to state a plausible fair trial claim.  See Brown v. City of New York, 2014 U.S. Dist. LEXIS 181736, *10 (E.D.N.Y. Dec. 23, 2014) (dismissing right to fair trial claim based on allegedly false statements contained in arrest paperwork); see also Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at *11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").

    F.  First Amendment Claim.

        1.  Retaliation.

            As an initial matter, Fitzgerald's First Amendment retaliation claim will be dismissed on the basis that there was probable cause to arrest him.  The existence of probable cause will defeat a First Amendment claim "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive."  Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution

- 20 -

supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."). Fitzgerald pled guilty to a disorderly conduct violation arising from his arrest on March 17, 2012. (Plaintiffs' Memorandum of Law in Opposition, 4); see N.Y. Penal Law § 240.20. Because "a conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause," Cameron, 806 F.2d at 387, Fitzgerald's First Amendment retaliation claim will be dismissed at this stage.

Marom's and Rocek's retaliation claims, however, remain in issue. "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). To satisfy the first element, plaintiffs must allege that they were engaged in speech protected by the First Amendment. Defendants argue that plaintiffs have failed to establish this element because plaintiffs allege only that they were present in Zuccotti Park.

"It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Virginia v. Black, 538 U.S. 343 (2003)). The test for determining whether conduct is sufficiently expressive to implicate the First Amendment is whether "'[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Id. (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)) (alterations in original). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First

Amendment applies [] and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Id. (internal citation omitted).

Plaintiffs allege that they were present in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). While they do not explicitly state that they were "protesting for" or "supporting" or "engaging in political speech with" the OWS movement, they assert that they "participated in a First Amendment Assembly." (FAC ¶ 2). In the context of the FAC, the Court finds it reasonable to infer that plaintiffs used the phrases "in connection with six-month anniversary of the OWS movement" and "participated in a First Amendment Assembly" as shorthand for alleging that they were present in Zuccotti Park with the intention of supporting the OWS movement and its political message. That inference also applies to Rocek, whom plaintiffs allege was volunteering as a street medic in connection with the OWS movement. (FAC ¶ 175). However, because plaintiffs' allege only that they were present in Zuccotti Park "in connection with" the six-month anniversary of OWS, the question remains whether supportive presence at a political rally, without more, qualifies as expressive conduct.

Courts in this district have held that physical occupation of Zuccotti Park in connection with an OWS rally constitutes expressive conduct. Gersbacher v. City of New York, 14 cv 7600 (GHW), 2015 WL 5692178, at *8 (S.D.N.Y. Sept. 25, 2015); Meyers v. City of New York, 14 cv 9142 (ALC), 2015 WL 6503825, at *14 (S.D.N.Y. Oct. 27, 2015); cf. Pluma v. City of New York, 13 cv 2017 (LAP), 2015 WL 1623828, at *8 (S.D.N.Y. Mar. 31, 2015) (holding that plaintiff who admitted to being "a bystander and citizen journalist witnessing the event," rather than a protester in OWS, was not engaged in expressive conduct). This Court agrees with those holdings. The test for expressive conduct is whether "[a]n intent to convey a particularized

message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." Johnson, 491 U.S. at 404. A fair reading of the FAC is that plaintiffs intended to convey a particularized message of political support for OWS with their presence in, and occupation of, Zuccotti Park. The Court also concludes that such a message would have been sufficiently clear to any passerby—even if plaintiffs were not shouting or holding signs. It is plausible to conclude that an individual that chooses to physically associate with the OWS movement in its iconic locale on its six-month anniversary was engaging in expressive conduct protected by the First Amendment.

       Plaintiffs must also plausibly allege that defendants' actions against them were motivated or substantially caused by the exercise of their First Amendment rights and that defendant's actions caused them some injury. Regarding the third element—injury— plaintiffs can show "*either* that [their] speech has been adversely affected by the government retaliation or that [they have] suffered some other concrete harm." Dorsett, 732 F.3d at 160 (emphasis in the original). Criminal charges qualify as "some other concrete harm." See Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (holding that the "issuance of the tickets was an injury in that it subjected [plaintiff] to a state action requiring that she either appear in court, pay a fine, or both"). Defendants' arrest of Marom and Rocek qualifies as an injury to them because it both halted their speech immediately and subjected them to criminal charges.

       Regarding the second element—that defendants arrested them *because* they were exercising their First Amendment rights—the FAC includes no factual content regarding the circumstances surrounding plaintiffs' arrests. The only pertinent allegation made in the FAC is that prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶

157, 175, 196).  Marom and Rocek fail to describe any part of the interaction between themselves and the police or recount what they or the police were doing at or around the time they were arrested.  While the law in no way requires plaintiffs' to set forth a detailed account of the events surrounding their claims in order to survive a motion to dismiss, it does require enough factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

A court in this district has previously held that a plaintiff involved in an OWS protest in 2011 adequately pled the second element of a retaliation claim by alleging only that officers arrested him while he was engaged in First Amendment speech.  Meyers, 2015 WL 6503825, at *12; see also Gersbacher, 2015 WL 5692178, at *8 (denying motion to dismiss retaliation claim where plaintiff alleged he was arrested due to his participation in Occupy Wall Street).  The district court based its holding on the Second Circuit's decision in Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015).  In that case, the Circuit held that an officer's appearance at the plaintiff's house to deliver traffic tickets "mere hours" after plaintiff engaged in protected speech by complaining about the officer's prior conduct to his superiors "was sufficiently proximate to imply that the issuance of the tickets was motivated by [the plaintiff's] complaint."  Campbell, 782 F.3d at 100.  It was on that basis—the proximity in time between the plaintiffs' protected speech and the defendants' act—that the court in Meyers concluded that the plaintiff alleged a plausible retaliatory motivation for his arrest.  Meyers, 2015 WL 6503825, at *12.

Even though the facts alleged by the plaintiff in her complaint in Smith v. Campbell provided ample factual support, beyond mere proximity in time, for the inference that the officer's conduct was in retaliation for the plaintiff's protected speech, 782 F.3d at 96, the

Court concludes that Marom's and Rocek's allegation that they were "lawfully present in Liberty Plaza in connection with the six month anniversary of the OWS movement" and were subsequently arrested, (FAC ¶¶ 157-59, 175-77), is adequate to state a retaliatory motive.  But see Anemone v. Metro. Transp. Auth., 629 F.3d 97, 120 (2d Cir. 2011) (affirming summary judgment denying a retaliation claim where the timing of allegedly impermissible action "reflected instead the steady accumulation of misconduct" by plaintiff and not a retaliatory motive).  Thus, Marom and Rocek have stated a plausible First Amendment retaliation claim. The Court acknowledges that the claim, like all claims, may look very different at the summary judgment stage and mere temporal proximity may ultimately prove to be insufficient for a reasonable jury to rule in Marom's and Rocek's favor.

2.    Time, Place, and Manner Restriction.

In addition to their retaliation claim, it appears that plaintiffs also challenge "the restrictions imposed by defendants on plaintiffs' First Amendment rights" as being unconstitutional time, place, and manner restrictions.  (FAC ¶ 242).

> "[E]xpressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used.  Accordingly, [the Supreme Court] has held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication."

Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992) (quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)).  It is not clear, however, what plaintiffs are asserting were improper time, place, and manner restrictions.

The FAC, read in a light most favorable to plaintiffs, could be alleging that the rules governing the use of Zuccotti Park were unconstitutional time, place, and manner

restrictions.  To that end, plaintiffs cite several zoning regulations that deal with a variety of issues regarding the park: the requirement that at least 50% of the sidewalk must be free of obstruction, (FAC ¶ 50), the process for making physical modifications to the park, (FAC ¶¶ 51-52),  the requirement that all prohibitions on conduct in the park must be clearly posted in writing, (FAC ¶ 53), and the requirement that "public plazas shall be accessible to the public at all times, except where the [New York City Planning Commission] has authorized a nighttime closing," (FAC ¶ 55).  However, plaintiffs make no allegations explaining how any of these regulations could plausibly be an improper time, place, and manner restriction on plaintiffs' First Amendment activity.  They do allege that police erected barricades around Zuccotti Park beginning on November 15, 2011, (FAC ¶ 93), and "ratified and enforced arbitrary and shifting criteria determining who could enter the park," (FAC ¶ 94).  But, plaintiffs fail to specifically identify any regulation or allege how that regulation was unconstitutional.

    Instead, plaintiffs allege that defendants violated the rules regarding Zuccotti Park when arresting OWS protestors on March 17, 2012.  And, to the extent the FAC is alleging that the NYPD's conduct itself was somehow an unconstitutional time, place, and manner restriction, plaintiffs only make reference to two actual "policies:" the No-Summons and MAPP policies. According to plaintiffs own complaint, however, those policies dealt with how arrested protestors would be processed by the NYPD.  Plaintiffs do not claim that those policies were related to the decision to arrest OWS protestors in the first place.  And, to the extent the police arrested plaintiffs in violation of the First Amendment, that constitutional deprivation is covered by plaintiffs' retaliation claim.  In sum, even assuming that Zuccotti Park is a traditional public forum in which the First Amendment applies with full force, see Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at *9 (S.D.N.Y. Aug. 26, 2015) (describing that the recent

decisions in this court involving OWS have assumed, but not clearly held that the First

Amendment applies to Zuccotti Park), plaintiffs fail to identify any plausible unconstitutional

time, place, and manner restriction.

G.  Equal Protection Claim.

"There are several ways for a plaintiff to plead intentional discrimination that

violates the Equal Protection Clause."  Brown v. City of Oneonta, New York, 221 F.3d 329, 337

(2d Cir. 2000).  A plaintiff could: (1) "point to a law or policy that expressly classifies persons

on [an improper basis];" (2) "identify a facially neutral law or policy that has been applied in an

intentionally discriminatory manner;" or, (3) "allege that a facially neutral statute or policy has

an adverse effect and that it was motivated by discriminatory animus."  Id.  It appears from the

FAC that plaintiffs are proceeding with an Equal Protection claim based on a selective

enforcement theory.

> "[A] violation of equal protection for selective enforcement would
> arise if: (1) the person, compared with others similarly situated,
> was selectively treated; and (2) that such selective treatment was
> based on impermissible considerations such as race, religion, intent
> to inhibit or punish the exercise of constitutional rights, or
> malicious or bad faith intent to injure a person."

LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (quoting

LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Plaintiffs claim the OWS protestors were subjected to different policing policies

than other similarly situated individuals.  In essence, plaintiffs allege that the City, through the

supervisory defendants and the NYPD, implemented two different policies regarding persons

detained and arrested for non-criminal violations.  The first policy, the standard one codified in

the NYPD's Patrol Guide, calls for individuals detained and arrested for non-criminal violations

to be eligible "for release with a Universal Summons or DAT [Desk Appearance Ticket] rather

than being held in custody for arraignment." (FAC ¶ 69). This would reduce the amount of time such individuals spent in custody to between two and four hours. (FAC ¶ 70). In contrast, plaintiffs allege that defendants used a second policy, which plaintiffs called the No-Summons Policy and MAPP, to specifically target OWS protestors detained and arrested at demonstrations and to deny them individual consideration for release with a summons. (FAC ¶ 64). Instead, the police centralized the processing of OWS protestors, created false documents regarding those protestors, and subjected them to unreasonably lengthy detention periods. (FAC ¶ 65).

Plaintiffs assert that they were subjected to these policing practices because of their political views. In other words, defendants arrested plaintiffs and refused to give them summonses because they intended to inhibit or punish plaintiffs for the exercise of their First Amendment rights. But, plaintiffs plead only conclusory allegations regarding defendants' intent to discriminate against plaintiffs. They allege no factual content that leads to a reasonable inference that defendants used the "No-Summons" and "MAPP" policies specifically against OWS protestors with an intent to discriminate against them or their political message. There is no non-conclusory allegation that defendants have any antipathy toward any aspect of the viewpoint of the OWS protestors. Conclusory allegations alone are not sufficient to establish a plausible equal protection claim. See Turkmen v. Hasty, 789 F.3d 218, 253-54 (2d Cir. 2015) (finding that claims of discriminatory intent are sufficient to defeat a motion to dismiss where plaintiffs alleged that high level officials condoned discriminatory actions by other officials).

Moreover, plaintiffs fail to adequately allege that they were in fact treated differently than other similarly situated persons. The Second Circuit has interpreted "similarly situated" to mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long

Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).  Plaintiffs fail to allege any comparative cases at all.

Plaintiffs have also failed to adequately allege that defendants policed the March 17, 2012 OWS

demonstration differently than other similarly large and disruptive demonstrations.  In fact, while

the FAC fails to allege that defendants used the standard policing policy during other similarly

large demonstrations, it does allege that other large demonstrations not associated with OWS

were subjected to policies similar to the "No-Summons" and "MAPP" policies.  Specifically,

plaintiffs allege that similar policies were used against demonstrations connected with the

Republican National Convention in 2004.  (FAC ¶¶ 29-45).

Thus, even assuming that defendants utilized a non-standard policing policy on

March 17, 2012, plaintiffs fail to plausibly allege that it was applied selectively against OWS or

with an intent to discriminate against OWS protestors.  Plaintiffs' equal protection claims do not

survive a motion to dismiss.

H.  Personal Involvement of Named Defendants.

"It is well settled in this Circuit that 'personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501

(2d Cir. 1994)).  Plaintiffs only surviving claims are Marom's and Rocek's false arrest and First

Amendment retaliation claims and Fitzgerald's claim for excessive use of force.  If the FAC fails

to plausibly allege the personal involvement of the individual defendants' in each of those

claims, those respective claims must be dismissed as to those particular defendants.

Prior to the Supreme Court's decision in Iqbal, the law in this Circuit regarding

when a defendant was "personally involved" in a constitutional deprivation differentiated sharply

between subordinate and supervisory officials.  See Williams v. Smith, 781 F.2d 319, 323 (2d

Cir. 1986); <u>Colon</u>, 58 F.3d at 873.  Any defendant, subordinate or supervisory, was liable under

section 1983 if he or she "directly participated" in a constitutional deprivation.  <u>Williams</u>, 781

F.2d at 323; <u>see also Colon</u>, 58 F.3d at 873.  Supervisory officials, however, could also be liable

for constitutional deprivations arising from conduct related to his or her supervisory

responsibilities.  <u>Colon</u>, 58 F.3d at 873.  Specifically, the Circuit in <u>Colon</u> held that personal

involvement of a supervisor may be established by evidence that:

> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong, (3) the defendant
> created a policy or custom under which unconstitutional practices
> occurred, or allowed the continuance of such a policy or custom,
> (4) the defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference . . . by failing to act on information
> indicating that unconstitutional acts were occurring.

58 F.3d at 873.  The "<u>Colon</u> test" permitted courts to find that supervisory officials were

"personally involved" in any constitutional deprivation, regardless of the elements of the

underlying constitutional provision at issue, if plaintiffs could prove any one of those five

factors.  <u>See, e.g.</u>, <u>Jenkins v. Garvin</u>, 95 cv 3273 (JSM), 1997 WL 414128, at *3 (S.D.N.Y. July

23, 1997) (recognizing that in a section 1983 claim premised on the Eighth Amendment a

"prisoner may demonstrate the personal involvement of a supervisor by evidence that shows that

the supervisor created or allowed the continuance of a policy under which the constitutional

deprivation occurred or was grossly negligent in the supervision of a subordinate").

The <u>Iqbal</u> decision rejected <u>Colon</u>'s one-size-fits-all "supervisory liability" test in

the context of examining a claim of "invidious discrimination in contravention of the First and

Fifth Amendments."  556 U.S. at 676.  Emphasizing that "vicarious liability is inapplicable to

*Bivens* and § 1983 suits," the Court held that a supervisory official could be found personally

liable for a constitutional deprivation only on the basis of "his or her own misconduct."  <u>Id.</u> at

676-77.  The Court also held that the factors necessary to establish when a supervisor's actions constituted "misconduct" depended only on "the constitutional provision at issue."  Id. at 675-76. For example, on a claim of discrimination in violation of the Fifth Amendment's equal protection component, a plaintiff must establish that each defendant acted with a discriminatory purpose.[4]  Id. at 676.  A plaintiff cannot establish that a supervisor was liable for discrimination simply by proving that the supervisor knew that a subordinate acted with a discriminatory purpose.  Id.  Where "purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities."  Id. at 677.

        The Second Circuit has yet to definitively address the impact of Iqbal on the Colon test in areas outside of discrimination.  See Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (casting doubt on the Colon test); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal.").  In the absence of binding precedent, district courts in this Circuit have divided into two camps.  Some courts hold that Iqbal categorically eliminated the second, fourth, and fifth Colon factors.  See, e.g., Bellamy v. Mount Vernon Hosp., 07 cv 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) aff'd sub nom. Bellamy v. Mount Vernon Hosp., 387 F. App'x 55 (2d Cir. 2010) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.").  While other courts hold that the viability of the second, fourth, and fifth Colon factors depends on the underlying constitutional claim.  See,

---

[4] The Supreme Court noted that Bivens actions are the "federal analog to suits brought against state officials under" section 1983.  Iqbal, 556 U.S. at 675.

e.g., Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."); Delgado v. Bezio, 09 cv 6899 (LTS), 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (holding that "where the claim does not require a showing of discriminatory intent, the Colon analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated") (internal quotation marks omitted).  Neither sect, however, disputes the viability of the "direct participation" and "policy or custom" factors.

        With regard to the disputed second, fourth, and fifth factors of the Colon test, this Court agrees with the latter group.  The holding in Iqbal does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was "grossly negligent" or "deliberately indifferent."  It only requires that a supervisor's action—whether direct or through "his or her superintendent responsibilities"—must *itself* violate the terms of the constitutional provision at issue.  Iqbal rejected the idea that subordinates and supervisors could be held to different standards of liability for violations of the same Constitutional right, which, to the majority, amounted to applying the forbidden vicarious liability standard under a different label.  But, Iqbal does not insulate supervisors from liability for any act or omission that on its own satisfies "each element of the underlying constitutional tort."  Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015).  The Second Circuit's recent decision in Turkmen v. Hasty supports this reading of Iqbal.  789 F.3d at 250 (holding that plaintiffs stated a plausible 1983 claim for an Eighth Amendment deprivation against certain

supervisory defendants whose conduct amounted to "deliberate indifference" because the "underlying constitutional violation requires no more than deliberate indifference").

In the present case, the surviving claims are for false arrest, First Amendment retaliation, and excessive force. Plaintiffs allege that the supervisory defendants were personally involved in each those violations. In line with the view stated above, the second, fourth, and fifth Colon factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement. See Dorsett, 732 F.3d at 160 (holding that on a claim for First Amendment retaliation plaintiffs must show that a "defendant's actions were motivated or substantially caused by his exercise of [plaintiff's First Amendment rights]"). But, those factors may be viable when it comes to false arrest and excessive force claims because those claims have no state-of-mind requirement, only an objectively reasonable standard. It is not necessary, however, for the Court to weigh in definitively on which of the disputed Colon factors are viable for which claims because plaintiffs fail to plausibly allege any facts showing that the supervisory defendants were "grossly negligent" or "deliberately indifferent." Plaintiffs only plausibly allege that defendants "directly participated" in, and "created a policy or custom" allowing for, their constitutional deprivations.

Importantly, even if plaintiffs did establish that one of the supervisory defendants created a policy or custom under which a constitutional deprivation occurred, they "must also establish that the supervisor's actions were the proximate cause of the [their] constitutional deprivation." Raspardo, 770 F.3d at 116 (2d Cir. 2014). Section 1983 specifically extends liability to "every person who . . . subjects, *or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any [Constitutional rights.]" 42 U.S.C. § 1983 (emphasis added). The Supreme Court has interpreted this language

to mean that "Congress did not intend § 1983 liability to attach where such causation was absent." Monell, 436 U.S. at 692. Causation incorporates the tort concept of proximate cause, a concept that has long turned on reasonable foreseeability. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 833 (1985) ("Ordinary principles of causation used throughout the law of torts recognize that 'but for' causation, while probably a necessary condition for liability, is never a sufficient condition of liability."); See also Stanford v. Kuwait Airways Corp., 89 F.3d 117, 125 (2d Cir. 1996) (describing two concepts of foreseeability, with one, "the foreseeability of the specific injury the plaintiff suffered," being related to proximate cause). Where acts of third parties are involved, which will generally be the case in section 1983 claims where a supervisor's liability is premised only on her creation of a "policy or custom," the supervisor may be held liable for "those consequences attributable to *reasonably foreseeable* intervening forces." Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (internal quotation marks omitted) (emphasis added). Thus, if the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant. See Victory v. Pataki, No. 13--3592, 2016 WL 373869, at *15 (2d Cir. Feb. 1, 2016), as amended (Feb. 24, 2016) (affirming dismissal of claims against Governor Pataki for lack of personal involvement where plaintiff only alleges that Governor Pataki had a blanket policy of opposing parole to violent offenders, but does not allege that that policy led the Governor's staff "to intervene in parole decisions" or to ratify "the rescission procedures employed by the Board of Parole").

- 34 -

1.  False Arrest.

    i.      Officers Galgano, Boyle, and Valentine.

Plaintiffs do not allege that Galgano or Boyle were personally involved in seizing Marom or Rocek from Zuccotti Park.  However, they do allege that Galgano and Boyle were personally involved in creating the NYPD paperwork documenting Marom's and Rocek's arrests.  (FAC ¶¶ 139-40).  Galgano allegedly filled out the arresting paperwork for Marom, (FAC ¶ 139), and Boyle allegedly filled out the arresting paperwork for Rocek, (FAC ¶ 140). Plaintiffs also allege that the paperwork included "false statements" about what the officers allegedly saw.  (FAC ¶¶ 144-45, 147).  These allegations are adequate, at this stage, to support claims that Galgano "directly participated" in Marom's false arrest and Boyle "directly participated" in Rocek's false arrest.[5]

        "Direct participation" means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."  Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).  First, Galgano and Boyle intentionally participated in the respective arrests by filling out the arresting paperwork for each of those plaintiffs.  Second, there is a plausible basis to infer that Galgano and Boyle knew that the arrests were unlawful, if indeed they were, because they were tasked with filing the arrests, which presumably included stating the basis for probable cause.  While the FAC also alleges that Officer Valentine filled out the arresting paperwork for Fitzgerald, his false arrest claim does not survive the motion to dismiss.  Beyond that, there are no allegations that Officer Valentine directly participated in the arrests of, or filled out the arresting paperwork for, Marom and Rocek.

---

[5] Damages for a false arrest claim "cover the time of detention up until issuance of process or arraignment," Wallace v. Kato, 549 U.S. 384, 390 (2007), not just the initial seizure.

In sum, Marom adequately alleges that Officer Galgano was personally involved in his false arrest and Rocek adequately alleges that Officer Boyle was personally involved in her false arrest.

ii.    Supervisory Defendants.

Marom and Rocek also claim that the named "supervisory defendants"—Chief of Department Esposito, Deputy Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky—were personally involved in their false arrests.

The FAC alleges that Blanco and Charnyavsky met with and supervised Officers Galgano and Boyle in connection with processing Marom's and Rocek's arrests.  (FAC ¶¶ 127-28).  A supervisor can be personally liable if he "participated directly in the alleged constitutional violation."  Colon, 58 F.3d at 873.  "[O]rdering or helping others to do the unlawful acts, rather than doing them [oneself]," can constitute "direct participation."  Provost, 262 F.3d at 155.  Blanco and Charnyavsky allegedly gathered together and conferred with the arresting officers and eight other officers, and "conferred with each other about" what they had observed and what the charges were against plaintiffs.  (FAC ¶ 114).  And, Blanco and Charnyavsky allegedly "instructed" Officers Galgano and Boyle "regarding what to write in their NYPD arrest processing paperwork," including "creating false narratives."  (FAC ¶¶ 115-17).  Those allegations, coupled with the allegations that Officers Galgano and Boyle lied about conduct they allegedly did not see, (FAC ¶¶139-40), create a plausible claim that Blanco and Charnyavsky "participated directly in the" purported false arrests of Marom and Rocek with knowledge that they were unconstitutional.  Colon, 58 F.3d at 873.

Regarding Lieutenant Viviano, the FAC fails to plausibly allege that he was personally involved in Marom's and Rocek's false arrests.  Plaintiffs allege that Viviano was

responsible for ensuring the accuracy of Galgano's, Boyle's, and Valentine's arrest processing paperwork, (FAC ¶ 112), and that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Neither of those allegations give rise to a plausible inference that Viviano directly participated in either false arrest or created any policy or custom.

Regarding Deputy Inspector Winski, the allegations establishing his personal involvement in the false arrests are substantially the same as those against Viviano. Plaintiffs merely allege that he was the second highest ranking NYPD Officer in the vicinity of Marom's and Rocek's arrests, (FAC ¶ 108); that he, or Defendant Esposito, or both, had the responsibility "to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest," (FAC ¶ 111); and, that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Again, these allegations do not create a plausible inference that Winski directly participated in, or created a policy causing, the alleged unconstitutional arrests.

Lastly, regarding Chief of Department Esposito, plaintiffs' allegations fit into two categories. First, similar to the aforementioned allegations against Viviano and Winski, Marom and Rocek allege that Esposito was the highest ranking NYPD Officer "in the vicinity" of their arrests, (FAC ¶ 107), and that he was responsible for all supervisory decisions regarding all fellow officers at Zuccotti Park on March 17, 2012, (FAC ¶¶ 109-11). These allegations fail to state a plausible claim that Esposito "participated directly" in Marom's or Rocek's false arrest. Colon, 58 F.3d at 873.

Second, plaintiffs allege that Esposito "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873. They allege that between September 17, 2011 and March 17, 2012, Esposito was personally involved in planning for policing the OWS protests and in designing and implementing the NYPD's police responses to OWS. (FAC ¶ 61). They also allege that he met with the then-NYPD Commissioner on a regular basis to discuss the OWS protest and that during those meetings the City adopted the "No-Summons" and "MAPP" policies. (FAC ¶ 63-65). According to plaintiffs, the "MAPP" policy called for NYPD Legal Bureau and Criminal Justice Bureau agents to be involved in "the centralized processing of arrestees in a single mass arrest processing center," which led to the "creation of boilerplate NYPD documents containing false information."[6] (FAC ¶ 65). In an endeavor to connect the "MAPP" policy to Marom's and Rocek's allegedly false arrest, plaintiffs assert that Legal Bureau Attorney Charnavsky instructed Officers Galgano and Boyle to include false information in Marom's and Rocek's arresting documents.

The allegations connecting Esposito to the "MAPP" policy and their attempts to connect the "MAPP" policy to Marom's and Rocek's false arrests are too attenuated to be a plausible basis for showing Esposito's personal involvement. First, the FAC does not "show[]" that Esposito was responsible for creating and implementing the "MAPP" policy other than the assertion that he was present during certain meetings with other high ranking NYPD and City decision makers.

---

[6]The "No-Summons" policy, which was "related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," (FAC ¶ 64), only bears a causal relationship to the dismissed excessive detention claims.

Second, the FAC fails to plausibly allege that the "MAPP" policy proximately
caused the falsified reports or false arrests.  In a major population center, multiple individuals
may violate the law at a single location and at approximately the same time.  Those situations
may dictate that the police arrest many people in a short span of time.  Nothing is inherently
unlawful or unconstitutional about creating a plan in advance to deal with such occurrences.
There is nothing wrong with developing a uniform procedure for all arrests arising out of a large
event.  Nor is the use of boilerplate forms or specifically trained agents to facilitate the
processing of multiple arrests inherently unlawful or unconstitutional.  Of course, the entry of
knowingly false information on any record, boilerplate or otherwise, is unlawful.  The FAC,
however, fails to plausibly allege how Esposito or the "MAPP" policy he allegedly created
*caused* false information to be relied upon or recorded during the processing of Marom's and
Rocek's arrests.  Even assuming *arguendo* that certain defendants entered false information into
Marom's and Rocek's arrest reports, plaintiffs fail to show how that intervening event was a
reasonably foreseeable consequence of the so called "MAPP" policy.

In sum, plaintiffs' claims that Blanco and Charnyavsky were personally involved
in the false arrest of Marom and Rocek survive the motion to dismiss, but their claims against
Viviano, Winski, and Esposito do not.

2.  First Amendment Retaliation.

Marom's and Rocek's claims for First Amendment retaliation also survive
defendants' motion to dismiss.  Those claims are functionally identical to plaintiffs' false arrest
claims regarding the alleged basis for personal involvement of the named defendants, with
support for the allegation of a retaliatory motive arising from the proximity in time between
plaintiffs' expressive conduct and their arrests.  Because both claims arise from the same factual

- 39 -

allegations—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest on March 17, 2012—plaintiffs make identical contentions regarding how the named individual defendants were personally involved in those events.  On that basis, the Court's analysis regarding the issue of personal involvement is the same on these claims as it was on the false arrest claims.

Thus, for the reasons explained above, plaintiffs adequately allege that Officer Galgano was personally involved in Marom's First Amendment retaliation claim and that Officer Boyle was personally involved in Rocek's First Amendment retaliation claim.  Marom's and Rocek's claims that Blanco and Charnyavsky were personally involved in their retaliatory arrests also survives defendants' motion to dismiss.  However, the claims that Viviano, Winski, and Esposito were personally involved in the plaintiffs' retaliatory arrests do not.

3.  Excessive Force.

Fitzgerald's excessive force claim, as noted, also survives defendants' motion to dismiss.  A single unidentified officer was allegedly responsible for the actual force used against Fitzgerald.  (FAC ¶ 198).  Nevertheless, Fitzgerald maintains that Officers Galgano, Boyle, and Valentine and the "supervisory defendants" were personally involved in that use of excessive force.

i.    Officers Galgano, Boyle, and Valentine.

With regard to Officers Galgano and Boyle, plaintiffs do not allege that they saw Fitzgerald in Zuccotti Park, or otherwise participated in or witnessed the use of force against him.  And, with regard to Officer Valentine, plaintiffs affirmatively state that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct.  (FAC ¶¶ 136-37).  Therefore, the FAC does not plausibly allege that any of the officers were personally involved in

the unconstitutional use of force against Fitzgerald.  Fitzgerald's excessive force claim is dismissed as to Officers Galgano, Boyle, and Valentine.

> ii.    Supervisory Defendants.

There are no allegations that any of the supervisory defendants participated directly in the use of force against Fitzgerald.  The most Fitzgerald alleges is that the supervisory defendants were "in the vicinity" of Zuccotti Park during the protest.  For example, the FAC asserts that Esposito was "the highest ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 107), and that Winksi was "the second-highest-ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 108).  It also alleges that "at least defendants Winski and Viviano were personally involved in OWS-related false arrests in the vicinity of Liberty Plaza."  (FAC ¶ 150).  These claims of presence in a "vicinity," in the context of a large protest in Zuccotti Park, do not plausibly allege direct participation in the use of excessive force against Fitzgerald.

Plaintiffs do not plausibly allege a claim against Esposito.  As already discussed, plaintiffs allege that defendant Esposito helped develop policing policies used in Zuccotti Park on March 17, 2012, (FAC ¶¶ 61, 63-65).  They also allege, in a conclusory manner, that the use of force by police in making arrests was excessive or "extreme."  (FAC ¶ 86).  However, plaintiffs fail to draw any causal connection between the "No-Summons" and "MAPP" policies, which deal with methods of arrest processing and post-arrest disposition, and the use of force against OWS protestors.  (FAC ¶ 86).  Plaintiffs allege that Esposito helped design similar policing policies for the 2004 RNC protests and that those policies resulted in the use of excessive force by police against many arrestees in 2004.  (FAC ¶¶ 30-39).  But again, the FAC fails to plausibly allege that the policies were the proximate cause of the use of force against Fitzgerald during this OWS protest.  Instead, the facts alleged in the FAC give rise to the

- 41 -

reasonable inference that the actual use of force was an unforeseeable intervening act. There is nothing alleged about any of the cited policies from which a police supervisor could reasonably foresee that subordinate officers would use excessive force by reason of those policies. Rule 8(a) requires a party to set forth or "show[]" facts that make the allegation plausible. Apart from conclusory allegations, the FAC does not permit a reasonable inference that Esposito created or continued policies that caused the excessive use of force against Fitzgerald.

In sum, plaintiffs do not plausibly allege a basis for holding any of the named individual defendants personally liable for the excessive use of force against Fitzgerald and the claim is dismissed as to them all.

I.   Failure to Intervene.

Plaintiffs also claim that the named individual defendants are liable for failing to intervene to prevent plaintiffs' alleged constitutional deprivations. Specifically, Marom alleges that the supervisory defendants and Officers Boyle and Valentine failed to intervene to protect his rights; Rocek alleges that the supervisory defendants and Officers Galgano and Valentine failed to intervene to protect her rights; and, Fitzgerald alleges that the supervisory defendants and Officers Galgano and Boyle failed to intervene to protect his rights. Because a "failure to intervene [] claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012); see also Feinberg v. City of New York, 99 cv 12127 (RC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004), plaintiffs' failure to intervene claims are assessed only as they relate to Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's excessive force claim.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." <u>Anderson</u>, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." <u>Id.</u> However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." <u>Id.</u>

1.   False Arrest Claims.

Rocek alleges that Officers Galgano and Valentine failed to intervene in her unlawful arrest and Marom alleges that Officers Boyle and Valentine failed to intervene in his unlawful arrest. Specifically, the FAC alleges that Galgano, Boyle, and Valentine "gathered together and conferred with each other about what they had observed and what the charges were" regarding Marom and Rocek, prior to filing formal arresting paperwork and further detaining the two plaintiffs. (FAC ¶ 114). On that basis, Rocek plausibly alleges that Galgano and Valentine had a realistic opportunity to intervene in her false arrest and Marom plausibly alleges that Boyle and Valentine had a realistic opportunity to intervene in his false arrest.

Marom and Rocek also allege that the supervisory defendants failed to intervene to stop their false arrests. As an initial matter, Marom and Rocek plausibly allege that Blanco and Charnyavsky were personally involved in their false arrests. Those defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation. Regarding Viviano's, Winski's, and Esposito's failure to intervene in Marom's and Rocek's false arrest, the two plaintiffs fail to allege any facts

showing that those three supervisory defendants were present during any part of the arrest or arrest processing of Marom and Rocek.  For that reason, there is no basis to infer that Winski, Viviano, or Esposito had "a realistic opportunity to intervene to prevent" the false arrests from occurring and there is no plausible failure to intervene claim pled against those defendants.

2.  First Amendment Retaliation Claims.

As previously explained, Marom's and Rocek's claims for First Amendment retaliation arise from the same factual allegations as their false arrest claim—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest after which Officers Galgano, Boyle, and Valentine, along with Sergeant Blanco and attorney Charnyavsky, gathered together to discuss filing the arresting paperwork for both plaintiffs.  As a result, the allegations as to how each of the named defendants are liable for a failure to intervene to prevent Marom's and Rocek's First Amendment retaliation claims are the same as for their false arrest claims.  The Court's analysis regarding the plausibility of the failure to intervene claims is the same as well.  Marom plausibly alleges that Officers Boyle and Valentine are liable for failing to intervene to prevent his retaliatory arrest and Rocek plausibly alleges that Officers Galgano and Valentine are liable for failing to intervene to prevent her retaliatory arrest.  But, neither Marom nor Rocek plausibly allege that Winski, Viviano, or Esposito failed to intervene.

3.  Excessive Force Claim.

Fitzgerald fails to plausibly allege that any of the named defendants are liable for failing to intervene to prevent the use of excessive force against him.  With regard to Officers Galgano and Boyle, Fitzgerald does not allege that they saw him in Zuccotti Park, nor does he allege that they participated in or witnessed the use of force against him.  With regard to Officer

Valentine, Fitzgerald affirmatively states that he never saw Fitzgerald before Fitzgerald arrived

at the Midtown South Precinct.  (FAC ¶¶ 136-37).  And, regarding the supervisory defendants,

Fitzgerald fails to allege that any of the supervisory defendants were present at the actual scene

of Fitzgerald's arrest with a "realistic opportunity" to prevent the use of force.

  J.  Monell Claims.

Finally, plaintiffs assert that the City of New York is liable for the deprivation of

their constitutional rights.  "In order to establish municipal liability, 'a plaintiff must show that

the violation of his constitutional rights resulted from a municipal custom or policy.'"  DeCarlo

v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941

F.2d 119, 122 (2d Cir.1991)).  A municipality may not be held liable on section 1983 claims

solely "by application of the doctrine of respondeat superior."  Pembaur v. City of Cincinnati,

475 U.S. 469, 478 (1986).  Instead, municipal liability can be found where: (1) "a particular

municipal action itself violates federal law, or directs an employee to do so," Bd. of Cty.

Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an

"authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right,"

Id. at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have

the force of law," Connick v. Thompson, 563 U.S. 51, 61 (2011), and (4) where a municipality's

failure to train its employees about their legal duty to avoid violating a citizen's rights amounts

to "deliberate indifference," Id.  In any case, "a plaintiff must show that the municipal action was

taken with the requisite degree of culpability and must demonstrate a direct causal link between

the municipal action and the deprivation of federal rights."  Bryan Cty., 520 U.S. at 404.

To succeed in plausibly alleging a claim for municipal liability against the City of

New York, the FAC must demonstrate a "direct causal link between" a municipal action and one

of the surviving claims: (1) Marom's and Rocek's false arrest claims, (2) Marom's and Rocek's

First Amendment retaliation claims, and (3) Fitzgerald's excessive force claim.  Plaintiffs list

nine potential policies and practices of the City of New York that they believe are bases for

municipal liability, (FAC ¶ 269), as well as one claim that the City failed to properly train its

police officers.  The Court will first address the various alleged municipal practices and then will

address the failure to train theory.

    1.   Municipal Policies and Practices.

        When alleging a <u>Monell</u> claim based on the existence of a municipal policy or

practice, plaintiffs must show that the practice causing the deprivation of federal rights is "so

persistent and widespread as to practically have the force of law." <u>Connick</u>, 563 U.S. at 61.

Generally, "a single incident alleged in a complaint, especially if it involved only actors below

the policy making level, does not suffice to show a municipal policy." <u>DeCarlo</u>, 141 F.3d at 61.

"[T]he mere assertion that a municipality has such a custom or policy is insufficient in the

absence of allegations of fact tending to support, at least circumstantially, such an inference."

<u>Zahra v. Town of Southold</u>, 48 F.3d 674, 685 (2d Cir.1995) (alterations omitted) (quoting

<u>Dwares v. City of N.Y.</u>, 985 F.2d 94, 100 (2d Cir.1993)).

        Three of the alleged municipal policies and practices bear no direct causal link to

the constitutional deprivations implicated in the surviving claims.  First, the alleged practice of

using "arrests and full-blown arrest processing in lieu of issuing summonses for summons-

eligible offenses," (FAC ¶ 269g), has no connection to Marom and Rocek being arrested without

probable cause, or in retaliation for their speech, or with Fitzgerald being subjected to excessive

force.  That alleged practice is possibly related to plaintiffs' excessive detention claims, but those

have been dismissed.

- 46 -

Second, the alleged practice of "assigning 'arrest teams' of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to 'process' the arrests of multiple arrestees, including by filing out NYPD paperwork and swearing out accusatory instruments containing false information," (FAC ¶ 269h), may relate to plaintiffs' malicious abuse of process or right to a fair trial claims because of the implication that materials were regularly falsified, but neither of those underlying claims has survived the motion to dismiss.

Third, the alleged practice of "inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact," (FAC ¶ 269i), similarly may relate to plaintiffs' dismissed malicious abuse of process and fair trial claims, but has no plausible causal link to the surviving claims.

In contrast, the remaining six alleged municipal policies and practices bear some plausible connection to plaintiffs surviving claims.  Plaintiffs allege that the City has practices whereby the NYPD applies the prohibition against "violation-level trespass," (FAC ¶ 269e), and the prohibition on disorderly conduct, (FAC ¶ 269f), against protestors without justification. And, that the City has a practice of treating groups of protestors as a "unit" for "mass arrest" without first giving meaningful notice or opportunities for dispersal.  (FAC ¶ 269d). Presumably, plaintiffs are alleging that these three practices regularly lead to false arrests.

Similarly, plaintiffs allege that the City has two practices whereby the NYPD unreasonably restricted protected activities in Zuccotti Park between September 2011 and March 17, 2012, (FAC ¶ 269a), and continually fails to provide adequate opportunities to disperse before arresting protestors engaged in First Amendment activity, (FAC ¶ 269b).  Presumably, plaintiffs are alleging that these practices led, and continue to lead, to retaliatory arrests without

- 47 -

probable cause.  Plaintiffs also allege that there is an NYPD policy and practice of using

excessive force against protestors.  (FAC ¶ 269c).

        For each of these policies, Plaintiffs fail to allege sufficient factual content

allowing for the plausible inference that any one of them were "so persistent and widespread as

to practically have the force of law."  Connick, 563 U.S. at 61.  Plaintiffs allege that these

policies were "persistent and widespread" on the basis of purported connections to the events of

prior demonstrations.  For example, the FAC includes allegations that, during the RNC protests

in 2004, the City's "crowd and disorder control planning" and "mass arrest and mass arrest

processing plans" led to mass arrests, a failure to make individualized probable cause

determinations, and excessive force.  (FAC ¶¶ 37-39).  And, it cites, in blunderbuss fashion, a

number of lawsuits brought against the City for actions during that and various other protests in

the early 2000s.  (FAC ¶ 26).  Plaintiffs, however, fail to assert which—if any—of those lawsuits

led to findings of liability against the City for false arrests, First Amendment retaliatory arrests,

or excessive force.  According to the FAC, only one of the referenced cases led to any finding of

guilty or liability: a conviction of a police officer for falsifying police records.  (FAC ¶ 26, citing

People v. Pogan, 06416-2008 (Sup. Ct. N.Y. Co.)).  Plaintiffs also fail to specifically connect any

of the mentioned lawsuits or the RNC allegations to the specific policies and practices they

allege in their Monell claims in this action.  On that basis, the FAC lacks sufficient factual

content tending to show, even circumstantially, the existence of municipal policies and practices

responsible for the plaintiffs constitutional deprivations.

   2.   Failure to Train.

        Plaintiffs' last theory of Monell liability is based on the City's failure to train its

police officers about their legal duty to avoid violating a citizen's rights—namely, using

excessive force and making false or retaliatory arrests during mass protests.  See Connick, at 61.

They allege that the City, through its agents in the NYPD, knew or should have known that the

mass arrest policies used in 2004 during the RNC protests led officers to use excessive force

against protestors and to falsely arrest protestors for engaging in First Amendment activity.

(FAC ¶¶ 42-45).  And, that the City thereafter failed to properly train officers to ensure that

similar constitutional deprivations would not occur under comparable circumstances again—

such as the March 17, 2012 "raid" on Zuccotti Park.  (FAC ¶ 45).

       "A municipality's culpability for a deprivation of rights is at its most tenuous

where a claim turns on a failure to train." Connick, 563 U.S. at 61.  Plaintiffs must show that a

municipality's failure to train its employees amounted to "deliberate indifference."  Id.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action."  Id. (quoting Bryan Cty., 520 U.S.,

at 410).  Generally, "[a] pattern of similar constitutional violations by untrained employees is []

necessary to demonstrate deliberate indifference for purposes of failure to train."  Id. at 62

(internal quotation marks omitted).  A plaintiff must also "demonstrate that the policymaker's

inaction was the result of conscious choice and not mere negligence."  Cash v. Cty. of Erie, 654

F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted).  "[D]eliberate indifference may

be inferred where the need for more or better supervision to protect against constitutional

violations was obvious, [], but the policymaker fail[ed] to make meaningful efforts to address the

risk of harm to plaintiffs."  Id. (internal citations and quotation marks omitted).

       At the motion to dismiss stage, the Second Circuit utilizes a three-prong test to

determine whether plaintiffs have demonstrated a municipality's "deliberate indifference" in the

context of a failure to train claim.  Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir.

1992).  "First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation."  Id. at 297 (internal quotation marks omitted).  "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."  Id.  And, third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  Id. at 298.  Where all three elements are established a plaintiff has stated a plausible Monell claim based on a failure to train.  Id.; see also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004).

Plaintiffs have failed to make this threshold showing.  It is plausible to infer from the FAC, and is matter of general common sense, that NYPD decision makers are aware that their officers, at some point, will need to arrest protestors taking part in a large demonstration.  (FAC ¶¶ 29, 59-64), and that NYPD officers mishandling large protests could cause constitutional deprivations, (FAC ¶¶ 26, 38-40).  However, plaintiffs fail to plausibly allege that there is a history of the NYPD mishandling mass protesting situations on a scale that could be reasonably construed as setting out a pattern or practice of constitutional abuse.

As previously explained, plaintiffs only factual support for the assertion that there is a pattern of the NYPD causing similar constitutional deprivations are the allegations about the 2004 RNC protests and the mention of various other section 1983 lawsuits brought against the City.  (FAC ¶¶ 26, 37-39, 42).  However, the allegations regarding the RNC protest are plaintiffs' own conclusions, unsupported by facts, that the NYPD's actions in 2004 caused a substantial number of constitutional violations.  And, the allegations concerning previous section 1983 lawsuits fail to explain which—if any—lawsuits led to findings of liability against the

NYPD for constitutional violations, beside the one conviction of an NYPD officer.  (FAC ¶ 26).

They also do not allege that testimony was taken during any of those lawsuits that shows a

pattern and practice of constitutional abuse.  Plaintiffs do cite a joint study produced by The

Global Justice Clinic at NYU Law School and the Walter Leitner International Human Rights

Clinic at Fordham Law School, but that paper references 130 "alleged incidents of physical force

[in New York City] . . . which warrant investigation by authorities."  (Suppressing Protest:

Human Rights Violations in the U.S. Response to Occupy Wall Street (July 25, 2015), p.1,

http://hrp.law.harvard.edu/criminal-justice/suppressing-protest-human-rights-violations-in-the-u-

s-response-to-occupy-wall-street/).  Neither a newspaper report nor an academic paper reporting

on incidents that ought to be investigated is a showing of anything entitled to a presumption of

truth.

        In sum, plaintiffs fail to plausibly allege the City, through the NYPD, engaged in

a pattern or practice of similar constitutional deprivations against protestors.  See Pluma, 2015

WL 1623828, at *12 (holding that allegations of a "handful of dissimilar incidents occurring

over the course of more than a decade is too sparse to put the City on notice that the NYPD's

training program produces officers who are likely to commit constitutional violations through

their deployment of pepper spray"); cf. Connick, 563 U.S. at 62 (holding that four overturned

Brady convictions "could not have put [the defendant] on notice that the office's *Brady* training

was inadequate with respect to the sort of *Brady* violation at issue here").  In addition, plaintiffs

allege no facts explain how policing the OWS protest "presents [NYPD officers] with a difficult

choice of the sort that training or supervision will make less difficult."  While the bar at this early

stage of litigation is modest, See Amnesty Am., 361 F.3d at 130 n.10 (interpreting Walker test to

have held that, at the motion to dismiss stage, plaintiffs are not required to identify a specific

deficiency in a municipality's training program or to establish a causal link between the lack of training and the misconduct to establish a failure to train claim), plaintiffs' simply do not meet the standard of plausibility on this, or any other, theory of <u>Monell</u> liability.

CONCLUSION

   Defendants' motion to dismiss is granted in part and denied in part.  Specifically, all claims are dismissed except for: (1) Yotam Marom's false arrest and First Amendment retaliation claims against defendants Galgano, Blanco, and Charnyavsky and the unidentified defendants who physically arrested him, as well as his related failure to intervene claims against defendants Boyle and Valentine; (2) Miriam Rocek's false arrest and First Amendment retaliation claims against defendants Boyle, Blanco, and Charnyavsky, and the unidentified defendants who physically arrested her, as well as her related failure to intervene claims against defendants Galgano and Valentine; and, (3) Don Fitzgerald's claim for excessive use of force against the unidentified defendants who hit him.  All claims against the City of New York, Winski, Viviano, and Esposito are dismissed and they are no longer parties to this action.

   SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
   March 7, 2016

- 52 -