```
                                                Page 1
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   -------------------------------------------------------X
 4   YOTAM MAROM, MIRIAM ROCEK and DON FITZGERALD,
 5                              Plaintiffs,
 6               -against-
 7   NYPD SERGEANT FIOR BLANCO, NYPD LEGAL BUREAU OFFICER
 8   OLEG CHERNYAVSKY, NYPD OFFICER MICHAEL GALGANO, SHIELD
 9   NO. 2671, NYPD OFFICER CYNTHIA BOYLE, SHIELD 06663,
10   NYPD OFFICER STEVEN VALENTINE, SHIELD 13585, and SNYPD
11   OFFICERS JOHN and JANE DOE #1-15 (the names being
12   fictitious, as the true names andhsield numbers are not
13   prsently known), in their individual and offical
14   capacities,
15                              Defendants.
16   -------------------------------------------------------X
17                              100 Church Street
                                New York, New York
18
                                December 7, 2016
19                              11:09 a.m.
20
21        EXAMINATION BEFORE TRIAL of NYPD OFFICER MICHAEL
22   GALGANO, a Defendant herein, taken by the Plaintiff,
23   pursuant to Article 31 of the Civil Practice, Law & Rules
24   of Testimony, and Notice, held at the above-mentioned time
25   and place, before a Notary Public of the State of New York.
```

M. Galgano

                                                        Page 10

1        A    Yes.

2        Q    Is that the person?

3        A    That should be the other person that was in the

4    room, yes.

5        Q    How long was that meeting that you had around three

6    months ago?

7        A    About an hour or so.

8        Q    And in order to prepare for the deposition today,

9    did you review any documents?

10       A    No.

11       Q    Did you review any video?

12       A    No.

13       Q    Did you review any photos?

14       A    No.

15       Q    Since the testimony that you gave in October of 2014

16   in the Caravalho case, have you viewed any videos related to

17   the events of March 17th, 2012?

18       A    No.

19       Q    Since the testimony that you gave in October of

20   2014, have you been sued in your capacity as a police

21   officer?

22       A    No.

23       Q    So, the only two lawsuits that you've been named, in

24   your official capacity as a police officer, are this one, the

25   Marom one, and the Caravalho case?

M. Galgano

Page 14

1    A    All finished.

2    Q    Is anything that you just read refresh your

3    recollection about anything that happened on March 17 or 18,

4    2012?

5    A    Some of my recollection.

6    Q    If I can just ask you not to actually read from the

7    document, but tell me in what ways what you just read

8    refreshed your recollection?

9    A    Basically that we were assigned to the Saint

10   Patrick's Parade after role call.  Gave us the RNP number.

11   We went up to the parade.  What we did.  And then where we

12   were post changed to afterwards.

13   Q    Do you remember where your post changed to

14   afterwards?

15   A    Zuccotti Park.

16   Q    Do you know what time that post change occurred?

17   A    Post change was, no.

18   Q    Is there any reason that you can think of that you

19   would remember the events of March 17th to 18th 2012 any

20   better than you did in October of 2014 when you were deposed

21   in the other case?

22   A    Say that again?

23   Q    Sure.

24        Is there any reason you can think of why you would

25   remember the events of March 17th to 18th, 2012 any better

M. Galgano

Page 15

1    today than you did when you were deposed about those same

2    events in October?

3        A    It would all be the same events.  There is

4    nothing -- you are talking about another year later, so.

5        Q    So, is it fair to say that as far as you know,

6    sitting here today, there is nothing that's happened between

7    when you were deposed before and today that refreshed your

8    recollection further?

9        A    No.  Nothing that's changed it.

10       Q    So, I am going to show you what's been marked as

11   Galgano 3.  This is a mass arrest report, a version of a mass

12   arrest report, with the Bates numbers as D593B through D600B.

13              MR. OLIVER:  Off the record for a second.

14              (Whereupon, a discussion was held off the record).

15              MR. OLIVER:  So, the mass arrest report that has

16           been marked as Galgano 3, according to the Bates

17           numbers in the middle, are actually D46 through 53.

18           And although the version of the mass arrest report

19           that is marked as an exhibit does say that it's

20           confidential, I understand that counsel is withdrawing

21           the purported confidentiality designation?

22              MS. ROBINSON:  Agreed.

23              MR. OLIVER:  Okay.

24       Q    So, Officer Galgano, I am going to show you this

25   document.  I am going to ask you to take a look at it.  It's

M. Galgano

Page 29

1           So, for just a minute, I am going to refer you back

2     to Esposito 3.  On the second page, do you see where there is

3     an attorney's name there Oleg Chernyavsky?

4           A    Yes.

5           Q    Do you know Oleg?

6           A    Yes.

7           Q    Do you know Mr. Chernyavsky?

8           A    Yes.

9           Q    Did you see him on the day of the incident?

10          A    Not that I can recall.

11          Q    Do you know who Lieutenant Dan Albano is, right?

12          A    Yes.

13          Q    Did you see Lieutenant Albano on the day of the

14    incident?

15          A    Not that I can recall.

16          Q    You met with the legal bureau attorney in connection

17    with preparing arrest processing paperwork related to the

18    incident, right?

19          A    They were spoken to over the phone.  We didn't meet

20    with anybody.

21          Q    You spoke with a legal bureau attorney over the

22    phone?

23          A    I did not.  The sergeant did.  Sergeant Blanco.

24          Q    And who did she speak with?

25          A    I don't know.

M. Galgano

Page 30

1     Q     Are you a hundred percent sure that's what happened?

2     A     Not a hundred percent, but I would say that's 95

3   percent what happened.  It's been some time, so.

4     Q     Would it make a difference to you if Sergeant Blanco

5   testified that there was a legal bureau attorney at the

6   precinct?

7     A     If that's what she testified to, then that's what

8   she testified to.  I can't recall exactly what happened.

9     Q     And when we are talking about the precinct, we are

10  talking about which precinct?

11    A     Midtown South.

12    Q     And you are familiar with the layout of the

13  precinct?

14    A     Yes.

15    Q     Do you remember testifying at your deposition in

16  Caravalho that you saw a legal bureau attorney in Zuccotti

17  Park on the day of the incident?

18    A     In the Caravalho case?  No, I don't recall that.

19    Q     Why don't you go ahead and look at Exhibit 4

20  (handing).  If you would please look at page 22, lines 11 to

21  15.  You talked about a sergeant.

22    A     I got it.  11, 12, 13, 14 and 15.

23    Q     Yeah.

24    A     Okay.

25    Q     Do you know, sitting here today, who the sergeant

M. Galgano

1          Q     What happened next?

2          A     At that point we began to move in a line going

3    across the park.  And anybody that wanted to leave, was asked

4    to leave verbally and given directions to which they can go

5    to leave.  Anybody that was still laying, chanting or

6    whatever, we told them to leave, but we knew they weren't

7    going to leave so we just continued to move people out.

8          Q     At that point, did you make any arrests?

9          A     No.

10         Q     Did you assist in any arrests at that point?

11         A     No.

12         Q     Can you point to me where within the park you were

13   when you made the first arrest on the day of the incident?

14         A     I did not make an arrest.

15         Q     You didn't make any arrest on the day of the

16   incident?

17         A     No.

18         Q     What happened next?

19         A     After all was said and done and the park was cleared

20   out.  We got to the end of the park.

21         Q     Meaning which end?

22         A     Meaning the Trinity Place entrance or exit --

23   whatever you want to use -- as we cleared it out.  We then

24   began to reform back up on the steps and that's when

25   Lieutenant Viviano approached myself and other officers and

M. Galgano

Page 40

```
 1   said there was some kind of a mix-up and that there was a

 2   city bus parked on Broadway with people who were in handcuffs

 3   and to go into the bus and pick out five and assign yourself

 4   the arrests.

 5       Q    Okay.

 6            You are familiar with the term turnover arrests?

 7       A    Yes.

 8       Q    What does it mean to you, a turnover arrest?

 9       A    Officer starts processing the arrest, can't continue

10   for whatever reason, and the supervisor then turns it over to

11   another officer and explains what happens and you continue

12   from there.

13       Q    And --

14       A    Or --

15       Q    Go ahead.

16       A    That's pretty much what it boils down to.

17       Q    Or?  What were you going to say?

18       A    There is no or.

19       Q    So, turning back to the map for a minute, you go

20   through the park and you end up on the Trinity side, right?

21       A    Yes.

22       Q    When you are at two, before you go through the park,

23   is there already a bus on the Broadway side?

24       A    No, not that I recall.

25       Q    And when you get to the Trinity side, do you stay at
```

M. Galgano

```
                                                            Page 43
 1       A     Yes.

 2       Q     And did you see any of the people whose arrests you

 3   were assigned to process in Zuccotti Park before they were

 4   arrested?

 5       A     Say that again?

 6       Q     Did you see any of the people whose arrests you were

 7   assigned to process in Zuccotti Park before they were

 8   arrested?

 9       A     There was one gentleman when I walked on the bus who

10   I remember telling "You have to leave the park before you are

11   arrested."  And when I got back on the bus, he was still

12   sitting there looking at me.

13       Q     And who is that gentleman?

14       A     At this point I can't remember his name.

15       Q     What did he look like?

16       A     I couldn't recall.

17       Q     Okay.

18       A     So, I am in the park, had an interaction with him

19   and I told him to leave.  Saw him again on the bus.  That's

20   it.

21       Q     What did you see him doing in the park?

22       A     His arms were linked to another person.  He was -- I

23   don't remember if he was sitting or standing, but I remember

24   getting close enough to tell him leave before you are

25   arrested.
```

M. Galgano

```
 1      Q     And could you put --
 2            First of all, point for me where you saw this person
 3   in the park?
 4      A     Somewhere in the middle.
 5      Q     Can you put a three at the location?
 6      A     (Witness complying)
 7      Q     And when you saw the person at that location, you
 8   said they had their arms linked?
 9      A     Yes.
10      Q     Who did they have their arms linked with?
11      A     I can't recall.
12      Q     Can you recall anything about who they had their
13   arms linked with?
14      A     No.
15      Q     Do you remember the gender of any person they had
16   their arms linked?
17      A     I believe it was a woman, but I couldn't be totally
18   sure now.
19      Q     Why do you believe it was a woman?
20      A     I just thought it was odd at that point the amount
21   of people running around this person had his arms linked to a
22   female.
23      Q     Why was that?
24      A     There wasn't that many females in the park at the
25   area where I was standing.
```

M. Galgano

```
                                                    Page 45
 1       Q     There weren't that many females.  Okay.
 2             What did that female look like?
 3       A     I can't recall.
 4       Q     Do you remember what color their hair was?
 5       A     No.
 6       Q     And which arm did he have linked with the female?
 7       A     I can't recall.
 8       Q     What else do you remember about that person?
 9       A     That's it.
10       Q     What did he look like?
11       A     I couldn't tell you.
12       Q     What was the color of his skin?
13       A     I couldn't tell you.
14       Q     What was he wearing?
15       A     I don't recall.
16       Q     What was the color of the woman's skin?
17       A     I don't recall.
18       Q     What was she wearing?
19       A     I don't recall.
20       Q     What was the color of the man's hair?
21       A     I don't recall.
22       Q     How long was his hair?
23       A     I don't know.
24       Q     How long was the woman's hair?
25       A     I don't know.
```

M. Galgano

1      Q      The other person that the male person had his arms

2    linked with aside from the woman --

3      A      I never saw anybody after that.

4      Q      Okay.

5      A      I told that gentleman to leave the park and kept

6    moving west toward Trinity.

7      Q      How long was the interaction that you had with that

8    gentleman?

9      A      Long enough for him to tell him "Leave now before

10   you are arrested."

11     Q      How long in seconds?

12     A      Stood in front of him.  Told him, "You should leave

13   before you get arrested.  Unlink your arms and go before you

14   get arrested" and continued on.  However long it takes to

15   tell someone to do that.

16     Q      About how long did that take you on the date of the

17   incident?

18     A      However long it took me to say those words.

19     Q      So, why don't you say them again and we can count?

20     A      "You should leave now.  Unlink your arms and leave

21   the park before you are arrested."

22     Q      So, would you say that's about two or three seconds?

23     A      If you want to say that, that's fine.

24     Q      I would like you to --

25     A      I am not timing it, so I don't know what it could

M. Galgano

Page 47

1    be.  Don't forget, we are yelling over people.  And I am

2    standing face-to-face to a gentleman and telling him to

3    leave.  So, however long it takes.

4        Q    So, sitting here today, you don't have a specific

5    recollection of how long that took?

6        A    No.

7        Q    And did you place that person under arrest?

8        A    No.

9        Q    You didn't place anybody under arrest --

10       A    No.

11       Q    -- related to the incident?

12       A    No.

13       Q    Okay.

14            And what happened next?

15       A    Walked onto the bus.  I recognized him from having

16   told to leave by myself.  Looked at the other four people

17   that he was with and said, "I would be the arresting officer

18   for this evening.  We will find out what command we are

19   taking you to and we are going to process you and have you

20   out sometime later on Sunday."

21       Q    And how did you pick the five people whose arrests

22   you later processed?

23       A    I recognized the one face from the gentleman I had

24   told to leave.  And then I just took the next four that were

25   sitting next to him.

M. Galgano

1    arrests you processed in the park?

2        A    No.

3        Q    So, the one person who is suing you now, is the one

4    person you now remember seeing in the park?

5        A    I don't remember him now.  I remembered him that

6    night.

7        Q    You did?

8        A    Well, I spoke to him and told him it was time to

9    leave.  And when I got on the bus, I recognized him again.

10   That's the only two times I interacted with him.

11       Q    You didn't say that during your deposition in

12   Caravalho, right?

13       A    I don't believe it came up.

14       Q    You don't believe it came up.  Okay.

15            What happened next?

16       A    The bus left Zuccotti Park.  We were told we are

17   going to Midtown South Precinct Stationhouse to begin to

18   process the arrests.  We pulled in front of Midtown South.  I

19   took the five prisoners off the bus into Midtown South.

20   Searched them.  Entered their information onto the pedigree

21   sheets.  Uncuffed them.  Took them into the cells one at a

22   time.  Put them in the cell.  And began doing the arrest

23   paperwork work.

24       Q    What arrest paperwork?

25       A    Online booking worksheet.

M. Galgano

Page 52

1             Galgano 16 for identification, as of

2             this date)

3       Q    Which paperwork did you fill out with respect to

4    each of the five arrestees?

5       A    Just the online booking worksheet, that I can

6    recall.

7       Q    And you said prisoner pedigree?

8       A    Yes.

9             MR. OLIVER:  So, I would call for the production of

10            the prisoner pedigree cards.

11      Q    They are cards, right?

12      A    Yes.

13            MR. OLIVER:  I would call for the production of the

14            prisoner pedigree cards.

15      Q    Aside from the prisoner pedigree cards and the OLBS,

16   did you fill out any arrest processing paperwork?

17      A    That's all I filled out.

18      Q    You didn't fill out a DAT packet?

19      A    Just filled out one sheet, the DAT Investigation

20   Sheet.  But they weren't getting DAT-ed.  So, that ended

21   that.

22      Q    So, you did fill out a DAT Investigation Sheet?

23      A    Yes.

24      Q    And you filled out five of them?

25      A    Should be one for all of them, yes.

M. Galgano

Page 53

```
 1            MR. OLIVER:  So, I call for production of those
 2       documents.
 3       Q    Have you looked for documents related to the
 4   arrests?
 5       A    Everything I have, all of you have.
 6       Q    So, you have looked?
 7       A    Yes.
 8       Q    Where and when did you look for documents related to
 9   this incident?
10       A    Everything was turned over to the DA's Office that
11   night.  And then again, when this lawsuit appeared.
12       Q    So, when you say everything was turned over to the
13   DA's Office that night, what do you mean?
14       A    All the arrest paperwork was given to the DA's
15   office.
16       Q    When you say all the arrest paperwork, which
17   paperwork do you mean?
18       A    Online booking and any paperwork that was filled
19   out.
20       Q    What other paperwork do you mean?
21       A    The DAT, if it was filled out, which in this case it
22   was.
23       Q    When you the DAT, you mean a desk appearance
24   investigation worksheet that you filled out by hand?
25       A    Yes.
```

M. Galgano

Page 54

1      Q     Did anyone assist you in filling out the DAT

2    investigation worksheet?

3      A     No.

4      Q     And you already looked for that document with

5    respect to these arrestees and you haven't been able to find

6    it?

7      A     Yes, I have, and I haven't been able to find it.

8      Q     I am showing you what has been marked as Galgano 16

9    (handing).

10           I am just going to ask you to read this list of

11    documents to yourself.

12                MR. OLIVER:  Off the record.

13                (Whereupon, a discussion was held off the record)

14                (Whereupon, a short break was taken)

15     Q     When you got on the bus, how did you pick the five

16    people?

17     A     As I already said, I recognized one gentleman who I

18    told in the park "It's time to leave.  Unlink your arms and

19    leave before you get arrested."  I recognized him and I just

20    picked the next four sitting next to him.

21     Q     So, you didn't just pick the first five people you

22    saw on the bus?

23     A     No.

24     Q     Where was he sitting on the bus?

25     A     I don't recall.

M. Galgano

Page 55

1      Q      So, you got on the bus and you picked the first five

2   people who were seated in the first --

3      A      No.  I looked around the bus when I got on to assess

4   the situation.  I saw him.  And said to myself, I remember

5   this gentleman and I told him to distinctively to unlink his

6   arms and leave.  So, wherever he was sitting, I said "I am

7   going to be your arresting officer.  I am also going to take

8   the next four sitting next to you."

9      Q      Where was he sitting?

10     A      I don't recall.

11     Q      Was he in the front of the bus?

12     A      I don't recall.

13     Q      Was he in the middle of the bus?

14     A      I don't recall.

15     Q      Was he in the back of the bus?

16     A      I don't recall.

17     Q      Was he on the left side of the bus?

18     A      I don't recall.

19     Q      Was he on the right side of the bus?

20     A      I don't recall.

21     Q      Was he seated next to a window?

22     A      No.  I don't recall.

23     Q      No or you don't recall?

24     A      I don't recall.

25     Q      Was anyone seated in the same seat as he was?

M. Galgano

Page 56

1      A     The city bus -- there is probably only one person

2    per seat.  I don't really recall.

3      Q     Do you remember the layout of that MTA bus?

4      A     No.

5      Q     What happened next after you informed the five

6    people that you would be their arresting officer?

7      A     Went back to Midtown South.  We offloaded the bus at

8    Midtown South.  Searched everybody.  Uncuffed them.  Took

9    their ID.  Put them in the cell.  And began to enter

10   everything into the computer to generate arrest numbers.

11     Q     And did you, yourself, escort anyone off the bus?

12     A     I took my five prisoners off the bus.

13     Q     And what can you tell me about, if anything, about

14   any of the other four prisoners, what they looked like?

15     A     I don't recall anything about them.

16     Q     Do you remember how tall they were?

17     A     No.

18     Q     Do you remember their gender?

19     A     No.

20     Q     Were all five of the prisoners who you processed

21   male?

22     A     Not that I can recall.

23     Q     Tell me what you mean by "not that I can recall"?

24     A     At this point in time so much time has passed that I

25   can't tell you they are male or female.  I don't even

M. Galgano

Page 57

1    remember their names.

2        Q    Had you ever been assigned to process arrests before

3    where you had not seen the underlining conduct?

4        A    No, this was the first time.

5        Q    Are you familiar with NYPD large scale arrest

6    processing procedure?

7        A    Yes.

8        Q    And when you saw the five people who are on the bus,

9    how many of them had you seen before that moment?

10       A    Just the one gentleman.

11       Q    Just the person who is suing you in this case?

12       A    Yes.

13       Q    And did you have any personal knowledge based on

14   what you had, yourself, observed as to what any of the other

15   four people had done?

16       A    Personal knowledge?

17       Q    Yes.

18       A    No.  What personal knowledge would I have?

19       Q    Well, you could have observed them in the park.

20       A    I did not observe them, no.

21       Q    You remember observing one of them in the park?

22       A    Yes.

23       Q    But the other four, you did not observe in the park?

24       A    No.

25       Q    When you say no, you mean --

M. Galgano

Page 58

```
 1      A     I did not interact with any of the other four.  The
 2   only interaction was with the one gentleman.
 3      Q     Who is suing you in this case?
 4      A     Yes.
 5      Q     So, in all of the other arrests that you had made in
 6   connection with protests, you had never dealt with a turnover
 7   arrest before?
 8      A     No.
 9      Q     No, you had not?
10      A     No.
11            Everything else was me observing, me taking my five
12   and me processing all the way through.
13      Q     You are familiar -- withdrawn.
14            I am going to show what was previously marked in
15   Caravalho as Plaintiff's Exhibit 26.  This is a copy of
16   Patrol Guide Procedure 213-06, that was disclosed in
17   Caravalho, without a Bates number.  It's large scale arrest
18   processing procedure (handing).
19            Are you familiar with this document?
20      A     Yes.
21      Q     You see at number four there where it says "Ensure
22   arresting/assigned officers have definite knowledge of the
23   arrest"?
24      A     Yes.
25      Q     Did you do anything to ensure that you had definite
```

1    knowledge of each of the five arrests?

2        A    How so?

3        Q    Did you do anything to ensure that you had definite

4    knowledge of the arrests?

5        A    Only knowledge I had was that the warnings were read

6    and given and that people who did not leave the park were

7    placed under arrest.

8        Q    Okay.

9        A    I did not arrest anybody that night.

10       Q    In the arrests that you processed in the past in

11   connection with demonstrations, have Polaroid pictures been

12   taken?

13       A    Yes.

14       Q    Tell me about the Polaroid pictures?

15       A    In a normal situation where it's not as chaotic as

16   this situation was, the arresting officer takes a photo with

17   the defendant after he has been cuffed, or at the very

18   minimum, the officer off to the side.  And the officer's name

19   and the prisoner's name goes on the Polaroid.

20       Q    And it goes on the Polaroid with a pedigree label

21   that goes on the back?

22       A    Yes.

23       Q    And that's the pedigree label which is referred to

24   in paragraph 6 of second page of this patrol guide procedure?

25       A    Yes.

M. Galgano

Page 61

1          The black box that I am pointing to, is that where

2     the digital picture taken at the precinct would normally go?

3       A     Yes.

4       Q     And that picture would be taken and put into the

5     prisoner movement slip, that would then accompany the

6     prisoner as they are moved through the system, right?

7       A     Yes.

8       Q     You said earlier, words to the affect, that when the

9     situation isn't as chaotic as it was in this instance

10    Polaroids are taken?

11      A     Yes.

12      Q     How do you know that Polaroids weren't taken because

13    of, as you said, a chaotic situation, as opposed to

14    unavailability of a Polaroid or something else?

15      A     I wouldn't know if there is no availability of

16    Polaroids.

17      Q     So, you don't know why no Polaroids were taken?

18      A     I have no knowledge as to why Polaroids were not

19    taken.

20      Q     So, when you said something earlier about why

21    Polaroids might not have been taken in this case, were you

22    guessing?

23      A     Was I guessing?  The situation was a little more

24    chaotic than a normal arrest situation.  So, I would have no

25    idea as to whether a Polaroid camera was available or not.

M. Galgano

Page 62

1       Q    But as part of a task force, you have been involved

2   in a lot of chaotic arrest situations?

3       A    Yes.

4       Q    And, in fact, the large scale arrest processing

5   procedures are supposed to apply specifically to situations

6   where there are multiple arrests and there is chaos, right?

7       A    Yes.

8       Q    And, in fact, part of the reason Polaroids are

9   supposed to be taken with the arresting officers is so that

10  an observing officer who observed the conduct that led to the

11  arrest can be located for arrest processing?

12      A    Yes.

13      Q    And that did not happen here, right?

14      A    Yes.

15      Q    And the observing officers were totally separated

16  from the arrestees, right?

17      A    Yes.

18      Q    And as far as you know, were the observing officers

19  separated from --

20           Were all of the observing officers separated from

21  their arrestees?

22               MS. ROBINSON:  Objection.

23               You can answer.

24      Q    If you know?

25      A    I have no idea why the observing officers were not

1       Q     How do you find out if someone qualifies for DAT?

2       A     There is a supervisor on the scene that makes that

3    determination.

4       Q     Based on the DAT Investigation Sheet?

5       A     Investigation sheet.  Whether there is outstanding

6    warrants.  And the person's background.

7       Q     But those pieces of paper need to be created, right?

8       A     No.  They wouldn't need to be created unless the

9    person is already qualified for a DAT.

10      Q     Explain what you mean by that?

11      A     You can qualify for a DAT on any number of reasons.

12   So, if you know you are going to DAT somebody, you are going

13   to fill all of this out.  If they are not going to qualify

14   for DAT, on certain arrests you can't even get a DAT.  There

15   are certain arrests you are not going to get a DAT.

16      Q     And the arrests for which people are DAT eligible

17   are detailed in the DAT eligibility provision of the patrol

18   guide, right?

19      A     Yes.

20      Q     And people who are charged with assaulting police,

21   for examples, don't get DATs, do they?

22      A     They are not supposed to.

23      Q     Right.  They shouldn't.

24            Generally felonies don't get DATs, right?

25      A     Generally, yes.

M. Galgano

Page 69

1    A    No, not that I am aware.

2    Q    You see in step number five where the desk officer

3    is supposed to review the arrest worksheet for accuracy?

4    A    Yes.

5    Q    Who reviewed your OLBS for accuracy related to the

6    incident?

7    A    Sergeant that was at the scene at the stationhouse.

8    That would be Sergeant Blanco.

9    Q    Did Sergeant Blanco assist you in preparing the

10   OLBS?

11   A    Yes.

12   Q    How did she assist you?

13   A    I entered everything into the computer.  I printed

14   it out.  I brought a copy and said, "Sergeant, can you check

15   that over for me.  If there is anything missing.  We will go

16   back in and we will change it."

17   Q    Let's do it this way.

18        When you first arrived at the precinct, what is the

19   very first thing that you did?

20   A    Took the prisoners in front of the desk.  Filled out

21   the pedigree sheet.  Searched them to make sure they have

22   nothing on them.  Handed the pedigree sheets to Sergeant

23   Blanco who was behind the desk.  Uncuffed them one at a time.

24   Brought into the cells one at a time.

25   Q    So, you walk into Midtown South --

M. Galgano

Page 71

1        A     I don't recall.

2        Q     Do you know Officer Bovell?

3        A     No, I do not.

4        Q     How many other officers were on the bus with you?

5        A     I don't recall.

6        Q     Were you the first officer to get off the bus?

7        A     Not that I can recall.

8        Q     When you brought your prisoners into the precinct,

9   were there other prisoners ahead of them in a line?

10       A     Not that I can recall.

11       Q     After you lodged the prisoners, what is the next

12   thing that you do?

13       A     After they were lodged?

14       Q     Yes.

15       A     I began to enter in my prisoner's information into

16   the online booking worksheet.  There is computer terminals in

17   the muster area.  As I was entering into the computer the

18   information, and everything else was done, Sergeant Blanco

19   came back, since she spoke to someone from legal, and said

20   the narrative was to be used on the online booking worksheet

21   for the narrative portion of it.  So, I entered that in and

22   continued to put in the person's information.

23       Q     I'm sorry.  Say that part one more time?

24       A     Sergeant Blanco came back with a piece of paper

25   saying she spoke with someone from legal and said she has the

M. Galgano

1     narrative portion of it, to put into the narrative section.

2          Q     And then what happened?

3          A     I continued to enter everything into the computer.

4     I printed out an online booking sheet with an arrest number.

5     It was reviewed.  And then we started to print the prisoners

6     to be ready to be transported down to Central Booking.

7          Q     When you say print the prisoners, you mean you

8     rolled their prints on a --

9          A     Yes, yes.

10         Q     So, by the time you printed them, you had already

11    completed their OBLS paperwork?

12         A     You don't get fingerprinted if you don't have an

13    OBLS number.  So, the OLBS has to be done before you get

14    fingerprinted.

15         Q     And there is a place on the OLBS arrest worksheet --

16    withdrawn.

17               You are familiar with the NYPD patrol guide

18    provisions about live scanning, right?

19         A     Yes.

20         Q     And don't they require that you fill out a Scratch

21    OLBS worksheet as you were doing printing?

22         A     As you are doing printing?

23         Q     Yes.

24         A     No.  You can't print them until you finish the

25    arrest report.  And then you print them.  Because you need

1    that arrest number.

2        Q    And you are sure about that?

3        A    That, yes.

4        Q    And if the patrol guide says something different,

5    that would surprise you, right?

6        A    Yes.

7        Q    Did you use force on either of --

8            Did you use force on any of the five people whose

9    arrests you processed?

10       A    No.

11       Q    Were you injured --

12       A    Me?  No.

13       Q    -- in connection with processing any of their

14   arrests?

15       A    No.

16       Q    I am going to show you what's been marked as Galgano

17   8, which is a D25 through D28 from the Caravalho case

18   (handing).

19           And Galgano 10 is D1 through D4 in this case

20   (handing).

21           I am going to ask you to review both of those and

22   let me know when you are done.

23           Do you recognize those documents?

24       A    Yes.

25       Q    And what are they?

M. Galgano

1    to the system, you just input all that information --

2         Q    When did they make that change?

3         A    I don't recall that.

4         Q    It was a lot of years ago?

5         A    I would assume so, yes.

6         Q    When you just explained -- withdrawn.

7              Do you specifically remember that you did not fill

8    out OLBS Arrest Worksheets related to this incident?

9         A    Do I specifically remember, no.

10        Q    So, it's possible you filled it out?

11        A    Possible, yes.

12        Q    And if you did fill them out, what is supposed to

13   happen to them?

14        A    They would have all gone into the arrest paperwork.

15        Q    Where --

16        A    The paperwork would have gone down to the DA's

17   Office.

18        Q    And how would it have gotten down --

19        A    In a manila envelope, handed by me, with the

20   prisoner's information on it.

21        Q    And what is supposed to go into that envelope?

22        A    Copy of the arrest report worksheet and any other

23   paperwork that was done that night.

24        Q    When you say any other paperwork that was done that

25   night, I am referring you now to Galgano 16, are you talking

M. Galgano

Page 86

1    arrested.  So, if I arrested him or processed him -- I didn't

2    arrest him at the scene.  I processed him at Midtown South.

3    So, when I processed it, I took five IDs from the five people

4    that I assigned myself on the bus.  He is one of them.

5        Q    I am going to show you Plaintiff's 21 from the

6    Caravalho case, which begins at Caravalho Bates Stamp D319

7    and goes on for seven pages total.  And I will be referring

8    you to the second page (handing).

9        A    It's listed Joseph C. Sharkey as being placed under

10   arrest.

11       Q    You didn't place Mr. Sharkey under arrest?

12       A    No, I did not.

13       Q    And you didn't place Mr. Marom under arrest?

14       A    No.

15       Q    But does this refresh your recollection as to

16   whether or not Mr. Sharkey was one of the five people you

17   self assigned yourself?

18       A    I assigned him myself, yes.

19       Q    You can set that aside.

20            Now, look back, if you would, at Galgano 8, what's

21   the defendant's name in Galgano 8?

22       A    Defendant is Joseph C. Sharkey.

23       Q    You don't need to write on it, please.

24       A    No, I'm not.

25       Q    Was Mr. Sharkey one of the people whose arrest you

1    processed relating to the incident?

2         A    That night, yes.

3         Q    Did you create this OLBS report by inputting the

4    information on it yourself?

5         A    Yes.

6         Q    And look at the Galgano 10, please.

7              What is the name on Galgano 10?

8         A    Yotam Marom.

9         Q    And did you, yourself, input the information in that

10   OLBS?

11        A    Yes.

12        Q    Did anyone assist you, in any way, in creating it?

13        A    No.

14        Q    Well, didn't Sergeant Blanco give you a piece of

15   paper?

16        A    Yes.

17        Q    And what was on the piece of paper?

18        A    The same thing that's written in the detail section

19   of the arrest report:

20             "At time and place of occurrence, Brookfield

21   Property Director Mike Larkin and Lieutenant Viviano of

22   Manhattan South Task Force informed the crowd that they had

23   to leave Zuccotti Park so it could be cleaned of debris.

24   Arrestee refused to leave.  Arrestee was informed by the AO

25   that they were under arrest.  Arrestee resisted by lying on

M. Galgano

Page 88

1    the ground, interlocking arms with others and refusing to

2    place their hands behind their backs."

3         Q    And it's the identical narrative for the other OLBS,

4    right?

5         A    Yes.

6         Q    And is it the identical narrative for the other

7    three OLBS reports that you created that night?

8         A    Yes.

9         Q    You are sure of that even though you don't have them

10   in front of you?

11        A    Yes.

12        Q    Why are you sure of that?

13        A    Sergeant Blanco spoke to legal.  Explained the whole

14   situation to them, what had gone on.  Legal said to her

15   rather than have 50 different events of what was going on, we

16   can summarize it down to what they gave us.

17        Q    You, yourself, observed Mike Larkin in the park

18   prior to the arrests; is that right?

19        A    Yes.

20        Q    How do you know Mike Larkin?

21        A    He identified himself that night as being property

22   director of Brookfield Properties through the bullhorn.

23        Q    And you remember that?

24        A    Yes.

25        Q    And you remembered that when you got to the

M. Galgano

```
 1    precinct?

 2        A    Yes.

 3        Q    You remembered his name?

 4        A    Yes.

 5        Q    You didn't just copy it off of the piece of paper?

 6        A    I copied it off the paper because I had heard him

 7    while standing there talking through the bullhorn.

 8        Q    You also saw Lieutenant Viviano making announcements

 9    in the park prior to arrests that night, right?

10        A    Yes.

11        Q    And did you observe Joseph Sharkey in the park

12    refusing to leave?

13        A    No.

14        Q    Did you observe anyone else in the park, whose

15    arrest you later processed, refusing to leave?

16        A    No.

17        Q    Did you inform Mr. Sharkey in the park that they

18    were under arrest?

19        A    No.

20        Q    Did you inform anyone in the park that they were

21    under arrest?

22        A    No.

23        Q    Did you see Mr. Sharkey in the park resisting arrest

24    by lying on the ground?

25        A    Sharkey, no.
```

```
 1        Q     Did you see anyone in the park resisting arrest by

 2   lying on ground?

 3        A     No.

 4        Q     When you swept through the park, you weren't making

 5   arrests, were you?

 6        A     No.

 7        Q     The point of your sweeping through the park wasn't

 8   to make arrests, was it?

 9        A     The point was to get people out of there who wanted

10   to leave and could leave on their own so that we had fewer

11   number of arrests to make that night.

12        Q     Understood.

13        A     It's also a safety issue.  I am not going to turn my

14   back to cuff someone on the floor while there were still

15   other people standing around.

16        Q     The directions that you had at that point from your

17   supervisors were not to make arrests at that point?

18        A     Clear out the park.  We can swing back around after

19   we are done and anybody that was still laying in the park was

20   obviously not going to leave so --

21        Q     So, you never informed Mr. Sharkey that he was under

22   arrest, right?

23        A     No.

24        Q     And nor did you inform any of the other four people

25   whose arrests you later processed that they were under
```

M. Galgano

```
                                                    Page 91
 1   arrest, right?

 2       A    Right.

 3       Q    Did you see Mr. Sharkey resist arrest by lying on

 4   the ground in the park?

 5       A    No.

 6       Q    Did you see any of the other four people resist

 7   arrest by lying on the ground in the park?

 8       A    No.

 9       Q    Did you see any of the five arrests you processed

10   resist arrest by interlocking arms with others?

11       A    No.

12       Q    Did you see any of the five people whose arrests you

13   processed resist arrest by refusing to place their arms

14   behind their backs?

15       A    No.

16       Q    What about by refusing to put their hands behind

17   their back?

18       A    No.

19       Q    And you didn't use force on any of them?

20       A    No.

21       Q    I am going to ask you to turn to the second page of

22   each of these documents, which you have in front of you.

23   Exhibit 10.

24            Why don't you go ahead and read what it says under

25   "force used"?
```

M. Galgano

1        A     Restraint control.  Yes.  Other restraint control.

2     That's the handcuffs.  They were handcuffed on the bus.

3        Q     Just a second.

4              It says "yes" for "force used"?

5        A     Yes.

6        Q     And does that indicate that you used force on them?

7        A     No.

8        Q     What does that indicate?

9        A     It indicates that handcuffs were used.  Technically

10    that's using force because they can't move around.

11       Q     I agree with you.

12       A     So, there you go.

13       Q     But this doesn't indicate that you used force on

14    them, does it?

15       A     No.

16       Q     You see where it says "officer injured" and "yes"?

17       A     Office injured.  Yes.

18       Q     Why did you put "yes" in that section?

19       A     That should be no.

20             If I was injured, we would have generated paperwork.

21    If there is no paperwork, no injury.

22       Q     Do you know if any other officers were injured?

23       A     I have no idea.  I can't recall.

24       Q     Who arrested Yotam Marom?

25       A     Who arrested him?  I don't know.

M. Galgano

1      Q    Who arrested Joseph Sharkey?

2      A    I don't know.

3      Q    Who arrested the other three people whose arrests

4   you processed?

5      A    I don't know.

6      Q    You see on the back page of each of these where it

7   says that Sergeant Blanco approved the report?

8      A    Yes.

9      Q    What did Sergeant Blanco do to approve the report?

10     A    What did she do?

11     Q    Yes.

12     A    She spoke to legal.  Explained the whole situation.

13  Came back with the narrative and made sure that all the

14  arrests were processed without anyone getting hurt.  If there

15  was any injuries, that paperwork was filled out and any other

16  type of issues that may have arose.

17     Q    When you entered the narrative that said that --

18  withdrawn.

19          Turning back to the narrative, where it says,

20  "Arrestee was informed by AO they were under arrest," who is

21  the AO in that --

22     A    Whoever cuffed him.

23     Q    So, how did you know that Mr. Sharkey was informed

24  by the AO that he was under arrest?

25     A    I had no idea that he was informed.  He was on the

M. Galgano

Page 94

1    bus in handcuffs.

2        Q    So, why did you put that in your OLBS?

3        A    That was discussed higher than me.  That's what came

4    from legal when they had a discussion with all the

5    supervisors as to how they were going to proceed with these.

6    That was handled up higher than up in the ladder than me.

7        Q    Would you agree that the detail section in these

8    OLBS contains statements that are not based on your own

9    personal knowledge?

10       A    Say that again?

11       Q    Would you say that the --

12            Would you agree that the detailed section that you

13   just read a moment ago on the OLBS contains information

14   that's not based on your own personal knowledge?

15       A    In this case, yes.

16       Q    Why didn't you say so?

17       A    Because at this point we had observed everything

18   else except for resisting -- they were laying on the ground

19   and people interlocking arms.  I didn't specifically see

20   these four, but there were other people -- so, at that point,

21   if they are at the park, that meant they didn't leave.  They

22   were laying, standing.  Legal hashed it out with the bosses.

23       Q    When you say legal hashed it out with the bosses,

24   please explain?

25       A    Whatever bosses they had.  There was a meeting, I am

M. Galgano

Page 95

1    sure, before we were assigned these arrests as to how they

2    were going to proceed with this, that they had a bus full of

3    prisoners that were handcuffed.  However it was determined

4    that we were taking these arrests did not include me in the

5    discussion.  I was told by the Lieutenant to go on the bus

6    and take five.  I processed those five.

7        Q    Didn't it make you uncomfortable to include

8    information in your arrest report that wasn't true?

9        A    Make me uncomfortable?  At that point?  No.

10       Q    Why not?

11       A    At that point I was just taking care of an arrest

12   that was assigned to me.

13       Q    You were just following orders, right?

14       A    Yes.

15       Q    And have you ever put in arrest reports that you

16   observed something that you didn't observe before?

17       A    The reports that I made up, up to this point, I

18   observed everything.

19       Q    So, this is the first time that you dealt with a

20   turnover arrest situation?

21       A    Was assigned the arrest in a situation like this,

22   yes.

23       Q    And what is supposed to happen, if you know,

24   according to NYPD procedure when there is, as you say, a

25   mix-up like this?

M. Galgano

1    for disobeying the warning to leave the park.  If those

2    warnings are loud enough on the bullhorn and you see cops

3    standing there with helmets and handcuffs getting ready to

4    move, don't you think you would leave?  Don't you think you

5    would turn around and say, "Gee, this is a bad situation.

6    Maybe I should go."

7            If you got on that bus and ended up on that bus in

8    handcuffs, whoever handcuffed you, should have stayed with

9    you.  Whoever I interacted with, left, except for the one

10   gentleman when I got back on the bus and was still there.

11        Q    Who was that?

12        A    Mr. Yotam Marom.

13        Q    How do you know that?

14        A    I only identified him when I got to the stationhouse

15   when I got his ID.  Now, I am being sued by him so now I know

16   his name.

17            But we are not going to stand there in the middle of

18   the night and say, "Hey, sarge, this is all wrong."

19   Obviously if they are on the bus, everybody above me who had

20   a meeting about this, who came up with a decision, must have

21   said they disregarded the warnings.  We didn't just show up,

22   get out of the bus and start locking people up.  There was a

23   procedure.  There was a time limit.  Mr. Larkin read the

24   warnings.  He waited.  He read them again.  He had a

25   bullhorn.  There is plenty of time for you to turn around and

M. Galgano

1    say, "Gee, I think I should leave."

2        Q    Why did you include information in your arrest

3    report that wasn't true?

4        A    If that was the narrative given to me by legal, I

5    have to go under the assumption that this is what legal

6    worked out.

7        Q    Is it your understanding of NYPD procedure that --

8             Are you familiar with the procedure for avoiding

9    arrests?

10       A    Yes.

11       Q    And what is that?

12       A    If it is determined that the arrest needs to be

13   voided by a supervisor, then it's voided.  And you have to

14   produce another online booking worksheet with the word "void"

15   on it and the prisoner is released.

16       Q    Did you do that in this case?

17       A    No.

18       Q    And why not?

19       A    No supervisor said anything about voiding an arrest.

20       Q    Were you prepared to go to --

21            If these cases went to criminal trial, were you

22   prepared to testify as to the details in the OLBS section?

23       A    I can't testify to anything that hasn't been asked

24   of me.  It never went to criminal court.  We don't know if

25   it's going to criminal court.  We have no idea.  We are

M. Galgano

```
                                            Page 101
 1       Q    And you check at the Criminal Justice Bureau on the

 2    first floor?

 3       A    Yes.

 4       Q    There is a log that you sign?

 5       A    Yes.

 6            MR. OLIVER:  I am going to call for a production of

 7            the CJB log.

 8       Q    And after you signed the log, you go up to ECAB?

 9       A    Yes.

10       Q    Which is the Early Case Assessment Bureau.

11            Then who was with you when you went up to ECAB?

12       A    I can't recall.

13       Q    Who did you talk to at ECAB?

14       A    Whatever district attorney was going to draw up the

15    cases.

16       Q    Did you talk to one DA in ECAB or more than one?

17       A    I can't recall.

18       Q    And does the name Stolfi Collins mean anything to

19    you?

20       A    Not at this point, no.

21       Q    What about Joshua Steinglass?

22       A    At this point, no.

23       Q    What about Erin Choi?

24       A    At this point, no.

25       Q    How many DAs did you meet with on --
```

M. Galgano

                                              Page 102

1           This is March 18th now, right?

2      A    Yes.

3      Q    What time did you get to 100 Centre Street?

4      A    I don't recall.

5      Q    Was it in your memo book?

6      A    Probably.

7      Q    Would you mind checking, to see if that refreshes

8    your recollection?

9      A    It's not in these pages.  I guess it's in this one,

10   but I don't see it.

11              (Document was marked as Plaintiff's

12               Exhibit Galgano 17 for identification, as of

13               this date)

14     Q    Do you see a time there?

15     A    Not a time we arrive.  Just a time that we left.

16     Q    What time does it say that you left?

17     A    It looks we left ECAB around 11:30 at night, 22:30

18   military.

19     Q    On the 18th, right?

20     A    Yeah.

21     Q    But you don't know what time you got there, right?

22     A    No.

23     Q    I am going to show you Galgano 17 (handing).

24          It's a copy of Patrol Guide 208-16 and I ask you to

25   review that?

M. Galgano

```
                                                    Page 105
 1        A    Never seen it before.

 2        Q    I am going to call this an OPA Report, an online

 3   prisoner arrangement report.

 4        A    Okay.

 5        Q    Referring to Galgano 9 in front of you, can you tell

 6   by looking at this document anything about which arrest

 7   processing steps you were taking related to Mr. Sharkey at

 8   which times?

 9        A    No, I cannot.

10        Q    Is that because you've never seen this form?

11        A    I never saw this before.

12        Q    So, do know what the "record create field" means,

13   for example?

14        A    No, I do not.

15        Q    Do you know what NYSID field means?

16        A    Arrest number.  At some point in your life you had

17   been arrested.

18        Q    So, you don't know this form.  So, looking at it is

19   not going to help you?

20        A    I've never seen it before.  First time.

21        Q    There did come a time when you met with a

22   prosecutor, right?

23        A    Yes.

24        Q    How many prosecutors did you meet with?

25        A    I don't recall.
```

M. Galgano

1     Q     Was it more than one?

2     A     I can't recall.

3     Q     Did you meet with a prosecutor related to this

4   incident on March 18th once or more than once?

5     A     Just once.

6     Q     How long was the meeting?

7     A     I don't recall.

8     Q     And you don't remember who was there?

9     A     No.

10     Q     Were there any other officers present?

11     A     I am sure there were, but I couldn't tell you who

12   they were.

13     Q     Were there any other DAs present?

14     A     I am sure there were, but I couldn't tell you who

15   they were.

16     Q     When you say "I am sure there were," is that because

17   you remember or because you are assuming?

18     A     I am assuming because I can't recall who was there

19   and who was not at this point in time.

20     Q     Tell me what occurred when you had that meeting?

21     A     I explained the entire situation to them, what I

22   saw, what I observed and what happened.

23     Q     When you say you explained the entire situation,

24   what specifically did you explain to them?

25     A     The entire day.  Started at the Saint Patrick's Day

M. Galgano

Page 107

1    Parade.  Post change down to Zuccotti Park.  At some point we

2    were told that we were going to clear the park.  Warnings

3    were read by the various people from the Brookfield Property

4    and the NYPD using a bullhorn.  There was an elapsed period

5    of time to let people leave.  All of that.  Then we were

6    lined up on the steps.  Before the warnings were read, we

7    were all lined up on the steps, myself and other members of

8    the NYPD, on Broadway off of Liberty facing westbound.  The

9    warnings were read by everybody that had to read them.  The

10   park was then ordered to be cleared and we cleared out the

11   park.

12          When all was said and done, the park was cleared,

13   Lieutenant Viviano asked me to get on one of the MTA buses

14   and to assign myself five prisoners.  I got on the bus and I

15   assigned myself the five prisoners.

16       Q    And what else did you tell them?

17       A    That that's what happened.  That we assigned these

18   five prisoners.  The attorneys that were came back and said

19   they are not going to draw up any of the collars except for

20   the one that I had observed when I was sweeping through the

21   park and had told to leave.

22       Q    So, you told the prosecutors about that one?

23       A    Yes.

24          And that the rest of them were being declined

25   prosecution.

M. Galgano

Page 108

1     Q     So, what specifically did you tell the prosecutor

2     about the person you say you observed in the park?

3     A     That at some point as we were moving through the

4     park to clear it out, I came face to face with him and told

5     him to leave.  He disregarding my warning.  When we continued

6     to move, I got back on the bus and he was sitting there in

7     handcuffs.  So, being that I had told him to leave earlier in

8     the park, I made the choice that I had already told him once

9     so I might as well prosecute him through.  I observed him

10    standing there or sitting there, however I observed him at

11    that point in time at the park, and that I had verbally told

12    him to leave.

13    Q     And who else did you tell the prosecutor that you

14    had observed in the park?

15    A     That was the only one.

16    Q     That was the only one?

17    A     Right.

18          The other ones I told them that I was assigned them

19    and that they declined to prosecute on those cases.

20    Q     And you did you have any -- withdrawn.

21          At that point, did the prosecutor have OLBS reports

22    with them that you had sent them?

23    A     Yes.  All the paperwork that we produced, we handed

24    over.

25    Q     And so, they had the two OLBSs that we had just

M. Galgano

1    reviewed?

2        A    Yes.

3        Q    And they also had three other OLBSs, right?

4        A    Everything that was prepared that night, I handed to

5    them, yes.

6        Q    And you went in and you told them --

7             Your testimony today is that you told the prosecutor

8    that you personally observed one of the five at the park?

9        A    Yes.

10       Q    Why didn't you say that at your previous deposition?

11       A    At the previous deposition?  I don't recall what I

12   said at the previous deposition.  You are talking about a

13   year later.

14       Q    What do you mean?

15       A    I don't recall what I said at that deposition, no.

16       Q    Well, at that deposition, you didn't mention that

17   you saw anybody in the park.

18       A    Okay.

19       Q    And then you got sued in this lawsuit and now you

20   are saying you saw the one person who is suing you in the

21   park, right?

22       A    Well, if it went through and it was drawn up, that

23   meant at some point when we were at DA's office, then, yes.

24   I told the DA's office that I observed and came face-to-face

25   with one gentleman.

M. Galgano

1      Q      With just one gentleman?

2      A      Yes.

3      Q      Okay.

4      A      Otherwise, I would have testified and handcuffed all

5      four of them, but I did not because I did not see them.

6      Q      So, do you remember now telling the DA's office

7      about that one gentleman?

8      A      If we drew up an arrest on it, then, yes.

9      Q      When you say if we drew up an arrest --

10     A      If they prosecuted them, then they interviewed me.

11     And based on my interview, at that point in time, yes.

12     Q      Then yes what?

13     A      That I observed one person in the park who I told to

14     leave.  That was the one person that was fully charged all

15     the way through and not dismissed with the rest of them.

16     Q      So, you are saying that one of the people --

17     A      One of the prisoners that night that I walked up and

18     told to leave was the same person who was on the bus in

19     handcuffs.  I did not handcuff him.

20     Q      Or arrest him?

21     A      Or arrest him, no.

22     Q      Did you ever see him in the park lying down on the

23     ground?

24     A      At some point when we were moving through the park,

25     again I can't recall exactly what it was, but that night I

M. Galgano

Page 111

1    told him to leave the park.  And that's what I told the

2    district attorney.  When it came to draw it up, we went

3    through the whole situation.  There was one of the four --

4    one of the five that I said to leave.  I did not cuff him at

5    the time.  I continued to sweep out the park.  When I came

6    back on the bus, there he was.

7        Q    Okay.

8        A    The other four I never saw.  I never had any

9    interaction with.  That's what I told the district attorney,

10   too.

11       Q    And so, you never saw the other four people whose

12   arrests you were processed in the park at all?

13       A    No.

14       Q    And you did not see those other four people in

15   Zuccotti Park refusing to leave, right?

16       A    Right.

17       Q    You only saw the person who is suing you in this

18   case now in the park?

19       A    Yes.

20       Q    And you never saw the other four people, whose

21   arrests you were assigned to process, link arms within the

22   park, did you?

23       A    No.

24       Q    And you never saw the other four people whose

25   arrests you were assigned to process being placed under

M. Galgano

Page 112

1    arrest in the park, did you?

2        A    I did not, no.

3        Q    And did you ever review any TARU footage of any of

4    the arrests that you were assigned to process?

5        A    No.

6        Q    Sitting here today, you are a hundred percent sure

7    you saw one of the people whose arrest you were later

8    assigned to process?

9        A    At that point in time, March 17th, I came

10   face-to-face with a gentleman inside Zuccotti Park.  As I was

11   moving toward the west side of the park, I came face-to-face.

12   I verbally told him to unlink, unhook or move or get out of

13   the way before you get arrested.  It's time for you to leave.

14   I continued to move.  When I got back on the bus, after the

15   park was clear, that same gentleman was sitting right there.

16            At this point in time, if you asked me to describe

17   him or whatever, I can't recall that.  That night, we were

18   face-to-face.

19       Q    So, would it help for you to see a picture of him?

20       A    No.

21       Q    Why wouldn't it help for you to see a picture?

22       A    Too much time has passed for me to remember who this

23   person is.

24       Q    Did you tell the prosecutor that you saw that person

25   in the park before they were arrested?

M. Galgano

1    A    Yes.

2    Q    Did you tell the prosecutor that you saw that person

3  in the park and refused to leave the park?

4    A    They refused to leave when I told him to leave

5  because he didn't turn around and walk away.  So, I continued

6  to move.  If he had left, he would have just left everybody

7  else.

8    Q    Did you tell the prosecutor --

9         MR. OLIVER:  Can you read that question --

10   A    I told the prosecutor exactly what happened.

11        MR. OLIVER:  Would you mind reading that question?

12                            (Whereupon, the following

13                            testimony was read back by

14                            the court reporter:

15                            "Q.  Did you tell the

16                            prosecutor that you saw that

17                            person in the park and

18                            refused to leave the park?")

19        THE WITNESS:  Yes.  Because we came face-to-face.

20        That's how I told him.  At some point, we came face to

21        face and interacted.

22   Q    For about three seconds?

23   A    Yes.

24   Q    And you didn't see him again until he was on the

25  bus?

M. Galgano

1      A    Yes.

2      Q    So, you don't know if he refused to leave, do you?

3      A    No, I wouldn't have no knowledge of that.  Because

4   once I moved on, he either left or stayed.  This is only the

5   two options that you had.

6      Q    And you didn't see him being placed under arrest?

7      A    No.

8      Q    Do you remember testifying that you met with a woman

9   from the DA's office?

10     A    I can't recall at this point in time who he or she

11  was.

12     Q    Do you remember testifying in 2014 that it was a

13  woman?

14     A    No, I do not remember 2014's testimony.

15     Q    Would it refresh your recollection if I showed it to

16  you?

17     A    It would, but I couldn't tell you her name or who

18  she was or who he was.

19     Q    If it might help refresh your recollection, look at

20  page 55 of your deposition (handing).

21     A    Okay.

22     Q    Do you see there where it says that the prosecutor

23  was a woman?

24     A    Yes.

25     Q    Does that refresh your recollection?

M. Galgano

1      A     Not at this point in time, no.  If that's what I

2    said back then.  I couldn't tell you with who I met with now,

3    but back then if I said it was a woman, then you would have

4    to go with what I said back then.  Now, it's a year later,

5    so.

6      Q     Based on what you told the prosecutor, they typed up

7    an affidavit for you?

8      A     Yes.

9      Q     Did you participate in choosing any of the language

10   in that affidavit?

11     A     No.

12     Q     But you read it before you signed it?

13     A     Yes.

14     Q     You signed it?

15     A     Yes.

16     Q     Do you remember testifying in 2014 that you didn't

17   sign it?

18     A     That I didn't sign it?

19     Q     Correct.

20     A     No, I signed it.

21     Q     Do you remember testifying in 2014 that you didn't

22   sign it because the prosecutors had a meeting and decided

23   that they were going to decline prosecution?

24     A     They declined prosecution on four of the five.  One

25   affidavit was signed.

M. Galgano

Page 116

1      Q    So, why did you testify otherwise in 2014?

2      A    Because we weren't talking about anybody being

3    arrested back then.

4      Q    In 2014, of your deposition about this incident, you

5    testified that you did not sign an affidavit related to this

6    incident?

7      A    I signed one.

8      Q    So, why did you testify that you did not sign it?

9      A    Wasn't the Caravalho case a different case than

10   this?

11     Q    Absolutely not.  It's the same incident.

12          MS. ROBINSON:  Objection.

13          It is a different case.

14     A    There you go.

15     Q    It's the same incident.

16     A    Same date.  Different case.

17          MR. OLIVER:  Now, first of all, Ms. Robinson, it's

18          totally inappropriate to coach the witness that way.

19          MS. ROBINSON:  It's not appropriate for you to tell

20          him that it's not another --

21          MR. OLIVER:  If you have an issue, then you should

22          raise it with me outside the presence of the witness.

23     A    This is another case.  That case --

24          MS. ROBINSON:  There is no question pending.

25     A    These are two different cases.  In his case there

M. Galgano

Page 117

1    was a supporting dep signed.  The other four, there was not.

2    There can't be a supporting dep if they are not prosecuting.

3        Q     When you testified in 2014 about the same incident,

4    you testified that you --

5        A     The same incident.

6        Q     That's right.

7              And these arrests, right?

8        A     In those arrests, there was one supporting dep.

9    That case is a different case.  So, if that's a different

10   case, there is no supporting dep to sign.

11       Q     I don't understand what you are talking about.

12       A     There is no case.  If there is no criminal court

13   complaint brought up, there is no affidavit to sign.  And in

14   this case that we are talking about now, there is a

15   complaint.  So, if there is a complaint, then there is

16   something to sign.  In the other case, if there is nothing,

17   there is nothing to sign.

18       Q     When you were referring to the other case, what are

19   you referring to?

20       A     The Caravalho case, which is not in case.  This is a

21   different defendant.

22       Q     No, you are the same defendant.

23       A     I am the same.  So, I signed an affidavit for Marom,

24   whatever his name is, Yotam whatever.  Him, I signed for.

25   But the others were declined.

M. Galgano

```
                                          Page 118
 1      Q    So, when you testified that you didn't sign any
 2   affidavit --
 3      A    For that case.
 4      Q    That's what you meant?
 5      A    Yes.
 6      Q    And you are sure of that?
 7      A    Yes.
 8      Q    Even though you hadn't read the deposition
 9   transcript?
10      A    There is no -- if there was a supporting dep to
11   sign, I would have signed one.  But in that case, there
12   wasn't one because it's two different people.
13      Q    So, it's your testimony today that you did sign an
14   affidavit related to the five arrests?
15      A    No.  One affidavit was signed for one arrest.
16      Q    For one?
17      A    For one.
18      Q    You are a hundred percent sure?
19      A    There couldn't be an affidavit generated if we are
20   declining prosecution.
21      Q    So, the other four were declined to prosecute?
22      A    Yes.
23      Q    And you are a hundred percent sure that Mr. Marom
24   was the only person that you now say you saw in the park?
25      A    Yes.
```

M. Galgano

Page 120

1    case, because that's my terminology and seems to be getting

2    into some confusion by referring to it by this case.

3        A    Okay.

4        Q    Looking at this document, is everything on the

5    second page true?

6        A    Everything on the second page true?  Up to the point

7    where it says observed defendant refused to leave, that I did

8    not say.  But everything up to that point, yes.

9        Q    So, in other words, you saw Mike Larkin yelling over

10   a bullhorn?

11       A    Yes.

12       Q    And you saw Lieutenant Viviano yelling over a

13   bullhorn?

14       A    Yes.

15       Q    But everything after that is not true, right?

16       A    Yes, because I didn't observe any of that.

17       Q    So, you see at the bottom where it says that false

18   statements made --

19       A    Yes.

20       Q    -- are punishable --

21       A    Yes.

22       Q    Why did you sign this document under penalties of

23   perjury if it contains things that are not true?

24       A    The DAs are the ones we spoke to.  District

25   attorneys draw it up.  District attorneys asked us to sign it

M. Galgano

Page 121

1    after we've spoken to them.  This is what they produced.

2    That's what I signed.

3        Q    So, you were just following orders?

4        A    Yes.

5        Q    Do you see the time at the bottom, 7:28 p.m.?

6        A    Yes.

7        Q    Is that your handwriting?

8        A    Yes.

9        Q    So, this was around 7:28 p.m. that you signed this?

10       A    Yes.

11       Q    And what time did you leave the DA's Office?

12       A    Well, when this would be done.  So, figure

13   another --

14       Q    You remember testified earlier about what time you

15   left DA's Office was in your memo book?

16       A    That was 23:30 hours.  That was leaving the ECAB

17   part of it.  Then we went over to draw it up.  On the 18th.

18   So, that would be Sunday the next day, because we kept going.

19   So, with all the meetings and were done, this is when it was

20   generated.

21       Q    So, what I am asking, though, is that this is

22   generated at 7:28 p.m., right?

23       A    Yes.

24       Q    And you signed it?

25       A    Yes.

M. Galgano

Page 122

1      Q     And then, you were at the DA's Office for several

2    more hours, right?

3      A     Because they were continuing to meet about what they

4    were going to do about this and how they were going to

5    proceed, which we were not privy to.

6      Q     And it wasn't until several hours later that you

7    left ECAB?

8      A     Yes.

9      Q     What were you doing when you were in ECAB?

10     A     Sitting on a plastic bench.

11     Q     I am going to show you what's been marked as --

12    withdrawn.

13           So, after you signed this complaint, you waited,

14    right?

15     A     Yes.

16     Q     Then what happened next?

17     A     We were informed that we were all done.  Once this

18    is done, then DAs do their thing and we are finished.

19     Q     Were you ever informed that any of the cases that

20    you wrote up had been declined to prosecute?

21     A     Before we drew these up, the DAs came out and said

22    they are not going to proceed with four out of the five

23    arrests.  But the one, based on what I had spoken to them

24    about, was going to be drawn up.

25     Q     And you see there are two defendants in this

M. Galgano

Page 123

1   complaint, right?

2      A    Well, one has a black line through it.

3      Q    So, you see number one with black line through it?

4      A    Yes.

5      Q    So, you see this is a complaint against two

6   defendants, right?

7      A    Yes.

8      Q    So, you swore that you saw two people, that you

9   prosecuted two people?

10      A    I only prosecuted one, that I am aware at the time.

11   This is blacked out.  I don't know whose name is on here.

12      Q    But you see two names, right?

13      A    Yes.

14      Q    So, you signed a criminal court complaint

15   prosecuting two of the five people, correct?

16      A    Yes.

17      Q    And why was that?

18      A    Two of the five?  I said I had come to face-to-face

19   with one.  I don't know who the other person is.  At this

20   point in time, I don't recall who the other person is.

21      Q    I understand.

22      A    So, at this point in time, I don't recall who this

23   other person is of the five.  So, you are talking about how

24   did it happen four years later.  I don't recall what was

25   done.

M. Galgano

1      Q     But looking at this document, it's not consistent

2    with the testimony that you just gave, right?

3      A     Consistent with what testimony?

4      Q     The testimony you --

5      A     We are talking about Marom, who is suing.  So, we

6    are dealing with the Marom case.

7      Q     You were assigned five arrests?

8      A     Yes.

9      Q     And you testified that you prosecuted one of them?

10     A     One of them, yes.

11     Q     And this shows that you prosecuted two?

12     A     This shows two.

13     Q     So, you were wrong?

14     A     At this point in time, I am going about from what I

15   can recall about something that happened four years ago.  So,

16   yes.

17     Q     You were --

18     A     Yeah, but back then.  It's two names.  I don't know

19   who this person even is.

20     Q     So, who else did you see in the park?

21     A     I don't know.  I am telling you right now, at this

22   point this in time, I don't recall who the other person is.

23     Q     So, again, it's just a coincidence that the only

24   person you now remember is the one person who is suing you in

25   this case, right?

M. Galgano

                                                      Page 125

1        A     If you want to say that, then, yes.

2        Q     Can you think of any other reason why you remember

3    just something about Yotam Marom, and not anything about

4    anyone else?

5        A     No, no.

6        Q     It's a coincidence, right?

7        A     Yeah.

8        Q     And you say that you did tell the prosecutor that

9    you saw two people in the park?

10       A     I can't recall what I told the prosecutor now.

11       Q     I am going to show what has been marked as Galgano

12   19 (handing).

13       A     You are saying that two of them went through?  Then

14   DA drew up two at that time.  You are talking about four

15   years later.  I don't recall every minuet detail.

16       Q     I am showing you Galgano 19.

17             This is a three-page data sheet that was produced in

18   Caravalho.  It does not bear a confidential designation on

19   the face of the document itself.  I am tempted to just right

20   it on the document.

21             MR. OLIVER:  Would that be okay with you, Counsel?

22             MS. ROBINSON:  Yes.

23             MR. OLIVER:  Thank you.

24             I am writing confidential on the first page because

25             out of an abundance of caution I believe this may have

M. Galgano

Page 126

```
1              been produced in Caravalho by the DA subject to a
2              confidentiality order.  Even though the document
3              doesn't say that, I want to be careful.  I know that
4              your office has this document, but I am not sure how to
5              pick it out for you because it doesn't have a Bates
6              number.  So, I will happily reproduce this exhibit
7              after the deposition for you.
8                  MS. ROBINSON:  Okay.  I am going to need a copy of
9              that, please.
10                 MR. OLIVER:  In fact, I will hand you a copy when I
11             am done.
12      Q    Officer Galgano, I am going to ask you to review
13   this DA data sheet (handing).
14      A    Uh-huh.
15      Q    By the way, did you tell the prosecutors that you
16   observed other arrests in the park?
17      A    No.  That I can recall, no.
18      Q    On the first page -- sorry.  Yeah.
19           On the first page of this document, do you see where
20   it says, "Officer Galgano observed defendants not leaving"?
21      A    Yeah.  Wait.  Where are we?  I never even seen this
22   form before.
23      Q    Here (indicating).
24      A    Fine.
25      Q    Do you see that?
```

M. Galgano

```
 1      A     Yeah.

 2      Q     That's not true, right?

 3      A     Not leaving?

 4      Q     You did not observe the five people --

 5      A     Right, I did not observe that.

 6      Q     But you never seen this document before?

 7      A     No, I never seen this one before, no.

 8      Q     When you met with the prosecutor, did you identify

 9   any witnesses?

10      A     Not that I can recall, no.

11            MR. OLIVER:  I am handing opposing counsel a copy

12         of the exhibit for the record (handing).

13      Q     I am going to show you what's been marked as Galgano

14   20, which I am also writing the word confidential on.  I am

15   going to do the same with Galgano 21 and Galgano 22.

16            Galgano 20, I will represent to you, is a five-page

17   exhibit (handing).

18            MR. OLIVER:  I will show it to opposing counsel.

19         This is your copy (handing).

20            MS. ROBINSON:  Okay.

21         Do you know what the Caravalho Bates stamps are for

22         these?

23            MR. OLIVER:  There are no Bates stamps.  It's the

24         DA's Office.

25            MS. ROBINSON:  That's right.  You already told me
```

M. Galgano

Page 132

```
 1        Q     Were you, in fact, a witness to three of Officer
 2   Sullo's collars?
 3        A     Not I can recall.
 4        Q     And sitting here today, do you know anything about
 5   the arrests that Officer Sullo was involved in?
 6        A     No, I do not.
 7        Q     And did there come a point where you learned that
 8   the prosecutor's office was going to decline to prosecute any
 9   of the cases that you were involved in?
10        A     Yes.
11        Q     When was that?
12        A     That night.
13        Q     How did you learn that?
14        A     They came out -- whoever the district attorney was,
15   came out and told us that they were not going to -- to myself
16   and the other officers at that were there -- that they were
17   not going to -- they were going to decline prosecution on the
18   following cases and they listed the names.
19        Q     I see.
20              Which other officers were with you at that time?
21        A     I don't recall.
22        Q     Is there anything you can think of that might
23   refresh your recollection?
24        A     No.
25        Q     What happened next?
```

M. Galgano

                                                          Page 135

1       Q    Have you seen a document like this before?

2       A    No.

3       Q    Do you see where it says, "The case is being

4    declined until such time as a witness can attest to the

5    defendant criminal's conduct based upon the witness's

6    personal observations"?

7       A    Yes.

8       Q    I am showing you again the OLBS related to this case

9    that you created, which is Galgano 8 (handing).

10           Do you see in the detail section where it says that

11   you observed Mr. Sharkey in the park?

12      A    The detail, yes.

13      Q    Do you see that?

14      A    Yes.

15      Q    And you agree that that is not true, you did not see

16   him in the park?

17      A    I did not.

18      Q    And the decline to prosecute form, Esposito 2 that

19   you are looking at, indicates that the prosecutor is

20   declining to prosecute the case because you were unable to

21   say which of your fellow officers observed the defendant

22   prior to arrest, right?

23      A    Yes.

24      Q    And the Marom OLBS, Galgano 10, says exactly the

25   same thing in the detail section as the Sharkey OLBS, right?

M. Galgano

1     A    Yes.

2     Q    I am going to show you what has been marked as

3     Galgano 22.  This is three pages that I am also marking as

4     confidential.  There is no Bates numbers.  I will represent

5     that these are the three other Decline to Prosecute Forms

6     that were produced in the Caravalho case (handing).

7               MR. OLIVER:  And at the end of the deposition, if

8          you wanted, I will hand you my copies that have a

9          slight amount of notes on them.

10    Q    Officer Galgano, I am going to ask you to just take

11    a quick look at these documents.

12    A    Okay.

13    Q    What time was it, by the way, that you left the DA's

14    Office, if you remember?

15    A    I don't recall.

16    Q    Would you mind checking one last time?

17    A    Looks like 00:15, but I don't know what date that

18    may have been.

19    Q    I believe your testimony earlier --

20    A    We left the DA'S Office looks like 23:30 from ECAB.

21    Q    So, you left at around 11:30 p.m.?

22    A    Yes.

23    Q    On March 18th?

24    A    The 18th?  No, probably the 17th.

25    Q    17th is the date of the arrest.

M. Galgano

Page 138

1          Is it fair to say that you told me everything that

2     you know or remember about -- withdrawn.

3          Is it fair to say that you've told me everything

4     that you remember about what you observed -- withdrawn.

5          Sitting here today, can you identify any fellow

6     officers who have any personal knowledge, that is from their

7     direct observation or direct knowledge, about the

8     circumstances leading up to any of the five arrests you

9     processed?

10     A    No.

11     Q    When you were assigned to process the arrests that

12     you were assigned to process, did any fellow officer tell you

13     anything about what any of those five people had done prior

14     to their arrests?

15     A    Not that I can recall, no.

16     Q    Do you know what Sergeant Blanco did, if anything,

17     to confirm the accuracy of your OLBS reports related to this

18     incident?

19     A    I don't know what she did, no.

20     Q    You showed them to her, though, before you finalized

21     them?

22     A    Yes.

23     Q    The document in front of you, Galgano 12, on the

24     second page, the last paragraph, does not contain truthful

25     statements about what you observed, does it?

M. Galgano

Page 140

```
1    this doesn't match up with this," it still gets signed
2    because this is all one big legal statement.  That's what
3    they produced and that's what we have to sign.
4        Q    But you could have said, "No, I don't want to sign
5    something that contains things that are not true," right?
6        A    They know what we told them.
7        Q    But you could have declined to sign something that
8    contained false statements, right?
9        A    I could have declined it, yes.
10       Q    But you didn't?
11       A    No.
12       Q    And the reason you didn't is that you were following
13   orders from your supervisors, right?
14       A    Correct.  Yes.
15               MR. OLIVER:  That's all I got.
16
17
18           (Continued on next page for jurat.)
19
20
21
22
23
24
25
```