UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

YOTAM MAROM and MIRIAM ROCEK,

                                              Plaintiffs,

        -against-

NYPD SERGEANT FIOR BLANCO, NYPD LEGAL
BUREAU LIEUTENANT DANIEL ALBANO,
NYPD LEGAL BUREAU DETECTIVE KENNETH
O'DONNELL, NYPD OFFICER MICHAEL
GALGANO, SHIELD NO. 2671, NYPD OFFICER
CYNTHIA BOYLE, SHIELD 06663,

                                              Defendants.

---------------------------------------------------------------------- x

**PLAINTIFFS' RESPONSE
TO DEFENDANTS' LOCAL
RULE 56.1 STATEMENT OF
FACT**

**15-CV-2017 (PKC)(SN)**

        Plaintiffs Yotam Marom and Miriam Rocek, by their attorney Gideon Orion Oliver, submit this

statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern

District of New York, responding to Defendants' Affirmative Statement of Material Facts about which they

contend there is no genuine issue to be tried. By responding to an allegation, Plaintiffs do not concede it is a

material fact.

### March 17, 2012: Events Related to Plaintiffs' Arrests

1. On March 17, 2012, plaintiffs were present in Zuccotti Park ("Park") in connection with the six-

month anniversary of Occupy Wall Street ("OWS"). Ex. D, Pl. Resp. to Req. to Admit,

¶¶1, 10.

        **Response 1: Admit.**

2. A large number of protestors were present in Zuccotti Park; the Park was full. Ex. D, Pl. Resp. to

Req. to Admit, ¶3.

        **Response 2: Dispute** that the Park was "full." **Admit** that "there was a large crowd of OWS

protesters that were in close physical proximity to plaintiff Marom," Ex. D, Pl. Resp. to Req. to Admit, ¶3, and that there "were hundreds of other OWS protesters congregating in and around the Park on that same day." *Caravalho v. City of N.Y.*, No. 13-cv-4174 (PKC)(MHD), 2016 U.S. Dist. LEXIS 44280, at *5 (S.D.N.Y. Mar. 31, 2016).

3. Plaintiffs were present in the Park with three or more persons immediately prior to their arrests on March 17, 2012. Ex. D, Pl. Resp. to Req. to Admit, ¶¶2, 11.

    **Response 3: Admit.**

4. Officers, including Officer Michael Galgano, were deployed to the Liberty St., side of the Park on orders from Lt. Viviano. Ex. K, Def. Galgano's Dep., 34:19-35:3.

    **Response 4: Admit.**

5. Officers, including Galgano, were then ordered to line up on the rows of steps leading in to Zuccotti Park. Ex. K, Def. Galgano's Dep., 38:4-5.

    **Response 5: Admit.**

6. Galgano was positioned on the first row of steps leading into Zuccotti Park. Ex. K, Def. Galgano's Dep., 33:20.

    **Response 6: Admit.**

7. A representative from the owner of Zuccotti Park, Brookfield Properties ("Brookfield"), using a bullhorn, identified himself to the crowd and explained that the Park was going to be closed for cleaning and people in the Park had to leave. Ex. K, Def. Galgano's Dep., 38:4-9.

    **Response 7: Admit.**

8. The Brookfield representative stated, "you have to clear the Park now. Leave the Park now please." Ex. R, TARU Video, 01:23-01:29.

    **Response 8: Admit.**

9. He then turned to the north of the Park and began making the announcements again. Ex. R, TARU Video, 01:29-01:33.

**Response 9: Admit.**

10. Thereafter, the bullhorn was passed to Inspector Winksi, who instructed the crowd that the Park would be closed for cleaning, and that anyone who did not leave the Park would be arrested. Ex. K, Def. Galgano's Dep., 38:11-12.

**Response 10: Admit.**

11. Inspector Winski was unable to finish this first announcement before protestors began cursing at him, drumming, and raising their voices, including raising a chant of "Bullshit" over his orders and warnings. Ex. R, TARU Video, 02:24-02:49.

**Response 11: Dispute.** Inspector Winski can be seen and heard finishing his announcement on the cited video, so he was able to finish his announcement.

12. Inspector Winski continued making announcements to the protestors through a bullhorn, stating: "Brookfield properties needs to clean the Park. You need to leave the Park, or you will be arrested for trespass. Folks the Park is closed. You need to leave the Park. Brookfield properties is going to clean the Park. If you don't leave you're going to get arrested for trespass." Ex. R, TARU Video, 02:30-02:49.

**Response 12: Admit.**

13. Inspector Winski went on to state, "Folks the Park is closed. Brookfield properties is going to clean the Park. You need to leave now, or you will be arrested for trespass." Ex. R, TARU Video, 02:59-03:07.

**Response 13: Admit.**

14. Inspector Winski then passed through a banner set up by protestors to enter further into the

Park and began announcing again "Folks the Park is closed Brookfield properties is going to…" Ex. R, TARU Video, 03:10-03:17.

**Response 14: Admit.**

15. Inspector Winski continued to make announcements through a bullhorn from within the Park stating. "- you need to leave, or we are going to start making arrests." Ex. R, TARU Video, 03:18-03:21.

**Response 15: Admit.**

16. Inspector Winski announced again "Folks the Park is closed. You need to leave so Brookfield properties can clean the Park. If you don't leave now you will be arrested for trespass." Ex. R, TARU Video, 03:22-03:33.

**Response 16: Admit.**

17. Inspector Winski continued to circulate through the Park making announcements including "leave now or you will be arrested for trespass. The park is closed. Brookfield properties is going to clean the Park. If you don't leave now you're going to be arrested for trespass." Ex. R, TARU Video, 04:02-04:17.

**Response 17: Admit.**

18. Inspector Winski continued to make announcements while he circulated through the dense crowd at Zuccotti Park. Ex. R, TARU Video, 04:40-04:50.

**Response 18: Admit**, except **dispute** the characterizations of the "crowd" as "dense."

19. Inspector Winski can be seen announcing directly to the group seated with their arms linked again "Folks the Park is closed. You need to leave now, or you will be arrested." Ex. R, TARU Video, 05:16-05:22.

**Response 19: Admit.**

20. Inspector Winski approached the group of protestors who had linked arms and sat down in the Park at approximately 10:32 p.m. on March 17, 2012, and issued the following order "Folks the Park is closed. You need to leave now, or you will be arrested." Ex. R, TARU Video, 05:05-05:11.

**Response 20: Admit.**

21. Thereafter, the bullhorn was passed to Lieutenant Viviano who made the same announcements to the crowd. Ex. K, Def. Galgano's Dep., 38: 12-13.

**Response 21: Admit.**

22. After the announcements and warnings were given by Brookfield, Winski and Viviano, protestors were given an opportunity to leave the Park. Ex. K, Def. Galgano's Dep., 38:14-16.

**Response 22: Admit.**

23. Inspector Winski gave the order to Galgano and other officers to go through the Park and begin to clear it. Ex. K, Def. Galgano's Dep., 38: 16-19.

**Response 23: Admit.**

24. Officers, including Galgano, began to move in a line going across the Park and gave verbal directions to the protesters to leave. Ex. K, Def. Galgano's Dep., 39:1-7.

**Response 24: Admit.**

25. Although numerous warnings to clear the Park were articulated to the crowd, a group sat down and refused to leave. Ex. M, Winski's Carvalho Dep., 104:17-22.

**Response 25: Admit.**

26. Inspector Winski gave the order to arrest this group because they refused to comply with Brookfield's request to leave. Ex. M, Winski's Caravalho Dep., 104:23-24 – 105:2-4.

**Response 26: Admit** that Winski so testified about his reasons.

27. Police officers moved in to make arrests of people who did not leave the Park. Ex. N, Def.

Boyle's Dep., 52:18-23, 55:17-21; Ex. O, Def. Blanco's Dep. 36:14-16.

**Response 27: Admit** that some police officers moved in to make arrests of people who did not leave the Park, but **dispute** that Boyle, Galgano, or Blanco arrested Plaintiffs or observed them prior to their arrests. *See, e.g.,* Responses 38, 58, 76, 78, 95, 98.

**Yotam Marom**

28. Yotam Marom admits that he observed police officers enter the Park. Pl. Resp. to Req. to Admit, ¶4.

**Response 28: Admit**.

29. Marom admits that he was present in the Park when officers made announcements via bullhorn for the assembled crowd to leave. Ex. I, Pl. Marom Dep., 37:18-20; Ex. D, Pl. Resp. to Req. to Admit, ¶8.

**Response 29: Admit** Mr. Marom heard announcements made by at least one NYPD officer with a bullhorn, either before or after police entered the park. Marom Dep. 37:14-38:7.

30. Marom admits that the announcements given by the officers were dispersal orders instructing the crowd that the Park was closed and that if the individuals in the Park did not leave, they would be arrested. Ex. I, Pl. Marom Dep., 38:8-12.

**Response 30: Admit**.

31. Marom admits that, when police entered the Park, he sat down and linked arms with other individuals. Id., Pl. Resp. to Req. to Admit, ¶6, Ex. I, Pl. Marom Dep., 25:2-4, 38:22-39:13.

**Response 31: Admit.**

32. Marom admits that, after the police officers made the announcements that they were going to close the Park, he did not leave. Ex. I, Pl. Marom Dep., 39:14-18.

**Response 32: Admit**.

33. Marom admits that he did not leave the Park until he was arrested and escorted out of the Park by police. Ex, D, Pl. Resp. to Req. to Admit, ¶9.

   **Response 33: Admit**.

34. Marom admits that officers had to aggressively tear him away from the individuals with whom he was linking arms. Ex. I, Pl. Marom Dep., 40:11-15.

   **Response 34: Admit** that a number of officers aggressively tore Mr. Marom from other people and dragged him along a bench. Marom Dep. 40:11- 16. **Dispute** that the cited testimony, or any other record evidence, establishes that the officers "had to" do so.

35. Marom admits that after his arrest, he refused to get up and walk; officers had to carry him. Ex. I, Pl. Marom Dep., 40:23-25.

   **Response 35: Dispute.** Mr. Marom **initially** refused to get up and walk on his own after being arrested. Marom Dep. 40:23-41:2. Two officers then lifted Mr. Marom by the arms and legs and dropped him off a bench. Marom Dep. 40:17-19. One officer then kicked at Mr. Marom, telling him to get up and walk, and Mr. Marom complied. Marom Dep.40:19-22.

36. Officer Galgano was the assigned officer for five arrestees, including Marom and Caravalho plaintiff, Joe Sharkey—Galgano did not place handcuffs on these arrestees. Ex. K, Def. Galgano's Dep., 112:6-15.

   **Response 36: Admit.**

37. Galgano admits that did not observe four of his five assigned arrestees in Zuccotti Park, including Caravalho plaintiff Sharkey. Ex. K, Def. Galgano's Dep., 43:2-11.

   **Response 37: Dispute.** Although Defendants concede Galgano did not observe four of his five assigned arrestees in the Park, based on the record evidence cited in Response 38, a reasonable jury could find that Galgano also **did not** see Mr. Marom in the Park. *See* Response 38.

38. Galgano did observe Marom before his arrest. Id.

**Response 38: Dispute** that Galgano saw Mr. Marom in the Park or before his arrest.

In both 2014 and 2016, Galgano testified that Lt. Viviano told him there was "some kind of a mixup" as a result of which there was a New York City MTA bus that the NYPD was using to hold prisoners who had been separated from arresting officers, that officers from the MSTF would be assigned to process those arrests, and that Galgano should go to the bus, pick out five people, and assign himself 5 arrests. P's 56.1 ¶¶ 75-78. In 2014, Galgano testified that he went onto the bus and assigned to himself the first five arrestees who he saw. P's 56.1 ¶ 82. Before his 2014 testimony, Galgano reviewed his memo book entry from March 17-18, 2012, which showed a "white male" as "Perp # 1" and Mr. Marom as the third "Perp." P's 56.1 ¶ 79-81. Galgano made no mention of having recognized any person on the bus from within Zuccotti Park. In 2016, Galgano's story changed. For the first time, he testified that he did not just pick the first five people he saw on the bus, but that he recognized one arrestee from an earlier three-second interaction with that arrestee, in which he told the arrestee to leave the Park as Galgano moved through it, and picked that person and the four next to him to assign himself to process. P's 56.1 ¶¶ 88-92.

Beyond that, in 2014, Galgano testified that he told prosecutors that he selected his arrestees by picking the first five he saw on the MTA bus, as a result of which the DANY declined to prosecute all five of his arrestees. P's 56.1 ¶¶ 195-196. In 2016, Galgano testified that he told a prosecutor that he had recognized only one of his four arrestees, as a result of which DANY declined to prosecute his other four arrestees. P's 56.1 ¶¶ 197-200. Neither version is correct: in truth, DANY declined to prosecute only three of Galgano's arrestees and initiated prosecutions against **two** of Galgano's arrestees. P's 56.1 ¶¶ 202. DANY declined to prosecute these three out of five Galgano arrestees because Galgano did not observe and was unable to say

which of his fellow officers observed, his arrestees prior to their arrests. P's 56.1 ¶ 140. This is the exact same explanation they provided while simultaneously declining to prosecute the other 23-then-remaining arrests at 11:33 p.m. on March 18, 2018. P's 56.1 ¶ 226.

Reviewing the accusatory instrument he swore out against two persons, Galgano could not account for the discrepancies between his previously emphatic testimony that he had only observed one person among the five he assigned himself to process the arrests of within Zuccotti Park prior to their arrests and the sworn allegations in the accusatory instrument that he had observed both Mr. Marom and another arrestee engage in identical conduct within Zuccotti Park. P's 56.1 ¶ 203. Neither could he provide any basis for distinguishing between Mr. Marom and the other person identified in the accusatory instrument beyond the fact that Mr. Marom, and not the other person, was suing him. P's 56.1 ¶ 95.

A reasonable jury could determine that Galgano's 2014 testimony that he did not see any of his arrestees before their arrests is the true and accurate version of the events at issue-especially as the 2014 testimony was closer in time to the events, and was not clouded by Galgano's knowledge that he was defending himself in a lawsuit brought by Plaintiff Marom. P's 56.1 ¶¶ 70, 94

39. While making a sweep across the Park with other officers to continue giving orders to leave the Park, he saw Marom linking arms with another protester believed to be a woman. Ex. K, Def. Galgano's Dep., 43:21-44:18.

**Response 39: Dispute** that Galgano saw or interacted with Mr. Marom at all in the Park or before his arrest. *See* Response 38.

40. Galgano came face-to-face with Marom and told him, "[y]ou have to leave the park before you are arrested." Ex. K, Def. Galgano's Dep., 43:9-11, 46:12-15, 47:1-3, 108:3-5.

**Response 40: Dispute** that Galgano saw or interacted with Mr. Marom at all in the Park or

before his arrest. *See* Response 38.

41. Marom disregarded Galgano's warning. Ex. K, Def. Galgano's Dep., 108:3-5.

**Response 41: Dispute** that Galgano saw or interacted with Mr. Marom at all in the Park or

before his arrest. *See* Response 38.

42. Galgano is one hundred percent sure that he told Marom to leave the Park and unlink his arms

before his arrest. Ex. K, Def. Galgano's Dep., 112:6-15.

**Response 42: Dispute** that Galgano saw or interacted with Mr. Marom at all in the Park or

before his arrest. *See* Response 38.

43. Video evidence depicts Galgano in the Park standing above the crowd and the arresting officers

observing the protesters who were sitting and locked arms:



Ex. S, YouTube Video #3, 3:40.[1]

---

[1]    Ex. S to Defendants' Declaration in support of their summary judgment motion, Dkt. 140, the "YouTube Video disc", contains video of a number of incidents from March 17, 2012. For purposes of the current motion, Plaintiffs refer to the videos as:
- "Inside the NYPD Re-Eviction of Liberty Square M17.mp4" ("*NYPD Re-Eviction*");
- "NYPD's Iron Fist_ OWS Re -Occupation Arrests Protester Has Seizure in Handcuffs.mp4" ("*NYPD's Iron Fist*")(referred to by Defendants as YouTube Video #5);

**Response 43: Dispute**. The video shows Galgano in the vicinity of protesters other than Mr. Marom. Mr. Marom is not identified in the cited portion of the video. There is nothing to place the cited video in the timeline of Galgano's activities that night. *NYPD Violence*, 3:40.

44. Video evidence depicts Galgano in the Park standing directly next to the protesters who were sitting in and locked arms:



Ex. S, YouTube Video #5, 2:15-2:18.

**Response 44: Dispute**. The video shows Galgano in the vicinity of protesters other than Mr. Marom. Mr. Marom is not identified in the cited portion of the video. There is nothing to place the cited video in the timeline of Galgano's activities that night. *NYPD's Iron Fist*, 2:15-2:18.

45. After the arrests were made, Lt. Viviano asked Galgano to get on one of the MTA buses being used as a transport vehicle and to assign himself five arrestees. Ex. K, Def. Galgano's Dep., 107:12-15.

**Response 45**: **Admit.**

---

- "(2_2) NYPD violence v. OWS - March 17, 2012 (OWS 6 Month Anniversary).mp4" ("*NYPD Violence*")(referred to by Defendants as YouTube Video #3); and
- "#ows arrests inside Zuccotti park during reoccupation 31712 #m17.mp4" ("*OWS Arrests*").

46. The next time Galgano saw Marom, Marom was on the bus. Ex. K, Def. Galgano's Dep., 47:15-20, 97:7-16, 112:14-15.

    **Response 46: Dispute** that Galgano saw or interacted with Mr. Marom at all in the Park or before his arrest. *See* Response 38.

47. While on the bus, Galgano assigned himself Marom's arrest and the next four arrestees who were sitting near Marom. Ex. K, Def. Galgano's Dep., 47:15-25.

    **Response 47: Dispute**. *See* Responses 38, 46.

48. The arrestees on the bus, including Marom, were transported to Midtown South precinct; Galgano escorted his arrestees into the precinct, obtained their ID information and processed their arrests. Ex. K, Def. Galgano's Dep., 48:14-24; 69:18-24; 86:1-4.

    **Response 48**: **Admit.**

49. Subsequent to arrest processing, Galgano met with ADA Patricia Stolfi Collins once on March 18, 2018, pertaining to his five arrestees. Ex. K, Def. Galgano's Dep., 106:3-5, Ex. E, Crim. Ct. Comp.

    **Response 49**: **Dispute**. Galgano met with at least ADA Stolfi Collins. Galgano Dep. 101:16-24; 105:21-106:15.

50. Galgano told ADA Stolfi Collins:

> …at some point as we were moving through the park to clear it out, I came face-to-face with [Marom] and told him to leave. He disregarded my warning. When we continued to move, I got back on the bus and he was sitting there in handcuffs. So, being that I had told him to leave earlier in the park, I made the choice that I had already told him once, so I might as well prosecute him through. I observed him standing there or sitting there, however, I observed him at the point in time at the park, and that I have verbally told him to leave. Ex. K, Def. Galgano's Dep., 108:1-17.

    **Response 50: Dispute**. *See* Responses 38 and 49.

51. Galgano told the ADA that he observed and came face-to-face with one gentleman and told him

to leave the Park—that was one of the five arrestees—and when Galgano walked onto the bus, Marom was there. Ex. K, Def. Galgano's Dep., 109:22-111:10, 112:6-15.

**Response 51: Dispute.** *See* Responses 38, 46, 50.

52. The ADA declined to prosecute Galgano's other four arrestees, including Caravalho plaintiff, Sharkey. Ex. K, Def. Galgano's Dep., 108:18-19, 115:21-25.

**Response 52**: **Dispute.** DANY declined to prosecute **three** of Galgano's other four arrestees aside from Mr. Marom, including Mr. Sharkey. DANY prosecuted Mr. Marom and a third-party based on Galgano's sworn allegations against them. *See* Galgano DP Forms; Marom Complaint; Marom DA Datasheet.

53. Marom was charged with one count of violation of Penal Law § 205.30 (Resisting Arrest), one count of violation of Penal Law § 195.05 (Obstruction of Governmental Administration), one count of violation of Penal Law § 240.20(6) (Disorderly Conduct) and one count of violation of Penal Law § 140.45 (Trespass). Ex. E, Crim. Ct. Comp.

**Response 53: Admit.**

54. Galgano observed a Brookfield representative using a bullhorn state to the crowd in Zuccotti Park that the Park was closed for cleaning; everyone must exit. Ex. K, Def. Galgano's Dep., 102:9-11.

**Response 54**: **Admit.**

55. Galgano observed Lt. Viviano giving instructions to the crowd using the bullhorn. Ex. K, Def. Galgano's Dep., 120:12-13.

**Response 55**: **Admit.**

56. Galgano observed Marom refuse to leave the Park. Ex. K, Def. Galgano's Dep., 108:1-17, 113:2-7.

**Response 56: Dispute** that Galgano saw Mr. Marom in the park or before he was under arrest at

all. *See* Responses 38, 50, 58. Moreover, Galgano testified that he did not see anyone whose arrest

he later processed refusing to leave the park. Galgano Dep. 89:11-16.

57. Galgano observed Marom with his arms linked before his arrest. Ex. K, Def. Galgano's Dep.,

112:6-15.

>    **Response 57: Dispute** that Galgano saw Mr. Marom in the Park or before he was under arrest at
>
>    all *See* Response 38. Moreover, Galgano testified that he did not see anyone whose arrest he later
>
>    processed resist arrest by interlocking arms with others. Galgano Dep. 91:9-11.

58. Galgano was not asked whether he observed Marom in Zuccotti Park when he was deposed in

the Caravalho case. Ex. L, Def. Galgano's Caravalho Dep.

>    **Response 58: Dispute**. In his Caravalho deposition, Galgano testified in detail about pre-arrest
>
>    observations of the arrests he processed. Galgano testified that his conduct on the evening of
>
>    March 17, 2012, before assigning himself arrests on the MTA bus, included standing by on the
>
>    Liberty Street and then the Broadway side of the Park, during which time he did not recognize
>
>    anyone in the Park. Ps' 56.1 ¶ 71. Galgano then testified that, following warnings from Brookfield
>
>    and police to a group, he and other officers then "moved through the crowd instructing people to
>
>    exit to either side of the park," by saying to people 'Please leave the park, it's time to go, it's being
>
>    closed.' Ps' 56.1 ¶ 72. Galgano then testified that after he moved through the Park, he and the
>
>    other MSTF officers re-formed and remained on the Broadway side of the Park, while other non-
>
>    MSTF officers made arrests in the Park. Ps' 56.1 ¶ 73. Galgano then told prosecutors that he
>
>    "went on the New York City MTA bus," and he "took the first 5 prisoners that was there." Ps'
>
>    56.1 ¶¶ 82, 84. In 2014, when Galgano testified regarding his movement through the Park asking
>
>    people to leave and about what occurred on the MTA bus leading to his responsibility for five
>
>    arrestees, he did not testify that he recognized anyone when he boarded the bus. Ps' 56.1 ¶ 83.

59. Galgano specifically testified in Caravalho that in order to remember the names of his assigned

arrestees, he would need to refer to his memo book entries. Ex. L, Def. Galgano's Caravalho Dep., 48:14-49:4.

> **Response 59: Admit.** However, notwithstanding Galgano's ability to remember their names (or not), Galgano did not testify that he could not remember his interactions with them without knowing their names. In 2014, referring to a partially redacted version of his memo book entries, Galgano testified fully in *Caravalho* regarding his conduct within the Park before Plaintiffs' arrests as well as the events that occurred on the MTA bus, and he did not say that he recognized anyone (regardless of their name) on the bus. Ps' 56.1 ¶¶ 70-74, 79-84, 192, 194-195.

60. During his deposition in Caravalho, Galgano was shown a version of his memo book entries for March 17, 2012, in which Marom's name and information was entirely redacted. Id.

> **Response 60: Admit**. However, in 2014, Defendants' counsel had an un-redacted copy of that page of Galgano's memo book, and Galgano reviewed a version of the memo book page to prepare for his deposition. *See* Ps' 56.1¶¶ 79-81.

61. Galgano did not recall seeing Boyle on March 17-18, 2018. Ex. K, Def. Galgano's Dep., 18:9-20.

> **Response 61: Dispute.** Galgano testified that he could not recall *whether* he saw Boyle on March 17-18, 2018- not that he "did not recall seeing" her. *See also* Response 62.

62. Galgano is one hundred percent sure that entered all of the OLBSs reports for his five arrestees. Ex. K, Def. Galgano's Dep., 84:3-7.

> **Response 62: Dispute.** All five of Galgano's OLBS Reports state that they were "Entered By" Boyle. *See* Galgano OLBS Reports.

63. Boyle is likely listed as entering the OLBS report on the system, because he used her code to get into the OLBS system; Galgano's' password had expired. Ex. K, Def. Galgano's Dep., 83:5-8.

> **Response 63: Admit** that Galgano so theorized/guessed. *See, e.g.,* Galgano Dep. 83:5-10.

64. After Marom was released, he e-mailed individuals that he was taking the arrest on March 17,

2012. Ex. I, Pl. Marom's Dep., 52:14-19.

**Response 64: Dispute.** Mr. Marom e-mailed that "he had to take an arrest." Marom Dep. 52:14-19.

65. Marom admits that he considered himself to be taking the arrest on March 17, 2012. Ex. I, Pl. Marom's Dep., 52:20-21.

**Response 65: Admit**.

66. Marom was in custody for approximately 40 hours. Ex. C, Second Amended Comp., ¶167.

**Response 66: Admit.**

67. On his first court appearance after being arraigned, Marom accepted an ACD. Ex. C, Second Amended Comp., ¶173, Ex. G, Certificate of Disp.

**Response 67: Admit.**

<u>**Miriam Rocek**</u>

68. Rocek admits that she saw a large number of police officers enter the Park. Ex. C, Second Amended Complaint ¶132.

**Response 68**: **Admit** based upon Second Amended Complaint, ¶176.

69. Rocek admits that she was present in the Park when officers made announcements via bullhorn for the assembled crowd to leave. Ex. J, Pl. Rocek Dep., 18:7-21; Ex. D, Pl. Resp. to Req. to Admit, ¶13.

**Response 69**: **Dispute**. Ms. Rocek heard an officer wearing a white shirt say "the park is closed" several times before her arrest. Rocek Dep. 18:12-19:1, 21-22; 43:11-21; 47:15-17. Ms. Rocek heard an officer wearing a white shirt say "you have to leave" one time prior to her arrest. Rocek Dep. 19:22-23.

70. Rocek admits that, after the orders were given, she sat down. Ex. J, Pl. Rocek Dep., 50:2-6.

**Response 70**: **Admit.** Just prior to her arrest, Ms. Rocek was standing between the protesters and the police who had begun to move towards the protesters. Rocek Dep. 49:24-50:1. Ms. Rocek realized she and her medic partner were the only people standing and Ms. Rocek felt she and her partner were "creating a target of ourselves by standing when everybody else was sitting with the police so close to us, so [she] sat down." Ex. J, Pl. Rocek Dep. 34:17-18; 49:24- 50:8.

71. Rocek admits that, after the orders were given, she linked arms with other individuals. Ex. J, Pl. Rocek Dep., 50:11-15.

    **Response 71**: **Admit.** As police approached, a protester linked his arm with Ms. Rocek, and then Ms. Rocek linked arms with her medic partner, because she was afraid that she would lose her when the police reached the protesters, as the protesters ran away or police started arresting or attacking people. Rocek Dep. 50:9-19.

72. Rocek admits that officers had to pull her apart from the individuals with whom she was linked arms. Ex. J, Pl. Rocek Dep., 51:1-7, 56:11-20.

    **Response 72: Dispute.** The cited testimony does not show that officers "had to" pull Ms. Rock apart from other individuals**.** When asked, "Did the officers have to break your arms apart?" Ms. Rocek responded by explaining that police separated Ms. Rocek's arms from the people on her sides by pulling Ms. Rocek forward and pushing the other people. Rocek Dep. 51:1-8. When asked again about how she was separated from the people next to her, Ms. Rocek responded that when she was arrested, police pulled and dragged her forward – ripping her coat – and pushed others away. Rocek Dep. 56:11-20.

73. Rocek admits that after the announcements were made by police, she did not leave. Ex. J, Pl. Rocek's Dep., 48:18-20.

    **Response 73: Admit.** Ms. Rocek remained in the Park as a medic, so she wanted to stay near where the protesters were so she could help them if they were hurt, and because she believed that

the Park did not have a closing time. Rocek Dep. 48:18-49:1.

74. Rocek admits that she did not leave the Park until she was arrested and escorted out of the Park by police. Ex. D, Pl. Resp. to Req. to Admit, ¶14.

**Response 74**: **Admit.**

75. Officer Cynthia Boyle was assigned to an arrest team on March 17, 2012. Ex. N, Def. Boyle's Dep., 48:23-25.

**Response 75: Admit.**

76. Boyle directly observed each of her arrestees, including Rocek, in the Park before she made arrests. Ex. N, Def. Boyle's Dep., 60:9-12.

**Response 76: Dispute.** The Rocek OLBS Report reflects that arrestees were told by Brookfield Director Mike Larkin and Lieutenant Viviano that they would have to leave Zuccotti Park so it could be cleaned of debris, that Ms. Rocek refused to leave, that Boyle informed Ms. Rocek that she was under arrest, that Ms. Rocek resisted arrest by lying on the ground, that Ms. Rocek interlocked arms with others, and that Ms. Rocek refused to place her hands behind her back. Ps' 56.1 ¶ 144. Yet Boyle admitted that she was not within earshot of Lt. Viviano, Inspector Winski, or Mike Larkin to hear them give orders to protestors inside Zuccotti Park, and that she could not remember if she saw Ms. Rocek refuse to leave, if she informed Ms. Rocek that she was under arrest, if she saw Ms. Rocek lie on the ground, if she saw Ms. Rocek interlock her arms with others; or if she saw Ms. Rocek refusing to place her hands behind her back. Ps' 56.1 ¶¶ 48, 147-152, 184.

A reasonable jury could credit Ms. Rocek's detailed recollection of the events leading up to and after her arrest, and conclude based upon video evidence, Ms. Rocek's testimony, and the testimony of other officers that Boyle fabricated these statements in her OLBS Report that she forwarded to prosecutors, in that these statements were not based on her personal observation or

based on information provided by a fellow officer with personal knowledge—and indeed, did not reflect conduct that Ms. Rocek actually engaged in. Like Galgano, Boyle did not choose the language she used in the OLBS Report that she entered related to Ms. Rocek's arrest, or the other arrests that Boyle processed and forwarded to prosecutors. Ps' 56.1 ¶ 146. Instead, a NYPD Legal Bureau attorney instructed Boyle regarding what language to use in her OLBS Reports. Ps' 56.1 ¶¶ 114-115. Indeed, the DETAILS sections of all five OLBS Reports created by Boyle are identical to one another, and all five are identical to the Legal Bureau OLBS Narrative (ignoring incidental changes), with the exception of the words "AO observed arrestee" omitted and a slightly reworded first sentence. Ps' 56.1 ¶¶ 143-145. Further, the two sworn criminal court complaints covering the same five arrestees merely reflect the narrative in the OLBS reports. Ps' 56.1 ¶ 185.

Although Boyle testified that she put handcuffs on Ms. Rocek and physically placed Ms. Rocek under arrest, Ms. Rocek was placed under arrest by two male officers. *Compare* Ps' 56.1 ¶¶ 49, 51, 53 *with* ¶¶ 40-47. Boyle herself testified that she was involved in numerous arrests that night, and as such did not know who was hers at the time, and she would not be able to remember if she carried out Ms. Rocek in particular. Ps' 56.1 ¶¶ 40-50, 52-53. Ms. Rocek's coat was torn during her arrest, and Boyle did not tear Ms. Rocek's coat nor did she see another officer tear Ms. Rocek's coat. When Boyle was shown all three videos depicting Mr. Rocek's arrest at her deposition, Boyle could not identify herself in any video depicting Ms. Rocek's arrest, even upon multiple viewings. Ps' 56.1 ¶¶ 30-33, 57, 63. Boyle only identified herself on video of the night at points after Ms. Rocek's arrest and away from the location of Ms. Rocek's arrest. Ps' 56.1 ¶¶ 58-64. Indeed, Boyle testified that she walked each of her arrestees to the van before returning to make additional arrests, Ps' 56.1 ¶ 51 and Boyle can be seen on video just 23 seconds after Ms. Rocek's arrest, engaged in an arrest in a different location. Ps' 56.1 ¶¶ 59-60. As such, a reasonable jury could conclude that as a matter of practical physics, Boyle could not have

observed any of Ms. Rocek's pre-arrest conduct, let alone participated in her arrest. Resp. 56.1 ¶ 76.

A reasonable jury could credit Ms. Rocek's testimony that she had not engaged at all in the conduct that Boyle wrote in her OLBS Report. Although Boyle wrote that Ms. Rocek resisted arrest by lying on the ground, in truth Ms. Rocek did not lie on the ground, and at no point did Ms. Rocek resist her arrest. *Compare* Ps' 56.1 ¶ 144 *with* ¶¶ 38, 40, 44-45. Boyle wrote that Ms. Rocek refused to place her hands behind her back, while in truth Ms. Rocek complied when her arms were pulled behind her back by the male officer who actually placed her under arrest. *Compare* Ps' 56.1 ¶ 144 *with* ¶¶ 34-43, 46-47.

77. Video evidence depicts Boyle in the crowd of protesters reaching down into the crowd, physically pulling protesters apart who were sitting and locked arms:



Ex. S, YouTube Video #3, 3:34-3:46.

**Response 77: Admit** to the extent that the cited video shows Boyle around 23 seconds after Ms. Rocek's arrest, in a different location from Ms. Rocek's arrest. *NYPD Violence* 3:14-3:46; *See* Oliver Decl. Ex. 4(b), *NYPD Violence* Still, 3:20.



*Ex. 4(b) (detail)*

Additionally, when Boyle was shown all three videos depicting Mr. Rocek's arrest, Boyle could not identify herself in any of them, even after multiple viewings. Ps' 56.1 ¶¶ 56-63. Boyle only identified herself on video of the night at points after Ms. Rocek's arrest and away from the location of Ms. Rocek's arrest. Ps' 56.1 ¶¶ 86-93.

78. It took more than one officer the remove Rocek, so the arrest was a team effort including Boyle and four or five other officers. Ex. N, Def. Boyle's Dep., 18:18-25.

    **Response 78**: **Dispute** that Boyle was involved in Ms. Rocek's arrest. *See* Response 76. Additionally, in the cited testimony, Boyle guessed: "We were **probably** part of the team that had to drag her out?" and could not recall anything "in particular" about Ms. Rocek's arrest: "It was more than one officer that had to remove her so **if it was myself** and maybe four or five others I **wouldn't remember if it was her in particular** because a lot of people were carried out." Def. Boyle's Dep. 18:16-25 (emphasis added).

79. Boyle believes that she was the one in the arrest team who placed Rocek under arrest. Ex. N, Def. Boyle's Dep., 18:8-13.

    **Response 79: Dispute** that Boyle placed Ms. Rocek under arrest. Admit only that Boyle so theorized. *See* Responses 76-78.

80. Boyle transported her arrestees, including Rocek, in the same prisoner van. Ex. N, Def. Boyle's Dep., 64:9-12.

    **Response 80: Admit** that Boyle so testified.

81. Plaintiffs filed their complaint in this on March 17, 2015, on the final day for filing a suit within the statute of limitations. Ex. A, Complaint.

    **Response 81: Admit**.

82. Plaintiffs deposed Boyle nearly five years after the date of incident. Ex. N, Def. Boyle's Dep.

    **Response 82**: **Admit**.

83. Although Boyle could not recall her conversation with the ADA nearly five years after the incident, Rocek's admissions, together with video evidence, support statements made in Rocek's criminal court complaint. Ex. F, Crim. Ct. Comp.; Ex. D, Pl. Resp. to Req. to Admit; Ex. S, YouTube Video #3, 3:34-3:46.

   **Response 83**: **Dispute**, except to the extent that Boyle could not recall what she told DANY. None of the cited evidence support or prove "statements made in" the Rocek Complaint. Defendants have not pointed to any such specific statements or explained how the two seconds of video cited or any of Ms. Rocek's admissions support any such statement.

   Beyond that, when she met with DANY, according to the Rocek DA Datasheet, Boyle informed DANY that as Ms. Rocek was removed from the Park, Ms. Rocek went limp and refused to cooperate and put her hands behind her back. Ps' 56.1 ¶ 182. This is not so—Ms. Rocek voluntarily walked to a police van. Ps' 56.1 ¶ 44. Boyle then swore out an NYC Criminal Court accusatory instrument against Ms. Rocek and three co-defendants, including the same false statements about her observations from her OLBS Reports, and additional false statements: that Ms. Rocek refused to get into a police vehicle, when in fact Ms. Rocek voluntarily walked to and entered the police van; that Ms. Rocek was carried or dragged from her arrest location, when in fact she walked voluntarily from her arrest location, and that multiple officers were required to remove Ms. Rocek from the arrest location, when in fact she was escorted to the police van by one officer. *Compare* Ps' 56.1 ¶ 183 *with* ¶¶ 38, 40, 44-45.

84. Rocek was charged with one count of violation of Penal Law § 205.30 (Resisting Arrest), one count of violation of Penal Law § 195.05 (Obstruction of Governmental Administration), one count of violation of Penal Law § 240.20(6) (Disorderly Conduct) and one count of violation of Penal Law § 140.45 (Trespass). Ex. F, Crim. Ct. Comp.

   **Response 84: Admit**.

85. Rocek Rocek was in custody for approximately 22 hours. Ex. C, Second Amended Comp., ¶193.

**Response 85: Admit**.

86. Rocek accepted an ACD. Ex. H, Certificate of Disposition.

**Response 86: Admit**.

87. Boyle does not recall being with Galgano or having any interaction with Galgano on March 17-18, 2012. Ex. N, Def. Boyle's Dep., 47:12-16.

**Response 87: Dispute.** In the cited testimony, Boyle testified that she did "not particularly" remember whether Galgano was with her at the location when she was on standby. Additionally, Boyle is listed on Galgano's OLBS Reports as having entered in Galgano's OLBS Reports. Galgano OLBS Reports.

88. Galgano was not a member of Boyle's shift or platoon on March 17,2012. Ex. N, Def. Boyle's Dep., 49:13-50:5.

**Response 88: Admit** that Boyle so testified.

89. Boyle does not recall speaking with Galgano on March 17-18, 2012, or helping Galgano make any arrests on March 17, 2012. Ex. N, Def. Boyle's Dep., 71:6-8, 95:14-16.

**Response 89: Admit** that Boyle so testified.

90. Boyle may have assisted other officers in simply inputting data pertaining to their OLBS reports. Ex. N, Def. Boyle's Dep., 90:6-9.

**Response 90: Dispute** the characterization of the cited testimony as "simply" inputting data. Boyle theorized that she "may have inputted in an online booking sheet for somebody else or entered another prisoner for somebody else." Ex. N, Def. Boyle's Dep. 90:6-9. Additionally, Boyle is listed as the officer who inputted more than twenty-five OLBS Reports, including Galgano's. *See, e.g.,* Arrest Processing Summary.

91. Any OLBS can be printed with Boyle as the officer who input the OLBS information if she does not log out from the computer after use. Ex. N, Def. Boyle's Dep., 100:14-17.

**Response 91: Admit** that is theoretically possible.

## Sgt. Fior Blanco

92. Before the warnings were given, Sgt. Fior Blanco was positioned at the top of the steps leading into Zuccotti Park Ex. O, Def. Blanco's Dep., 36:6-7.

**Response 92: Admit** that Blanco so testified with respect to some – not "the" – warnings.

93. Blanco recalled hearing the warnings given to the crowd many times; they were told that the Park was closed for cleaning and if the protesters did not leave the Park they would be arrested. Ex. O, Def. Blanco's Dep., 36:4-17.

**Response 93: Dispute.** Blanco did not hear Lieutenant Viviano or any Brookfield representative give any warnings. Def. Blanco's Dep. 54:21-55:3.

94. Blanco observed police officers move in to make arrests of people who did not leave the Park. Ex. O, Def. Blanco's Dep. 36:14-16.

**Response 94: Admit**.

95. Blanco observed where every arrestee was taken from. Ex. O, Def. Blanco's Dep., 128: 10-29.

**Response 95: Dispute.** In the cited testimony, Blanco only testified that "they saw where every defendant was taken from," referring to her (incorrect) assumption that the officers she was supervising had all seen, when they were in the park, where the arrestees that they were later assigned to process were "taken from." Blanco's Dep. 128:10-25.

96. Blanco was unaware that any of the arrests on March 17, 2012, were assigned. Ex. O, Def. Blanco's Dep., 129:4-9.

**Response 96: Admit** Blanco so testified**.**

97. Blanco was surprised to learn at her deposition in Marom that any of the arrests in Caravalho were declined to prosecute; she believed that all the officers saw their arrestees. Ex. O, Def. Blanco's Dep., 127:23-14.

**Response 97: Admit** Blanco so testified as to her surprise and belief.

98. Video evidence depicts Blanco leaning over the crowd of protesters who are sitting on the ground arms interlocked trying to physically pull the protesters apart to make/assist arrests:



Ex. S, YouTube Video #5, 1:11-1:29; Ex. O, Def. Blanco's Dep., 85:6-1.

**Response 98: Dispute**. The cited video shows Blanco apparently leaning over some protesters – other than Ms. Rocek, who had already been arrested in a different location around 14 seconds earlier (0:54-0:57) – and other than Mr. Marom, who is not identified in the cited portion of this, or any other, video. *NYPD's Iron Fist*, 0:54-1:29.

99. Blanco is 100 percent sure that she did not write the details section of Galgano's or Boyle's OLBSs for Marom or Rocek. Ex. O, Def. Blanco's Dep., 116:10-18.

**Response 99: Admit** Blanco so testified.

100. Blanco played no role in providing language to include in Galgano's or Boyle's detail sections

for Marom or Rocek. Ex. O, Def. Blanco's Dep., 117:25-118:4.

**Response 100: Dispute.** Although Blanco supervised Boyle, Galgano, and other Assigned Officers in creating their arrest processing paperwork including their OLBS Reports, there is ample testimony that Blanco did not take the required steps to verify the accuracy of any of the 52 OLBS Reports she signed off on as supervisor, such as interviewing the Assigned Officers. There is also evidence that Blanco did not follow the NYPD's PG procedures, including with respect to documenting the identities and observations of "Observing Officers." P's 56.1 ¶¶ 1-14, 25-27, 96-104. Instead, record evidence shows that Blanco consulted with a NYPD Legal Bureau attorney and provided the NYPD Legal Bureau OLBS Narrative to fellow officers with instructions to copy it into their OLBS Reports, rather than verifying and ensuring that the statements in the OLBS Reports were accurate. P's 56.1 ¶¶ 102, 109, 124-125.

101. Blanco did not assist Galgano in creating his OLBS report for Marom. Ex. O, Def. Blanco's Dep., 118:16-20.

**Response 101: Dispute.** *See* Response 100; *see also* P's 56.1 ¶ 104.

102. Blanco did not assist Boyle in creating her OLBS report for Rocek. Id.

**Response 102: Dispute**. *See* Response 100.

103. Blanco verified Galgano's and Boyle's OLBS report by looking at the detail section of the arrest report to make sure it described the crimes that were committed. Ex. O, Def. Blanco's Dep., 118:21-119:5.

**Response 103: Dispute.** X *See also* Response 100.

## Legal Bureau Attorneys

104. Lt. Daniel Albano, Legal Bureau, was present on the scene in Zuccotti Park on March 17, 2012. Ex. P, Def. Albano's Dep., 9:23-10:7.

**Response 104: Admit.**

105. Albano has no recollection of having been present at the arrest processing precinct, Midtown South, on March 17-18, 2012. Ex. P, Def. Albano's Dep.,17:10-16.

    **Response 105: Dispute**. In the cited testimony, Albano testified that he **may have** been at the Midtown South Precinct on March 17th through March 18th, 2012. Albano Dep. 17:10-13.

106. When told that several arrests were declined to prosecute by the DA's office, because they could not locate an observing officer, Albano testified, "[s]omething like this would not have gotten past me." "These arrests were processed without my staff being present." Ex. P, Def. Albano's Dep., 31:4-21.

    **Response 106: Admit** that Albano so theorized.

107. Albano testified that, "where an officer claims to not have witnessed [the offense], this is something that I would have picked up on or my staff would have picked up on. This wouldn't have happened if [the NYPD Legal Bureau] processed this arrest." Ex. P, Def. Albano's Dep., 33:4-8.

    **Response 107: Admit** that Albano so theorized.

108. Based on these facts, Albano does not believe that was present at the arrest processing location, Midtown South. Ex. P, Def. Albano's Dep., 33:13-17, 37:20-23.

    **Response 108: Dispute.** There is record evidence that a NYPD Legal Bureau attorney assisted in Plaintiffs' arrest processing (either in-person at the Midtown South Precinct or over the phone), P's 56.1 ¶¶ 110-113. 123-125, and that they provided a pre-written narrative that officers were directed to include in their OLBS Reports, regardless of whether they had made the observations contained in the narrative. *See, e.g.,* Ps' 56.1 ¶¶ 114-119, 123-127, 155-156; NYPD Legal Bureau OLBS Narrative. It was NYPD practice to assign a NYPD Legal Bureau attorney to assist with Large-Scale Arrest Processing. Ps' 56.1 ¶¶ 15-24. Defendants identified

either O'Donnell or Albano as the involved Legal Bureau attorney Ps' 56.1 ¶¶ 160-164. Neither Defendant could rule himself, or the other, out. Ps' 56.1 ¶¶ 165, 170-171, 173-174, 176. Albano opined that it was likely him as he was usually the one to "vet" the arrests under such circumstances, and further because providing a boilerplate narrative was part of his regular practice Ps' 56.1 ¶¶ 175-180.

109. Kenneth O'Donnell cannot recall whether he was present at the Midtown South precinct on March 18, 2012, and moreover, does not believe that he has ever been present at mass arrest processing at the Midtown South precinct ever in his entire career. Ex. Q, Def. O'Donnell Dep., 29:18-30:14.

> **Response 109: Dispute.** *See* Response 108. Additionally, O'Donnell played the Legal Bureau attorney supervisor role many times at OWS Events and could not swear he did not do so on March 17-18, 2012. Ps' 56.1 ¶¶ 15, 166, 170-171. A reasonable jury could determine that it was O'Donnell who assisted in Plaintiffs' arrest processing.

110. Albano does not know if Det. Kenneth O'Donnell, Legal Bureau, was present at arrest processing at Midtown South on March 17-18, 2012. Ex. P, Def. Albano's Dep., 18:16-19.

> **Response 110: Admit**.

111. Galgano has no recollection of their being a member of the Legal Bureau present at the precinct where arrests were processed. Ex. K, Def. Galgano's Dep., 37:20-22.

> **Response 111: Dispute.** In 2014, Galgano testified that a member of the NYPD Legal Bureau was present at the Precinct. 2014 Galgano Dep. 56:20-57:20.

112. Galgano has no recollection of ever speaking to any member of the Legal Bureau on March 17-18, 2012. Ex. K, Def. Galgano's Dep., 29:16-25.

> **Response 112: Dispute.** In 2014, Galgano testified that he personally "conferred with a

member of the NYPD legal division" who told him "word for word what to write down." 2014 Galgano Dep. 56:20-57:20.

113. Boyle does not recall seeing anyone from the Legal Bureau at the Midtown South precinct on March 18, 2012. Ex. N, Def. Boyle's Dep., 6-10.

> **Response 113: Dispute.** Boyle testified that he believed that an NYPD Legal Bureau attorney was physically present at the Precinct during the arrest processing. P's 56.1 ¶ 110. Boyle also testified that someone from the NYPD Legal Bureau instructed officers on what language to use in the OLBS Reports. P's 56.1 ¶¶ 14-15, 149-50.

114. Blanco did not recall seeing or speaking with Albano on March 18, 2012, at the Midtown South precinct. Ex. O, Def. Blanco's Dep., 57:19-21.

> **Response 114: Dispute**. *See* Response 115.

115. Blanco does not recall receiving instructions from or having any conversation with any member of the Legal Bureau on March 18, 2012. Ex. N, Def. Boyle's Dep., 95:20-24.

> **Response 115: Dispute.** The cited testimony is to Boyle's testimony, not Blanco's. The same cite, 95:20-24, in Blanco's deposition is testimony that Blanco does not remember leaving the park. In *Caravalho*, Blanco testified an NYPD Legal Bureau attorney was working at the Midtown South Precinct the night of the incident. 2015 Blanco Dep. 61:11-24. Blanco described the role the NYPD Legal Bureau attorney played in the arrest processing on March 17-March 18, 2012 as follows: "We just confer[ed] or talk[ed] about everything that went on. We [went] over the charges." 2015 Blanco Dep. 63:19-3. In her 2017 deposition in this case, Blanco testified that she did not have a specific memory sitting in the deposition in 2017 of a meeting with an NYPD Legal Bureau attorney at the Precinct on March 17-18, 2012, Blanco's Dep. 56:25-58:7, but that "I'm pretty sure I did because that's what we did on every demonstration.

They always respond to the Precinct and give us advice." Blanco Dep. 63:10-17. When shown her 2015 deposition testimony that she saw officers she was supervising talking to an NYPD Legal Bureau attorney and that she had probably spoken with the NYPD Legal Bureau attorney more than once on March 17-March 18, 2012, Blanco testified that she could not recall those events anymore in 2017. Blanco Dep. 60:11-61:8. Additionally, Galgano testified that Blanco conferred with a NYPD Legal Bureau attorney. Ps' 56.1 ¶¶ 124-126.

Dated: Brooklyn, New York
      December 18, 2018

Gideon Orion Oliver
*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY 10007
(646) 263-3495
Gideon@gideonlaw.com

By:     /s/ _____
           Gideon Orion Oliver