UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

YOTAM MAROM and MIRIAM ROCEK,

                                Plaintiffs,

                -against-

NYPD SERGEANT FIOR BLANCO, NYPD LEGAL
BUREAU LIEUTENANT DANIEL ALBANO,
NYPD LEGAL BUREAU DETECTIVE KENNETH
O'DONNELL, NYPD OFFICER MICHAEL
GALGANO, SHIELD NO. 267, NYPD OFFICER
CYNTHIA BOYLE, SHIELD 06663,

                            Defendants.

-----------------------------------------------------------------------X

**PLAINTIFFS'
MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**


**15-CV-2017 (PKC)(SN)**


**Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion for Summary Judgment**


Gideon Orion Oliver
*Attorney for Plaintiffs*
277 Broadway, Suite 1501
New York, NY 10007
(646) 263-3495

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………i

TABLE OF AUTHORITIES……………………………………………………..iv

PRELIMINARY STATEMENT………………………………………...……………1

SOME FACTUAL BACKGROUND………………………………….…………….1

ARGUMENT. ………………………………………………………………....6

      Fair Trial Rights Principles…………………….………………………………6

I.  There is ample record evidence, including in the form of OLBS Reports, DA Datasheets, and Criminal Court Complaints, based on which a reasonable jury could determine that Galgano, Boyle, Blanco, and either Albano or O'Donnell created and forwarded false information to DANY……………….9

      a.  A reasonable jury could find based on the record evidence that Defendant Galgano fabricated information pertaining to Plaintiff Marom regarding his alleged personal observations pertaining to Plaintiff Marom in Zuccotti Park………………………………..10

      b.  A reasonable jury could find based on the record evidence that Defendant Boyle fabricated information pertaining to Plaintiff Rocek regarding her alleged personal observations pertaining to Plaintiff Rocek in Zuccotti Park………………….………………..15

      c.  A reasonable jury could find based on the record evidence that Defendant Blanco was personally involved in fabricating the false information contained in the OLBS Reports that was forwarded to prosecutors and/or ultimately incorporated into DA Datasheets and/or Criminal Court Complaints. ………………….……………18

      d.  A reasonable jury could find based on the record evidence that Defendants Albano or O'Donnell was personally involved in fabricating the false information contained in the OLBS Reports that was forwarded to prosecutors and/or ultimately incorporated into DA Datasheets and/or Criminal Court Complaints. ………19

      e.  A reasonable jury could find based on the record evidence that Defendant Galgano was personally involved in Defendant Boyle's creation of false information, and vice versa. …………………..20

II.  There is ample record evidence based on which a reasonable jury could determine that Plaintiffs Marom and Rocek suffered liberty deprivations cognizable within the meaning of fair trial rights claim jurisprudence as a

result of Defendants' creating and/or forwarding false information to
DANY………….…………….…………………………………………20

III.   This Court should reject Defendants' *Caravalho III*-based
arguments…………………………………………………………23

IV.   Defendants are not entitled to qualified immunity as a
matter of law…..……………………………………………………25

**CONCLUSION**…………..……………………………………………25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbuckle v. City of New York*,
  14 Civ. 10248 (ER), 2016 U.S. Dist. LEXIS 136857 (SDNY Sept. 30,
  2016) .................................................................................................................... 20

*Benjamin Case, et al. v. City of NY*,
  233 F.Supp.3d 372 ................................................................................................. 5, 6

*Bryant v. Serebrenik*,
  No. 15-CV-3762 (ARR)(CLP), 2016 U.S. Dist. LEXIS 149717 (EDNY
  Oct. 28, 2016) ....................................................................................................... 19

*Buie v. City of NY*,
  No. 12 CV 4390 (RJD)(CLP), 2015 US Dist LEXIS 147642 (EDNY Oct.
  30, 2015) .................................................................................................................. 6

*Caravalho v. City of N.Y., No. 13-cv-4174 (PKC)(MHD), 2016 U.S. Dist. LEXIS
  44280 (S.D.N.Y. Mar. 31, 2016) ("Caravalho I")* ............................................. passim

*Caravalho v. City of N.Y., No. 13-cv-4174, 2016 U.S. Dist. LEXIS 104120
  (S.D.N.Y. July 29, 2016) ("Caravalho II")* ...................................................... 1, 22

*Caravalho v. City of N.Y., 732 F. App'x 18 (2d Cir. 2018) (Unpublished Opinion)*
  (Unpublished Opinion) ("*Caravalho III*") .............................................. 1, 21, 22, 23

*Coggins v. Buonaro*,
  776 F.3d 108 (2nd Cir. 2015) .............................................................................. 5, 24

*Collins et al. v. City of New York*,
  295 F. Supp. 3d 350 (SDNY Mar. 29, 2018) ................................................ 19, 21, 24

*Cross v. City of Albany*,
  No. 6:16-CV-00418, 2016 U.S. Dist. LEXIS 144681 (NDNY Oct. 19,
  2016) .................................................................................................................... 19

*Davis v. City of New York*,
  373 F.Supp.2d 322 (SDNY 2005) ........................................................................ 24

*Demosthene v. City of*
  NY, No. 14-CV-816 (SJ) (VMS), 2015 US Dist LEXIS 114902 (EDNY
  June 26, 2015) ......................................................................................................... 6

*Douglas v City of N.Y.*,
  595 F. Supp. 2d 333 (SDNY 2009) ....................................................................... 20

*Dowling v. City of N.Y.*,
  No. 11-CV-4954 (NGG) (RMI), 2013 US Dist LEXIS 142108 (EDNY
  Sept. 30, 2013).............................................................................................................20

*Egan v New York City*,
  2018 US Dist. LEXIS 175510 (SDNY Oct. 10, 2018) ......................................19

*Evans v. City of N.Y.*,
  12-CV-5341 (MKB), 2015 U.S. Dist. LEXIS 37781 (E.D.N.Y. Mar. 25,
  2015)............................................................................................................................19

*Faruki v. City of New York*,
  517 Fed. Appx. 1 (2d Cir. 2013) (Summary Order) ...........................................20

*Garnett v. City of New York*, 2014 US Dist LEXIS 112440 (SDNY Apr. 4,
  2014) ("*Garnett I*") ...................................................................................... 5, 7, 23

*Garnett v. Undercover Officer C0039*, 2015 U.S. Dist. LEXIS 45232 (SDNY
  April 6, 2015) ("*Garnett II*") ...................................................................... 5, 6, 7, 22

*Garnett v. Undercover Officer C0039*, 838 F.3d 265
  (2d Cir. 2016) ("*Garnett III*").......................................................................*passim*

*Genia v. Parker*,
  No. 03-CV-0870, 2007 U.S. Dist. LEXIS 19700 (EDNY Mar. 20, 2007).........20

*Gogol v. City of N.Y.*,
  15-CV-5703 (ER), 2017 U.S. Dist. LEXIS 127187 (SDNY Aug. 10, 2017) ..............19, 20

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ................................................................................................24

*Harris v. City of New York*,
  15-cv-8456 (CM), 2017 US Dist. LEXIS 206923 (SDNY Dec. 15, 2017).........................22

*Harris v. City of New York*,
  222 F.Supp.3d 341 (SDNY 2016) ........................................................................5, 19

*Hervey v. Estes*,
  65 F.3d 784 (9th Cir. 1995) ....................................................................................24

*Jean-Laurent v. Bowman*,
  No. 12 Civ. 2954 (JAM)(LB), 2014 US Dist LEXIS 131639 ................................5

*Jocks v. Tavernier*,
  316 F.3d 128 (2d Cir.2003) ..................................................................................5, 7

*Keller v. Sobolewski,*
    No. 10-CV-5198 FB (RML), 2012 US Dist LEXIS 147395 (EDNY Oct.
    12, 2012) ..................................................................................................................... 20

*Kirk v. Metropolitan Transp. Auth.,*
    99-CV-3787, 2001 U.S. Dist. LEXIS 2786 (SDNY March 19, 2001) .................................. 20

*Levy v. City of New York,*
    935 F. Supp. 2d 575 (EDNY Mar. 29, 2013) ........................................................................ 19

*Lippay v. Christos,*
    996 F.2d 1490 (3d Cir. 1993) .............................................................................................. 24

*MacNamara v. City of N.Y.,*
    No. 04 CIV. 9216 (RJS)(JCF), 2007 US Dist LEXIS 79870 (SDNY Oct.
    30, 2007) .............................................................................................................................5, 17

*MacNamara v. City of N.Y.,*
    No. 04 CV 9216 (RJS)(JCF), 2007 WL 755401 (SDNY Mar. 14, 2007)
    (KMK) ................................................................................................................................... 17

*Macpherson v. Town of Southampton,*
    No. 07-CV-3497, 2013 U.S. Dist. LEXIS 162477 (EDNY Nov. 13, 2013)...................... 20

*Marom v. City of N.Y.,*
    No. 15-cv-2017 (PKC), 2016 U.S. Dist. LEXIS 140720 (S.D.N.Y. July 29,
    2016) ...............................................................................................................................*passim*

*Marom v. City of New York,*
    No. 15-cv-2017 (PKC), 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7,
    2016) .......................................................................................................................... 1, 21, 22

*Marom v. Esposito, 15-cv-2017 (PKC), 2017 U.S. Dist. LEXIS 60969, at \*6-7*
    *(SDNY April 21, 2017)* ...................................................................................................... 12

*Martinez v. Gayson,*
    95-CV-3788, 1998 U.S. Dist. LEXIS 12281 (EDNY June 30, 1998)................................ 20

*Monroe v. Pape,*
    365 U.S. 167 (1961) ............................................................................................................ 23

*Morse v. Fusto,*
    804 F.3d 538 (2d Cir. 2015) ............................................................................................5, 24

*Murphy v. Lynn,*
    118 F.3d 938 (2d Cir. 1997) ............................................................................................... 19

*Naim v. City of New York,*
    No. 10-CV-912, 2012 U.S. Dist. LEXIS 100009 (EDNY July 18, 2012) ...................19, 20

*Nnodimele v. Derienzo*,
   No. 13 CV 3461 (ARR)(RLM), 2016 US Dist LEXIS 9881 (EDNY Jan.
   27, 2016) ..............................................................................................................................6, 7

*Norton v. Town of Islip*,
   No. 12 Civ. 4463 (PKC), 2016 U.S. Dist. LEXIS 7004 (EDNY Jan. 21,
   2016) aff'd 678 F. App'x 17 (2d Cir. 2017)................................................................19

*Perez v Duran*,
   962 F. Supp. 2d 533 (SDNY July 3, 2013)................................................................20

*Peterec v. Hilliard*,
   12-CV-3944 (CS), 2013 US Dist LEXIS 132118 (SDNY Sept. 16, 2013).........................20

*Price v City of N.Y.*,
   15 Civ. 5871 (KPF), 2018 U.S. Dist. LEXIS 105815 (SDNY June 25,
   2018)..............................................................................................................................19

*Ricciuti v. NY City Transit Authority*,
   124 F.3d 123 (2d Cir. 1997) ..........................................................................5, 6, 7, 24

*Rohman v. N.Y. City Tr. Auth.*,
   215 F.3d 208 (2d Cir 2000) ...........................................................................................19

*Rucks v. City of NY*,
   96 F.Supp.3d 138 (SDNY 2015) .....................................................................................6

*Sassower v. White Plains*,
   992 F. Supp. 652 (SDNY 1998) ...............................................................................19, 20

*Schiller, et al. v. City of New York, et al.*,
   04 Civ. 7922 (RJS)(JCF), 2008 US Dist LEXIS 4253 (SDNY January 23,
   2008) ...............................................................................................................................6

*Shepherd v. Mayer*,
   13 CV 6142 (NG)(PK), 2018 U.S. Dist. LEXIS 16827 (EDNY Jan. 31,
   2018)................................................................................................................................23

*Singer v. Fulton Cnty. Sheriff*,
   63 F.3d 110 (2d Cir. 1995) ...........................................................................................19

*Skinner v Stone, Raskin & Israel*,
   724 F2d 264 (2d Cir. 1983) ...........................................................................................23

*Soomro v. City of NY*,
   174 F Supp 3d 806 (SDNY 2016)....................................................................................6

*Swartz v Insogna*,
   704 F.3d 105 (2d Cir. 2013) ...........................................................................................19

*Thompson v. Clark*,
 No. 14-CV-7349, 2018 U.S. Dist. LEXIS 105225 (EDNY June 11, 2018)........................19

*Williams v City of N.Y.*,
 17 Civ. 4391 (ER), 2018 U.S. Dist. LEXIS 149313 (SDNY Aug. 31,
 2018)........................................................................................................................19

*Willis v. City of N.Y.*,
 No. 12-CV-5259 (RA), 2015 U.S. Dist. LEXIS 15911 (SDNY Feb. 9,
 2015)........................................................................................................................19

*Willner v. Town of North Hempstead*,
 977 F. Supp. 182 (EDNY 1997) ...............................................................................20

*Zahrey v. Coffey*,
 221 F.3d 342 (2d Cir. 2000) ...............................................................................5, 7

*Zellner v. Summerlin*,
 494 F.3d 344 (2d Cir. 2007) ...................................................................................23

**Statutes**

42 U.S.C. § 1983.............................................................................................................5, 23

New York Criminal Procedure Law § 510.40....................................................................2

**PRELIMINARY STATEMENT.** Plaintiffs respectfully oppose Defendants' motion for summary judgment, including Defendants' Memorandum of Law (Dkt. 142) ("Defendants' MOL").[1] Plaintiffs respectfully request oral argument if it would please the Court.

**FACTUAL BACKGROUND.** This Court is well familiar with the circumstances leading up to Plaintiffs' arrests from the *Caravalho/Guest* case. *See Caravalho v. City of N.Y.,* No. 13-cv-4174 (PKC)(MHD), 2016 U.S. Dist. LEXIS 44280 (S.D.N.Y. Mar. 31, 2016) ("*Caravalho I*"), *reconsideration den'd*, 2016 U.S. Dist. LEXIS 104120 (S.D.N.Y. July 29, 2016) ("*Caravalho II*"), *aff'd*, 732 F. App'x 18, 20 (2d Cir. 2018) (Unpublished Opinion) ("*Caravalho III*").

Like the Plaintiffs in *Caravalho*, Plaintiffs Yotam Marom and Miriam Rocek were arrested at a protest in Zuccotti Park (the "Park") on March 17, 2012, the six-month anniversary of Occupy Wall Street ("OWS"). *See Marom v. City of New York,* No. 15-cv-2017 (PKC), 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) ("*Marom I*"); *Marom v. City of N.Y.,* No. 15-cv-2017 (PKC), 2016 U.S. Dist. LEXIS 140720 (S.D.N.Y. July 29, 2016) ("*Marom II*").  P's 56.1 ¶¶ 28; 65-66; Resp. 56.1 ¶¶ 7-33; 68-71, 73-74.

The *Marom* Plaintiffs concede that NYPD Officers gave orders to disperse, some of which he heard, and that Plaintiffs did not leave prior to their arrests. Resp. 56.1 ¶¶ 29-33 (Marom); Resp. 56.1 ¶¶ 69, 74 (Rocek). Like the *Caravalho* Defendants, NYPD Officers Michael Galgano and Cynthia Boyle each processed five arrests, including Plaintiffs; and made sworn statements that they witnessed Plaintiffs engage in particular conduct in the

---

[1] Plaintiffs adopt the styles of referring to documents in the November 26, 2018 Declaration of Gideon Orion Oliver ("Oliver Decl."). Plaintiffs refer to their affirmative Fed.R.Civ.P. 56.1 statement as "Ps' 56.1" and to their responsive paragraphs to Defendants' Rule 56.1 Statement as "Resp. 56.1".

Park.  Ps' 56.1 ¶¶ 144, 182-183, 220-221.

Although Defendants claim now that Defendants Galgano and Boyle saw Plaintiffs Marom and Rocek (respectively) in the Park, a reasonable jury could find, based on the record evidence, that Defendants Galgano and Boyle did not see Plaintiffs in the Park, or prior to their arrests, at all. *See* Points I (a) and (b) below; *see also, e.g.,* Resp. 56.1 ¶¶ 38, 50, 58, 76, 78, 83.

Unlike the *Caravalho* Plaintiffs, whose cases the Office of the District Attorney of New York County ("DANY") declined to prosecute because their Assigned Officers had not seen their assigned arrestees engage in any pre-arrest conduct, and because their Assigned Officers could not identify any fellow Arresting Officer or Observing Officer who had observed such conduct, Marom and Rocek were prosecuted based on allegations sworn to by  Galgano (Marom) and Boyle (Rocek) that they had observed Marom and Rocek in the Park, engaging in specific, unlawful conduct. *See, e.g.,* Marom Complaint; Rocek Complaint.

Those factual allegations regarding Galgano's and Boyle's alleged observations of Plaintiffs Marom and Rocek conflicted with their own testimony as well as other record evidence. *See generally,* Points I (a) and (b) below.

Also unlike the *Caravalho* Plaintiffs, Marom and Rocek were not only detained after their arrests.  Instead, they were also arraigned, prosecuted, released on their own recognizance ("ROR'd") pursuant to New York Criminal Procedure Law ("CPL") § 510.40, and required to remain subject to the orders and processes of the NYC Criminal Court and make multiple court appearances, facing multiple misdemeanor-level criminal charges with potential criminal penalties of up to a year in jail each before their criminal cases were eventually dismissed. *See generally* Point II below.

After Plaintiffs were arrested in the Park by Arresting Officers (not the Defendants) whose identities cannot be ascertained. Ps' 56.1 ¶¶ 2, 26, 32, 34, 55, 85.  Plaintiffs were separated from those officers. Ps' 56.1 ¶ 76. MSTF Officers under Blanco's supervision, including Galgano and Boyle, were subsequently assigned to process those arrests. Ps' 56.1 ¶¶ 25, 77, 99-103. The Large-Scale Arrest Processing photographs that were meant to be taken to keep arresting officers and their arrestees together were not taken. Ps' 56.1 ¶¶ 12-14.

At the NYPD's Midtown South Precinct, Galgano and Boyle and other officers under Blanco's supervision created OLBS Reports related to their assigned arrestees.  Ps' 56.1 ¶¶ 99-104. There is record evidence that, as part of that process, an NYPD Legal Bureau attorney provided a document also in evidence with handwritten boilerplate and instructions to copy it into the "DETAILS" section of their OLBS Reports. Ps' 56.1 ¶¶ 114-120, 123-127. Thus, regardless of what the Assigned Officers actually observed, every single OLBS report for that night included substantively the same factual allegations in the DETAILS section. Ps' 56.1 ¶¶ 120-121; Oliver Decl. ¶¶ 71-77.

At least 23 arrests that generated substantively the same OLBS Reports involved officers stating they had observed their assigned arrestees engage in unlawful conduct, when they had not. Ps' 56.1 ¶ 226. None of the OLBS Reports were based on hearsay, or other information provided to them by fellow officers who had made direct observations of Plaintiffs. Ps' 56.1 ¶ 121. This fact is particularly important because this Court opined in *Marom II* that, if discovery showed that "the substance of the statements were true and accurate, even though they were based on information given to them by other officers," *see* 2016 U.S. Dist. LEXIS 140720, at *8-9, the statements might not be considered false. The evidence shows that many OLBS Reports recorded events as though the officers filling out the OLBS Reports – the "Arresting Officers" or "A/O"s - had personally observed those

events or otherwise had personal knowledge of them, Ps' 56.1 ¶¶ 119-121, when they had not. Ps' 56.1 ¶¶ 132-142 (Galgano), ¶¶ 146-152 (Boyle), ¶¶ 153-159. The OLBS Reports not contain statements that fellow officers made or informed them about observations; or identify any such fellow officers. Ps' 56.1 ¶ 121.

Those OLBS Reports were forwarded to DANY. Ps' 56.1 ¶¶ 181 (Boyle); 190 (Galgano). Based on the statements in the OLBS Reports, Boyle and Galgano and nine other officers whom Blanco had supervised and the NYPD Legal Bureau Attorney had assisted, made further representations to DANY, which are memorialized in DA Datasheets, NYC Criminal Court Complaints, and their own testimony. Ps' 56.1 ¶¶  182-183 (Boyle); 193-201 (Galgano); Oliver Decl. Ps' 56.1 ¶ 70. These documents reflect, beat for beat, the same narrative that is contained in all 51 OLBS Reports about the officer's their personal knowledge of; observations of; and/or conduct related to Plaintiffs and other third-party arrestees.

Defendants and other officers have admitted in deposition testimony that key statements in each of these documents were not truthful. Ps' 56.1 ¶¶ 132-142, 153-159, 205-206. And there is other circumstantial evidence based on which a jury could determine that other key statements were similarly false. *See generally,* Points I (a) and (b) below.

Throughout the day on March 18, 2012, DANY wrote up NYC Criminal Court complaints charging the 51 arrestees from the incident based on the MSTF officers' OLBS Reports and other statements. Ps' 56.1 ¶¶ 219-224. That evening, however, DANY stopped prosecuting the cases, and at 11:33 p.m., DANY simultaneously declined to prosecute all 23 then-remaining cases (including the *Caravahlo* Plaintiffs' and three of Galgano's five assigned arrests). Ps' 56.1 ¶ 226.

**ARGUMENT**. **Fair Trial Rights Principles.** Deprivations of life, liberty, or property that result from a police officer's forwarding material, false information to a prosecutor violate a person's fair trial rights. *See, e.g. Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016) ("*Garnett III*"), *affirming Garnett v. Undercover Officer C0039*, 2015 U.S. Dist. LEXIS 45232 (SDNY April 6, 2015) ("*Garnett II*"); *Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015); *Jocks v. Tavernier,* 316 F.3d 128, 138 (2d Cir.2003); *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000); *and Ricciuti v. NY City Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997).

Fair trial rights violations can run afoul of several constitutional guarantees. *See, e.g., Garnett III*, 838 F.3d at n. 6 and n. 7; *see also Morse*, 804 F.3d at 547 n. 7; *Harris v. City of New York*, 222 F.Supp.3d 341, 351-52 (SDNY 2016); *Jean-Laurent v. Bowman*, No. 12 Civ. 2954 (JAM)(LB), 2014 US Dist LEXIS 131639, at *8; *8 n. 1 (EDNY Sept. 18, 2014). The bottom line is that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti,* 134 F.3d at 130; *see also Jocks*, 316 F.3d at 138.

The material, false information can be of an officer's own false account of what the officer saw or heard. *See, e.g., Garnett III*, 838 F.3d at 275; *Garnett v. City of New York*, 2014 US Dist LEXIS 112440, at *39 (SDNY Apr. 4, 2014) ("*Garnett I*"); *See also Coggins v. Buonaro*, 776 F.3d 108, 113 (2d Cir. 2015); *Marom II*, 2016 US Dist LEXIS 140720, at *7-8; [*Benjamin Case, et al. v. City of NY,* 233 F.Supp.3d 372, 388] (SDNY 2017); *see also MacNamara v. City of N.Y.,* No. 04 CIV. 9216 (RJS)(JCF), 2007 US Dist LEXIS 79870, at *8 (SDNY Oct. 30, 2007).

In this connection, notwithstanding the arguments in Defendants' MOL at pp. 7-8, the "allegedly false information must be material such that it 'would likely influence the jury

5

*if* it arrived at a jury.'" *Case,* 233 F.Supp.3d at 388-389 (emphasis in original); *Marom II,* 2016 US Dist LEXIS 140720, at *7-8; *see also Garnett II,* 2015 US Dist LEXIS 45232, at *23-24; *Ricciuti*, 134 F.3d at 127; *Rucks v. City of NY,* 96 F.Supp.3d 138, 148 (SDNY 2015); *Demosthene v. City of* NY, No. 14-CV-816 (SJ) (VMS), 2015 US Dist LEXIS 114902, at *35-36 (EDNY June 26, 2015) (citing cases), *report and recommendation adopted*, No. 14 CV 816 (SJ) (VMS), 2015 U.S. Dist. LEXIS 114655 (EDNY Aug. 28, 2015); *Case,* 233 F.Supp.3d at 388-89; *Buie v. City of NY,* No. 12 CV 4390 (RJD)(CLP), 2015 US Dist LEXIS 147642, at *25-26 (EDNY Oct. 30, 2015); *Nnodimele v. Derienzo*, No. 13 CV 3461 (ARR)(RLM), 2016 US Dist LEXIS 9881, at *36-38 (EDNY Jan. 27, 2016); and *Soomro v. City of NY*, 174 F Supp 3d 806, 815-816 (SDNY 2016).  The fabrication of false evidence and forwarding it to prosecutors works material harm as long as it results in a liberty deprivation. Through fair trial rights claims, unlike through Fourth Amendment-based malicious prosecution claims, a plaintiff may seek damages related to a broader set of harms, including harms that result when there is no liberty deprivation that rises to the level of a seizure cognizable as a Fourth Amendment violation. *See, e.g., Garnett III*, 838 F.3d at 274-80.

A trial is not a "prerequisite to such a claim." *Schiller, et al. v. City of New York, et al.,* 04 Civ. 7922 (RJS)(JCF), 2008 US Dist LEXIS 4253, at *39 (SDNY January 23, 2008), citing *Ricciuiti,* 124 F.3d at 128; *accord, Garnett II,* at *4. "The limiting factor appears to be … whether the falsification caused material harm." *Schiller,* 2008 US Dist LEXIS 4253, at *39, *citing Henry v. City of New York*, 2003 US Dist LEXIS 15699, at *12 (SDNY Sept. 8, 2003); *accord, Garnett II*, 2015 US Dist LEXIS 45232, at *12. A deprivation of liberty is such a material harm. *See, e.g.*, *Garnett III*, 838 F.3d at 277-80 (citing *Riccitui*, 134 F.3d at 130, and *Jocks*, 316 F.3d at 138).

Probable cause is not a defense to a fair trial rights claim. *Ricciuti*, 124 F.3d at 130; *see*

*also Garnett III*, 838 F.3d at 277-280; *Jocks*, 316 F.3d at 138; *Garnett II,* 2015 US Dist LEXIS 45232, at *13-14 and *16-17; *Garnett I*, 2014 US Dist LEXIS 112440, at *36-37.

A fair trial rights "claim accrues when the officer forwards the false information to the prosecutors." *Ricciuti*, 134 F.3d at 130; *Jocks*, 316 F.3d at 138; *Garnett III*, 838 F.3d at 276. "At that point, he becomes responsible for the 'harm occasioned by such an unconscionable action.'" *Nnodimele v. Derienzo*, 2016 US Dist LEXIS 9881, at *39, *quoting Ricciuti,* 124 F.3d at 130. It is "the act of forwarding false information to prosecutors itself that works an unacceptable corruption of the truth-seeking function of the trial process.'" *Nnodimele,* 2016 US Dist LEXIS 9881, at *39, *quoting Ricciuti*, 124 F.3d at 130. The "corruption of the truth-seeking function of the trial process" may and often does occur well in advance of an actual trial, and whether or not a trial occurs. *See e.g., Garnett III*, 838 F.3d at 279. As long as it was reasonably foreseeable that the deprivation of liberty would result from the forwarding of fabricated evidence, a fair trial rights claim may be brought. *See, e.g., Zahrey*, 221 F.3d at 352–54.

   **I.    There is ample record evidence, including in the form of OLBS Reports, DA Datasheets, and Criminal Court Complaints, based on which a reasonable jury could determine that Galgano, Boyle, Blanco, and either Albano or O'Donnell created and forwarded false information to DANY.**

In *Marom II*, this Court decided that Plaintiffs had plausibly pleaded fair trial rights violations against Galgano, Boyle, Blanco, and the NYPD Legal Bureau attorney who assisted in processing Plaintiffs' arrests. *See Marom II*, 2016 U.S. Dist. LEXIS 140720, at *2-12. Plaintiffs Marom and Rocek pursue only those claims. Contrary to Defendants' arguments (*see, e.g.,* Defendants' MOL at pp. 9-13), based on the record evidence, a reasonable jury could find that each Defendant was personally involved and/or failed to intervene. *See*, *e.g.*, *Marom II*, 2016 U.S. Dist. LEXIS 140720, at *9-11.

**a. A reasonable jury could find based on the record evidence that Galgano fabricated false information about Marom**

Defendant Galgano created and forwarded an OLBS Report regarding Plaintiff Marom to prosecutors, which contains factual allegations about Defendant Galgano's alleged pre-arrest observations. P's 56.1 ¶¶ 122, 190. Defendant Galgano admitted that he copied the DETAILS section of Marom's OLBS Report from a narrative provided by the NYPD Legal and that the DETAILS section of the OLBS Reports that he created contained information that was not based upon, and did not accurately reflect, his personal knowledge or conduct. P's 56.1 ¶¶ 123-127; 132-139; 141-142.

In both 2014 and 2016, Defendant Galgano testified that Lt. Viviano told him there was "some kind of a mixup" as a result of which there was a New York City MTA bus that the NYPD was using to hold prisoners who had been separated from arresting officers, that officers from the MSTF would be assigned to process those arrests, and that Defendant Galgano should go to the bus, pick out five people, and assign himself 5 arrests. P's 56.1 ¶¶ 75-78. In 2014, Defendant Galgano testified that he went onto the bus and assigned to himself the first five arrestees who he saw. P's 56.1 ¶ 82. Before his 2014 testimony, Galgano reviewed his memo book entry from March 17-18, 2012, which showed a "white male" as "Perp # 1" and Mr. Marom as the third "Perp." P's 56.1 ¶ 79-81. Defendant Galgano made no mention of having recognized any person on the bus from within Zuccotti Park. In 2016, Defendant Galgano's story changed. For the first time, he testified that he did not just pick the first five people he saw on the bus, but that he recognized one arrestee from an earlier three-second interaction with that arrestee, in which he told the arrestee to leave the Park as Defendant Galgano moved through it, and picked that person and the four next to him to assign himself to process. P's 56.1 ¶¶ 88-92.

In the Marom OLBS Report, Defendant Galgano wrote that he informed Mr. Marom that he was under arrest, when he had not. *Compare* P's 56.1 ¶¶ 128 and 133. Defendant Galgano wrote that Mr. Marom resisted arrest by lying on the ground, when Galgano did not see Marom do that, nor did Marom in fact lie on the ground. *Compare* P's 56.1 ¶¶ 108 and 134. A number of officers aggressively tore Mr. Marom from other people he had linked arms with while he was sitting. P's 56.1 ¶ 67. Although Mr. Marom initially refused to get up and walk on his own after being arrested, he complied when an officer kicked at Mr. Marom, and told him to get up and walk. Resp. 56.1 ¶ 35.

Defendant Galgano also wrote that Mr. Marom interlocked arms with others, when he admits he did not see that. *Compare* P's 56.1 ¶¶ 128 and 136. Defendant Galgano further wrote that Mr. Marom refused to place his hands behind his back, which he admits he did not see. *Compare* P's 56.1 ¶¶ 128 and 137. Defendant Galgano also reported that he used force when arresting Mr. Marom, when admits he did not. *Compare* P's 56.1 ¶¶ 131 and 132. Defendant Galgano repeatedly admitted that the Marom OLBS contains false statements. P's 56.1 ¶¶ 132-139. Asked why he signed an OLBS Report containing false statements, Defendant Galgano testified that he was just following orders from his supervisors P's 56.1 ¶¶ 141-142 and had inputted into the OLBS Report the exact Legal Bureau OLBS Narrative handed to him by Defendant Blanco. P's 56.1 ¶¶ 132-127. In fact, the "DETAILS" sections of all five of the OLBS Reports created by Defendant Galgano are substantively the same as to the Legal Bureau OLBS Narrative. Galgano OLBS Reports; Galgano Dep. 87:1-88:2; Legal Bureau OLBS Narrative. P's 56.1 ¶ 126.

When he met with DANY, according to the Marom DA Datasheet, Defendant Galgano informed them that he observed Mr. Marom and Mr. Marom's co-defendant not leaving the Park, link arms with others and refuse to leave the Park. P's 56.1 ¶ 193. These

9

statements, made to prosecutors, are necessarily false even if a jury credits either of Defendant Galgano's 2014 testimony (that he did not witness anyone's pre-arrest conduct) or his 2016 testimony (that his only pre-arrest observation of any arrestee was an alleged three-second encounter with one person in the Park). P's 56.1 ¶¶ 82, 84, 88-92.

Contrary to his testimony — and to what Defendants assert is an uncontested fact — Defendant Galgano swore out an NYC Criminal Court accusatory instrument against Mr. Marom and a co-defendant, alleging that he:

- observed Marom and a co-defendant inside said park;

- observed Marom and a co-defendant refuse to leave;

- observed Marom and a co-defendant sit down on the ground;

- observed Marom and a co-defendant interlock their arms with several separately charged defendants; and

- observed Marom and a co-defendant refuse to place their hands behinds their backs. P's 56.1 ¶¶ 201-202.

Defendant Galgano has specifically admitted that each of these statements, all made under penalty of perjury, are false. P's 56.1 ¶ 205.

Beyond that, in 2014, Defendant Galgano testified that he told prosecutors that he selected his arrestees by picking the first five he saw on the MTA bus, as a result of which the DANY declined to prosecute all five of his arrestees. P's 56.1 ¶¶ 195-196. In 2016, Defendant Galgano testified that he told a prosecutor that he had recognized only one of his four arrestees, as a result of which DANY declined to prosecute his other four arrestees. P's 56.1 ¶¶ 197-200. Neither version is correct: in truth, DANY declined to prosecute only three of Defendant Galgano's arrestees and initiated prosecutions against **two** of Defendant Galgano's arrestees. P's 56.1 ¶ 202. DANY declined to prosecute these three out of five

Defendant Galgano arrestees because Defendant Galgano did not observe and was unable to say which of his fellow officers observed, his arrestees prior to their arrests. P's 56.1 ¶ 140. This is the exact same explanation they provided while simultaneously declining to prosecute the other 23-then-remaining arrests at 11:33 p.m. on March 18, 2018. P's 56.1 ¶ 226.

Reviewing the accusatory instrument he swore out against two persons, Defendant Galgano could not account for the discrepancies between his previously emphatic testimony that he had only observed one person among the five he assigned himself to process the arrests of within Zuccotti Park prior to their arrests and the sworn allegations in the accusatory instrument that he had observed both Mr. Marom and another arrestee engage in identical conduct within Zuccotti Park. P's 56.1 ¶ 203. Neither could he provide any basis for distinguishing between Mr. Marom and the other person identified in the accusatory instrument beyond the fact that Mr. Marom, and not the other person, was suing him. P's 56.1 ¶ 95.

Thus, a reasonable jury could credit Mr. Marom's version of events over Defendant Galgano's. Further, a reasonable jury could determine that Defendant Galgano's 2014 testimony that he did not see any of his arrestees before their arrests, is the true and accurate version of the events at issue- especially as the 2014 testimony was closer in time to the events, and was not clouded by Defendant Galgano's knowledge that he was defending himself in a lawsuit brought by Plaintiff Marom. P's 56.1 ¶¶ 70, 94. Even crediting Defendant Galgano's 2016 testimony that he saw Mr. Marom at some point in the Park on March 17, 2012, Defendant Galgano admits that he did not witness, and was not informed of by another officer, any of the other conduct that Defendant Galgano told prosecutors that he did indeed witness regarding Mr. Marom's pre-arrest and arrest conduct. P's 56.1 ¶¶ 130, 205-206. This admission alone could be credited by a reasonable jury as a free-standing

basis for a verdict in favor of Plaintiffs.

Additionally, third-party arrest processing documentation, including OLBS Reports, are relevant to whether "the non-party arrestees were 'detained on the basis of identically worded allegations and whether the charging documents were signed by officers or supervisors who had no knowledge of the facts pertinent to the charges.'" Dkt. 86 (11/30/16 Order from Hon. Netburn) at p. 4, quoting *Haus v. City of NY*, No. 03-CV-4915 (RWS)(MHD), 2006 US Dist LEXIS 23006, at *4-5 (SDNY Apr. 24, 2006). "[I]dentically worded allegations for non-party arrestees may suggest to the finder of fact that the defendants did not personally observe plaintiffs' conduct as required by NYPD protocol and/or instructed other officers to fill out such reports without having personally observed similarly-situated non-party arrestees' conduct." *Id.* at pp. 4-5; *aff'd*, *Marom v. Esposito*, 15-cv-2017 (PKC), 2017 U.S. Dist. LEXIS 60969, at *6-7 (SDNY April 21, 2017).

All of the 51 relevant OLBS Reports are substantively identical to each other and to the Legal Bureau OLBS Narrative that Defendant Galgano and Officer Valentine testified they were given during their arrest processing. P's 56.1 ¶¶ 116-121, 132-127; Oliver Decl. ¶¶ 71-77. Similarly, all criminal court complaints that came out of the relevant 51 arrests contain the same allegations about officer's alleged observations of pre- and post-arrest conduct. Oliver Decl. ¶ 71. Based upon the almost identically worded allegations in the OLBS Reports and criminal court complaints, and several officers' admissions that they knowingly included inaccurate information in their OLBS reports, a jury could determine that most or all these documents contained inaccurate information.

Moreover, a jury looking at the timeline of when Criminal Complaints were sworn to and when arrests were declined to prosecute on March 17-18, 2012 could determine that after a certain point in the day, DANY realized that at least many of the assigned officers

12

who swore out the OLBS Reports had not in fact seen the underlying conduct. Oliver Decl.

¶¶ 22, 71. All of the Complaints that were prosecuted were sworn between 2:50 p.m. and

11:16 p.m. on March 18, 2012. Pl's 56.1 ¶ ¶ 219-224. Defendant Boyle's five Complaints

were all sworn out between 2:50 p.m. and 3:45 p.m. on March 18, 2012, P's 56.1 ¶ 220 while

Defendant Galgano signed the Marom Complaint, charging Mr. Marom and a co-defendant,

at approximately 7:28 p.m. on March 18, 2012. P's 56.1 ¶ 221. After signing the Marom

Complaint, Defendant Galgano waited at DANY's office for several more hours while they

decided what they were going to do "about this." Pl's 56.1 ¶ 222.  After this "meeting among

the DAs," at 11:33 p.m., DANY declined prosecution on all remaining uncharged arrestees,

including Defendant Galgano's three remaining cases.

A jury looking at this timing and considering Defendant Galgano's, Defendant

Boyle's, and non-party officers' testimony about their interactions with DANY, , could

determine that at approximately 11:33 p.m., after a number of hours speaking to police and

having them each repeat an identical story, DANY realized that no officers had any personal

knowledge about the circumstances of any arrests, nor had officers been informed of the

arrestees' conduct by other officers, and DANY declined to process all the arrests that

remained after making that realization.

> **b. A reasonable jury could find based on the record evidence that Boyle fabricated false information about Rocek**

The Rocek OLBS Report reflects that arrestees were told by Brookfield Director

Mike Larkin and Lieutenant Viviano that they would have to leave Zuccotti Park so it could

be cleaned of debris, that Ms. Rocek refused to leave, that Defendant Boyle informed Ms.

Rocek that she was under arrest, that Ms. Rocek resisted arrest by lying on the ground, that

Ms. Rocek interlocked arms with others, and that Ms. Rocek refused to place her hands

behind her back. Ps' 56.1 ¶ 144. Yet Defendant Boyle admitted that she was not within

13

earshot of Lt. Viviano, Inspector Winski, or Mike Larkin to hear them give orders to protestors inside Zuccotti Park, and that she could not remember if she saw Ms. Rocek refuse to leave, if she informed Ms. Rocek that she was under arrest, if she saw Ms. Rocek lie on the ground, if she saw Ms. Rocek interlock her arms with others; or if she saw Ms. Rocek refusing to place her hands behind her back. Ps' 56.1 ¶¶ 48, 147-152, 184.

A reasonable jury could credit Ms. Rocek's detailed recollection of the events leading up to and after her arrest, and conclude based upon video evidence, Ms. Rocek's testimony, and the testimony of other officers that Boyle fabricated these statements in her OLBS Report that she forwarded to prosecutors, in that these statements were not based on her personal observation or based on information provided by a fellow officer with personal knowledge—and indeed, did not reflect conduct that Ms. Rocek actually engaged in.  Like Defendant Glagano, Defendant Boyle did not choose the language she used in the OLBS Report that she entered related to Ms. Rocek's arrest, or the other arrests that Defendant Boyle processed and forwarded to prosecutors. Ps' 56.1 ¶ 146. Instead, a NYPD Legal Bureau attorney instructed Defendant Boyle regarding what language to use in her OLBS Reports. Ps' 56.1 ¶¶ 114-115. Indeed, the DETAILS sections of all five OLBS Reports created by Boyle are identical to one another, and all five are identical to the Legal Bureau OLBS Narrative (ignoring incidental changes), with the exception of the words "AO observed arrestee" omitted and a slightly reworded first sentence. Ps' 56.1 ¶¶ 143-145. Further, the two sworn criminal court complaints covering the same five arrestees merely reflect the narrative in the OLBS reports. Ps' 56.1 ¶ 185.

Although Boyle testified that she put handcuffs on Ms. Rocek and physically placed Ms Rocek under arrest, Ms. Rocek was placed under arrest by two male officers. Compare Ps' 56.1 ¶¶ 49, 51, 53 with ¶¶ 40-47. Boyle herself testified that she was involved in

numerous arrests that night, and as such did not know who was hers at the time, and she

would not be able to remember if she carried out Ms. Rocek in particular. Ps' 56.1 ¶¶ 40-50,

52-53. Ms. Rocek's coat was torn during her arrest, and Boyle did not tear Ms. Rocek's coat

nor did she see another officer tear Ms. Rocek's coat. When Boyle was shown all three

videos depicting Mr. Rocek's arrest at her deposition, Boyle could not identify herself in any

video depicting Ms. Rocek's arrest, even upon multiple viewings. Ps' 56.1 ¶¶ 30-33, 57, 63.

Boyle only identified herself on video of the night at points after Ms. Rocek's arrest and

away from the location of Ms. Rocek's arrest. Ps' 56.1 ¶¶ 58-64. Indeed, Boyle testified that

she walked each of her arrestees to the van before returning to make additional arrests, Ps'

56.1 ¶ 51 and Boyle can be seen on video just 23 seconds after Ms. Rocek's arrest, engaged

in an arrest in a different location. Ps' 56.1 ¶¶ 59-60. As such, a reasonable jury could

conclude that as a matter of practical physics, Boyle could not have observed any of Ms.

Rocek's pre-arrest conduct, let alone participated in her arrest. Resp. 56.1 ¶ 76.

A reasonable jury could credit Ms. Rocek's testimony that she had not engaged at all

in the conduct that Boyle wrote in her OLBS Report. Although Boyle wrote that Ms. Rocek

resisted arrest by lying on the ground, in truth Ms. Rocek did not lie on the ground, and at

no point did Ms. Rocek resist her arrest. *Compare* Ps' 56.1 ¶ 144 with ¶¶ 38, 40, 44-45. Boyle

wrote that Ms. Rocek refused to place her hands behind her back, while in truth Ms. Rocek

complied when her arms were pulled behind her back by the male officer who actually

placed her under arrest. *Compare* Ps' 56.1 ¶ 144 with ¶¶ 34-43, 46-47.

Further, when she met with DANY, according to the Rocek DA Datasheet, Boyle

informed DANY that as Ms. Rocek was removed from the Park, Ms. Rocek went limp and

refused to cooperate and put her hands behind her back. Ps' 56.1 ¶ 182. This is not so—Ms.

Rocek voluntarily walked to a police van. Ps' 56.1 ¶ 44. Boyle then swore out an NYC

Criminal Court accusatory instrument against Ms. Rocek and three co-defendants, including the same false statements about her observations from her OLBS Reports, and additional false statements: that Ms. Rocek refused to get into a police vehicle, when in fact Ms. Rocek voluntarily walked to and entered the police van; that Ms. Rocek was carried or dragged from her arrest location, when in fact she walked voluntarily from her arrest location, and that multiple officers were required to remove Ms. Rocek from the arrest location, when in fact she was escorted to the police van by one officer. *Compare* Ps' 56.1 ¶ 183 with ¶¶ 38, 40, 44-45.

### c. A reasonable jury could find based on the record evidence that Blanco was personally involved in fabricating false information about Plaintiffs that was forwarded to prosecutors

Although Blanco supervised Boyle, Galgano, and other Assigned officers, there is ample testimony that Blanco did not take the required steps to verify the accuracy of any of the 52 OLBS Reports she signed off on as supervisor, such as interviewing the Assigned Officers. There is also evidence that Blanco did not follow the NYPD's PG procedures, including with respect to documenting the identities and observations of "Observing Officers." P's 56.1 ¶¶ 1-14, 25-27, 96-104. Instead, record evidence shows that Blanco consulted with a NYPD Legal Bureau attorney and provided the NYPD Legal Bureau OLBS Narrative to fellow officers with instructions to copy it into their OLBS Reports, rather than verifying and ensuring that the statements in the OLBS Reports were accurate. P's 56.1 ¶¶ 102, 109, 124-125. Despite Defendants' arguments to the contrary at pp. 9-10 of Defendants' MOL, there is ample record evidence based on which a reasonable jury could find that Blanco personally participated in, or failed to intervene to prevent, violating Plaintiffs' fair trial rights

**d. A reasonable jury could find based on the record evidence that Albano or O'Donnell was personally involved in fabricating the false information about Plaintiffs that was forwarded to prosecutors**

To the extent that Defendants claim that it does not matter what the contents of the communications that Defendants had with the NYPD Legal Bureau attorney were because those communications would have been privileged, there is record evidence regarding the substance of some of those communications, in the first instance; See, e.g., Ps' 56.1 ¶¶ 114-119, 123-125; and second, the privilege would not apply were the NYPD Legal Bureau attorney to instruct the officer to include false statements in a record that is intended to be forwarded to prosecutors. *See, e.g.,* Dkt. No. 81 at p. 4 n. 9 (citing *Schiller*, 2008 US Dist LEXIS 4253); *see also MacNamara v. City of N.Y.*, No. 04 CV 9216 (RJS)(JCF), 2007 WL 755401, at *8 (SDNY Mar. 14, 2007) (KMK); *MacNamara*, 2007 WL 3196295, at *1-2 (SDNY Oct. 30, 2007).

It was NYPD practice to assign a NYPD Legal Bureau attorney to assist with Large-Scale Arrest Processing. Ps' 56.1 ¶¶ 15-24. Defendants' identified either O'Donnell or Albano as the involved Legal Bureau attorney Ps' 56.1 ¶¶ 160-164. Neither Defendant could rule himself, or the other, out. Ps' 56.1 ¶¶ 165, 170-171, 173-174, 176. O'Donnell played the Legal Bureau attorney supervisor role many times at OWS Events and could not swear he did not do so on March 17-18, 2012. Ps' 56.1 ¶¶ 15, 166, 170-171. Albano opined that it was likely him as he was usually the one to "vet" the arrests under such circumstances, and further because providing a boilerplate narrative was part of his regular practice Ps' 56.1 ¶¶ 175-180. Despite Defendants' arguments to the contrary at pp. 10-12 of Defendants' MOL, there is record evidence that a NYPD Legal Bureau attorney assisted in Plaintiffs' arrest processing (either in-person at the Midtown South Precinct or over the phone), P's 56.1 ¶¶ 110-113, 123-125, and that they provided a pre-written narrative that officers were directed

17

to include in their OLBS Reports, regardless of whether they had made the observations contained in the narrative. *See, e.g.,* Ps' 56.1 114-119, 123-127, 155-156; NYPD Legal Bureau OLBS Narrative.

> **e. A reasonable jury could find based on the record evidence that Galgano and Boyle were each personally involved in the others' creation of false information about Plaintiffs, that was forwarded to prosecutors.**

Finally in this connection, a reasonable jury could find that Galgano was sufficiently personally involved (or failed to intervene to prevent) in Boyle's creating and forwarding false information about Plaintiff Rocek to prosecutors, and vice versa. Boyle's name appears as having entered the information into Galgano's OLBS Reports. Galgano OLBS Reports. And a reasonable jury could also find, each officer responsible for the others' misconduct in this case, based on the testimony that officers, supervised by Blanco, and with the assistance of a NYPD Legal Bureau attorney, including Galgano and Boyle, met with each other and their fellow officers and collectively participated in inputting the same, in many cases false, narrative into their OLBS Reports.

> **II. There is ample record evidence based on which a reasonable jury could determine that Plaintiffs Marom and Rocek suffered liberty deprivations cognizable within the meaning of fair trial rights claim jurisprudence as a result of Defendants' creating and/or forwarding false information to DANY.**

As a result of Galgano's statements in the Marom OLBS, the Marom DA Datasheet, and the Marom Complaint, Marom was detained for approximately 40 hours; charged with two violations (Trespass and Disorderly Conduct) as well as two misdemeanors based on his alleged physical resistance to Galgano (Resisting Arrest and Obstruction of Governmental Administration in the Second Degree ("OGA")); Ps' 56.1 ¶ 207; ROR'd at arraignment and required to appear one additional time before he ultimately accepted an Adjournment in Contemplation of Dismissal ("ACD") that led to the ultimate resolution of this case. Ps' 56.1 ¶¶ 208-211.

As a result of Boyle's statements in the Rocek OLBS, the Rocek DA Datasheet, and the Rocek Complaint, Rocek was detained for around 22 hours; Resp. 56.1 ¶ 85; faced the same charges as did Marom; Ps' 56.1 ¶¶ 185; was ROR'd at arraignment and required to appear in court five additional times before accepting an ACD that led to the ultimate resolution of this case. Ps' 56.1 ¶¶ 186-189.

Being ROR'd pursuant to CPL § 510.40 alone is a sufficient deprivation for either a fair trial right or a malicious prosecution claim.[2] Additionally, the requirement to attend one or more post-arraignment appearances, whether or not combined with other deprivations, amounts to a sufficient deprivation of liberty for both malicious prosecution and fair trial rights purposes.[3]

---

[2] *See, e.g., Swartz v Insogna*, 704 F.3d 105, 112 (2d Cir. 2013); *Rohman v. N.Y. City Tr. Auth.*, 215 F.3d 208, 216 (2d Cir 2000); *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995); *Price v City of N.Y.*, 15 Civ. 5871 (KPF), 2018 U.S. Dist. LEXIS 105815, at *21-22 (SDNY June 25, 2018); *Gogol v. City of N.Y.*, 15-CV-5703 (ER), 2017 U.S. Dist. LEXIS 127187, at *34 (SDNY Aug. 10, 2017); *Evans v. City of N.Y.*, 12-CV-5341 (MKB), 2015 U.S. Dist. LEXIS 37781, at *18 (E.D.N.Y. Mar. 25, 2015); *Levy v. City of New York*, 935 F. Supp. 2d 575, 589 (EDNY Mar. 29, 2013); *Naim v. City of New York*, No. 10-CV-912, 2012 U.S. Dist. LEXIS 100009, at *3 (EDNY July 18, 2012); *Sassower v. White Plains*, 992 F. Supp. 652, 656 (SDNY 1998)

[3] *See, e.g., Swartz*, 704 F.3d at 112; *see also Rohman v NY City Tr. Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (ROR and five appearances); *Singer*, 63 F.3d at 117 (2d Cir. 1995); *Egan v New York City*, 2018 US Dist. LEXIS 175510, at *51-52 (SDNY Oct. 10, 2018) (ROR and three post arraignment appearances); *Williams v City of N.Y.*, 17 Civ. 4391 (ER), 2018 U.S. Dist. LEXIS 149313, at *12 (SDNY Aug. 31, 2018) (three court appearances); *Price*, 2018 U.S. Dist. LEXIS 105815, at *20 (ROR and two appearances); *Thompson v. Clark*, No. 14-CV-7349, 2018 U.S. Dist. LEXIS 105225, at *38 (EDNY June 11, 2018) (two days in jail and "several" court appearances); *Collins et al. v. City of New York*, 295 F. Supp. 3d 350, 371 (SDNY Mar. 29, 2018) ("Spending a number of hours in jail has been found to constitute a sufficient deprivation of liberty, as has the obligation to attend numerous follow-up court appearances"); *Gogol*, 2017 U.S. Dist. LEXIS 127187, at *34 (ROR and one appearance); *Harris*, 222 F. Supp. 3d at 351-352 (two-hour detention followed by Desk Appearance Ticket); *Bryant v. Serebrenik*, No. 15-CV-3762 (ARR)(CLP), 2016 U.S. Dist. LEXIS 149717, at *19 (EDNY Oct. 28, 2016) (ACD at arraignment); *Cross v. City of Albany*, No. 6:16-CV-00418 (LEK/TWD), 2016 U.S. Dist. LEXIS 144681, at *17-18 (NDNY Oct. 19, 2016) (appearance in court post arraignment); *Norton v. Town of Islip*, No. 12 Civ. 4463 (PKC), 2016 U.S. Dist. LEXIS 7004, at *13 (EDNY Jan. 21, 2016) aff'd 678 F. App'x 17 (2d Cir. 2017) ("at least one" post-arraignment appearance); *Evans*, 2015 U.S. Dist. LEXIS 37781, at *13-24; *Willis v.*

At pp. 8-9 of Defendants' MOL, Defendants cite only to Plaintiffs' own admissions – made in the context of this litigation years after their arrests and prosecutions—to support their assertion about the "existence" of "independent probable cause" to prosecute at the time of Plaintiffs' arrests and prosecutions. That argument misses the proper focus of the liberty deprivation prong of a fair trial rights claim, which is whether Defendants' forwarding material, false information to prosecutors caused a liberty deprivation. In this case, Plaintiffs' alleged admissions did not support, and cannot have supported, their prosecutions. Defendants' reliance at p. 9 of Defendants' MOL on *Faruki v. City of New York*, 517 Fed. Appx. 1, 2 (2d Cir. 2013) (Summary Order) and *Arbuckle v. City of New York*, 14 Civ. 10248 (ER), 2016 U.S. Dist. LEXIS 136857 (SDNY Sept. 30, 2016) are misplaced. *Faruki*, a Summary Order, pre-dates *Swartz v. Ignosta*, and other relevant precedent, cited above. And Judge Ramos essentially overruled the holding Defendants cite from *Arbuckle* in *Gogol*, also cited above.

Contrary to Defendants' arguments there is ample record evidence based on which a reasonable jury could determine that Marom and Rocek in fact suffered liberty deprivations cognizable within the meaning of fair trial rights claim jurisprudence, including liberty

---

*City of N.Y.*, No. 12-CV-5259 (RA), 2015 U.S. Dist. LEXIS 15911, at *22, n. 9 (SDNY Feb. 9, 2015) (one post-arraignment hearing); *Macpherson v. Town of Southampton*, No. 07-CV-3497, 2013 U.S. Dist. LEXIS 162477, at *16 (EDNY Nov. 13, 2013); *Dowling v. City of N.Y.*, No. 11-CV-4954 (NGG) (RMI), 2013 US Dist LEXIS 142108, at *19 (EDNY Sept. 30, 2013) ("twenty-four hours in jail" and ACD); *Peterec v. Hilliard*, 12-CV-3944 (CS), 2013 US Dist LEXIS 132118, at *33 (SDNY Sept. 16, 2013) (one appearance, no bail, and no travel restrictions); *Perez v Duran*, 962 F. Supp. 2d 533, 543 (SDNY July 3, 2013) (ROR and two post-arraignment hearings); *Keller v. Sobolewski*, No. 10-CV-5198 FB (RML), 2012 US Dist LEXIS 147395, at *13-14 (EDNY Oct. 12, 2012) (arrest and 35-hour detention); Naim, 2012 U.S. Dist. LEXIS 100009, at *3 (only ROR); *Douglas v City of N.Y.*, 595 F. Supp. 2d 333, 348 (SDNY 2009) (five or six appearances); *Genia v. Parker*, No. 03-CV-0870, 2007 U.S. Dist. LEXIS 19700 (EDNY Mar. 20, 2007) (ROR and five court appearances); *Kirk v. Metropolitan Transp. Auth.*, 99-CV-3787, 2001 U.S. Dist. LEXIS 2786, *46 (SDNY March 19, 2001) (three appearances); *Sassower*, 992 F. Supp. at 656 (three appearances); *Martinez v. Gayson*, 95-CV-3788, 1998 U.S. Dist. LEXIS 12281, at *9 (EDNY June 30, 1998); *and Willner v. Town of North Hempstead*, 977 F. Supp. 182, 189 (EDNY 1997) (ROR and eight appearances).

20

deprivations beyond their arrests and pre-arraignment detentions by police, including in the form of Plaintiffs' facing criminal prosecutions for multiple charges, including criminal (i.e., non-violation level) charges, rather than one or even several violation-level charges; Plaintiffs' being required to appear for arraignment to face those charges; Plaintiffs' being ROR'd at arraignment (and therefore required to remain subject to the Court's orders and processes) to contest the charges; and Plaintiffs' being required to appear between one (Marom) and five (Rocek) additional times after arraignment, before the prosecutions were eventually resolved with dismissals. *See, e.g., Collins, et al. v. City of NY, et al.,* 295 F Supp.3d at 372-73, 375-76 (SDNY 2018).

For example, Marom and Rocek both faced charges, based on sworn allegations from Galgano and Boyle, for not only violation-level, non-criminal offenses but also criminal misdemeanor offenses for alleged intentional and physical resistance to leaving the Park and to police, which Galgano and Boyle did not observe. *See* Marom Complaint; Rocek Complaint. DANY's decisions to bring misdemeanor-level criminal charges against Plaintiffs were clearly "charging determinations" that were "adversely informed" by the false allegations about Galgano's and Boyle's purported observations of and interactions with Plaintiffs. A reasonable jury could find that Plaintiffs returned to fight the misdemeanor-level charges, the only basis for which was the false statements about Galgano and Boyle's purported observations of Plaintiffs.

### III.   This Court should reject Defendants' *Caravalho III*-based arguments.

Unlike the *Caravalho* Plaintiffs, whose detentions did not last until any arraignment because they were not prosecuted, the *Marom* Plaintiffs were prosecuted, arraigned, and

faced post-arraignment liberty restrictions.[4] "Damages for a false arrest claim 'cover the time
of detention up until issuance of process or arraignment,' …not just the initial seizure."
*Marom I,* 2016 US Dist. LEXIS 28466, at \*52, n 5 (internal citation omitted). "[A]n
arraignment is a 'further deprivation' only because it stems from a prosecutor's decision to
proceed with a case against a defendant, based on information provided by law
enforcement." *Harris v. City of New York,* 15-cv-8456 (CM), 2017 US Dist. LEXIS 206923, at
\*25 (SDNY Dec. 15, 2017). "Therefore," in a fabrication of evidence-based due process
claim, a Plaintiff must prove that "the fabrication … caused some further deprivation
beyond the deprivation wholly attributable to his unlawful arrest" by police. *Harris,* 2017 US
Dist. LEXIS 206923, at \*23-24, quoting *Ganek v. Leibowitz,* 874 F.3d 73, 91 (2d Cir. 2017)
(quotation marks omitted). "For example, fabricated evidence may cause a further
deprivation if it adversely informs a prosecutor's charging and bail determinations." *Id.* at
\*24, quoting *Ganek,* 874 F.3d at 91, citing *Garnett II,* 838 F.3d at 277.

In *Caravalho,* the Plaintiffs were released without prosecution, having suffered only
arrests and pre-arraignment police detentions caused by those arrests. *See generally Caravalho I,*
2016 US Dist. LEXIS 44280, at \*44-47; *Caravalho II,* 2016 US Dist. LEXIS 104120, at \*3-7.
None of the potential liberty deprivations associated with prosecutorial charging decisions,
ROR, or required court appearances were even potentially in play. The Second Circuit held
that entire time period of pre-arraignment detention was caused by the *Caravalho* Plaintiffs'
privileged arrests, and relatedly that the *Caravalho* Plaintiffs had "failed to adduce any
evidence demonstrating that they were detained *as a result of* the allegedly fabricated arrest

---

[4]  In fact, at the end of oral argument in connection with *Caravalho III,* the Court half-
jokingly opined that counsel should have sued on behalf of arrestees who, unlike the
*Caravalho* Plaintiffs, had been prosecuted, implying they would have had fair trial rights
claims. *See* http://www.ca2.uscourts.gov/decisions/isysquery/0c1825b8-cfc7-4798-bdee-
b04225847504/431/doc/17-1944.mp3  (in the last 10 seconds, "Go find that Plaintiff!").

paperwork, rather than their arrest for disorderly conduct." *Caravalho III,* 2018 U.S. App. LEXIS 10785, at *9 (emphasis added), *citing Ganek*, 874 F.3d at 91.

In contrast, where a Plaintiff's arrest is privileged, and the Plaintiff suffers additional post-arrest liberty deprivations, such as facing criminal charges brought by a prosecutor based on false statements, requiring travel restrictions associated with a Plaintiff's ROR and/or court appearances, the Plaintiff may pursue a fair trial rights claim based on those "further" liberty deprivations. To the extent that the fabricated evidence may have influenced prosecutorial decisions (including charging decisions such as whether to prosecute and what charges to levy), any "further" deprivation of liberty beyond the police detention arising from a privileged arrest suffices to support the claim. *Garnett III*, 838 F.3d at 277 (the falsified information need not be the "only" reason the plaintiff suffered a deprivation of liberty); *see also, Garnett I,* 2015 US Dist. LEXIS 45232, at *17-18; *Shepherd v. Mayer*, 13 CV 6142 (NG)(PK), 2018 U.S. Dist. LEXIS 16827, at *12-14 (EDNY Jan. 31, 2018). Common law tort principles – incorporated into analysis of Section 1983 claims under *Monroe v. Pape*, 365 U.S. 167, 187 (1961) – recognize that an injury may be attributed to multiple causes. *Skinner v Stone, Raskin & Israel*, 724 F2d 264, 266 (2d Cir. 1983).

**IV.    Defendants are not entitled to qualified immunity as a matter of law.**

To the extent there are genuine questions of fact relevant to any ultimate qualified immunity determination, those questions of fact are for a jury to resolve, and summary judgment on qualified immunity grounds as a matter of law is not appropriate. *See Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir. 2007) (citing cases). Additionally, government officials who take official actions with malicious intent to cause deprivations of constitutional rights or injury, or who falsify evidence and engage in similar, related dishonest practices, cannot enjoy qualified immunity. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982); *Garnett III,*

23

838 F.3d at 265-6; *Morse*, 804 F.3d at 541, 546-50; *Coggins,* 776 F.3d at 114; *Riccuti,* 124 F.3d

at 130; *Collins*, 295 F.Supp.3d at 371-72; *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993)

*Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995); *Davis v. City of New York*, 373 F.Supp.2d 322,

338 (SDNY 2005).

    **<u>CONCLUSION</u>**.  **WHEREFORE**, Plaintiffs respectfully pray that the Court deny

Defendants' motion, or grant such other and/or further relief as the Court may deem just

and proper.

DATED:      Brooklyn, NY
             December 18, 2018

                        /S/
                        _____
                        Gideon Orion Oliver