UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
YOTAM MAROM AND MIRIAM ROCEK,

                       Plaintiffs,                          15-cv-2017 (PKC)

      -against-

                                                 OPINION AND
                                                 <u>ORDER</u>

NYPD SERGEANT FIOR BLANCO, NYPD
LEGAL BUREAU LIEUTENANT DANIEL
ALBANO, NYPD LEGAL BUREAU
DETECTIVE KENNETH O'DONNELL, NYPD
OFFICER MICHAEL GALGANO, SHIELD NO.
2671, AND NYPD OFFICER CYNTHIA
BOYLE, SHIELD 06663,

                        Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiffs Yotam Marom and Miriam Rocek bring this section 1983 action against

five named individual defendants employed by the New York City Police Department

("NYPD"), specifically Sergeant Fior Blanco, Lieutenant Daniel Albano, Detective Kenneth

O'Donnell, Officer Michael Galgano, and Officer Cynthia Boyle.  The alleged violations arise

out of a protest that occurred in Zuccotti Park on March 17, 2012, the six-month anniversary of

Occupy Wall Street, during which Marom and Rocek were arrested.  Marom and Rocek each

assert claims under 42 U.S.C. § 1983 for violations of their right to a fair trial and failure to

intervene by certain defendants, whom they allege were involved in creating police reports and

accusatory instruments containing false information.[1]

---

[1] Plaintiffs Yotam Marom, Miriam Rocek, and Don Fitzgerald originally brought this action against the City of New York, eight named individual defendants employed by the NYPD, and fifteen unnamed individual NYPD Officers, asserting nine claims under 42 U.S.C. § 1983.  They asserted claims based on excessive force, excessive detention, malicious abuse of process, false arrests, First Amendment violations, equal protection violations, and deprivations of the right to a fair trial.  The claims, plaintiffs, and defendants have narrowed (as described above), following a

The defendants have moved for summary judgment with respect to these claims. For the reasons that follow, defendants' motion in granted as to all of Marom's claims and denied as to all of Rocek's claims.

THE UNDISPUTED FACTS

The facts discussed in this Opinion are undisputed except where otherwise noted. The Court has drawn all reasonable inferences in favor of the plaintiffs, as the nonmovants.[2] See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

On March 17, 2012, Marom and Rocek were participating in a protest in Zuccotti Park (the Park) on the six-month anniversary of Occupy Wall Street. (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1). At some point, numerous NYPD officers entered the Park. (Def. 56.1 ¶¶ 4-5; Pl. 56.1 Resp. ¶¶ 4-5). Defendant Sergeant Fior Blanco and Legal Bureau attorneys Lieutenant Daniel Albano and Detective Kenneth O'Donnell were among the officers at the Park that day.

_____

motion to dismiss decided by this Court on March 7, 2016 (Doc. 48), a motion for reconsideration decided by this Court on July 29, 2016 (Doc. 66), and a stipulation by the parties (Doc. 138).

[2] Defendants object to numerous exhibits to the Declaration of Gideon Orion Oliver (Doc. 156), which plaintiffs submitted in opposition to defendants' motion for summary judgment. Defendants argue that these exhibits "were not produced in this case[,] [and] [d]ue to the failure to produce these documents, plaintiffs have forfeited their ability to rely upon or use these documents as evidence on defendants' motion for summary judgment." (Def. 56.1 Resp. at 1). Among the objectionable exhibits are Exhibits 5, 7, and 13-18, which are deposition transcripts taken in relation to a separate litigation, Caravalho v. City of New York, 13-cv-4174 (PKC). These deposition transcripts are admissible at the summary judgment stage as the equivalent of affidavits pursuant to Fed. R. Civ. P. 56(c), and the Court has considered them in deciding defendants' motion for summary judgment. See Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A., 270 F. Supp. 3d 716, 720 (S.D.N.Y. 2017) ("[T]estimony [is not] excludable on summary judgment merely because it was taken in a different case."); see also Alexander v. Casino Queen, Inc., 739 F.3d 972, 978 (7th Cir. 2014) ("The weight of authority is that depositions can be the equivalent of affidavits, and are therefore admissible at the summary judgment stage."); Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001) ("Sworn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding. . . . Such testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c), and may be used against a party on summary judgment as long as the proffered depositions were made on personal knowledge and set forth facts that were admissible in evidence."). The Court need not resolve defendants' remaining objections because the Court has not relied on any of those exhibits in denying any part of defendants' motion for summary judgment.

(Pl. 56.1 ¶¶ 25, 160; Def. 56.1. Resp. ¶¶ 25, 160; Def. 56.1 ¶ 104; Pl. 56.1 Resp. ¶ 104). Blanco supervised eleven subordinate officers, including Officers Cynthia Boyle and Michael Galgano, who were also present at the Park. (Id.). Mike Larkin, a representative from Brookfield Properties (the owner of the Park) and NYPD Inspector Edward Winski made multiple announcements informing protesters that the Park was being closed for cleaning and that anyone who did not leave the Park would be arrested. (Def. 56.1 ¶¶ 8-10; Pl. 56.1 Resp. ¶¶ 8-10). Marom and Rocek did not leave the Park and were arrested by NYPD officers that evening. (Def. 56.1 ¶¶ 33, 35, 53, 74, 84; Pl. 56.1 Resp. ¶¶ 33, 35, 53, 74, 84).

*Marom's Arrest*

Marom was present in the Park when police officers entered and instructed the crowd to leave the Park or be arrested. (Def. 56.1 ¶¶ 28-32; Pl. 56.1 Resp. ¶¶ 28-32; Marom Dep. at 37-39). After this announcement, Marom refused to leave, sat down, and linked arms with other individuals. (Id.). He did not leave the Park until he was arrested and escorted out by police. (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33). To effectuate his arrest, officers had to tear his arms apart from the individuals he had linked arms with. (Def. 56.1 ¶ 34; Pl. 56.1 Resp. ¶ 34; Marom Dep. at 55). Marom testified that, during his arrest, he refused to get up and walk on his own despite an officer's instruction and officers "carr[ied]" him, "dragged" him away from the other protestors, "lifted [him] up by the arms and by the legs," and "dropped [him] off [a] bench." (Def. 56.1 ¶ 35; Pl. 56.1 Resp. ¶ 35; Marom Dep. at 41). He testified that one officer "was sort of kicking at [him][,] seemed to be frustrated and told [him] to just get up and walk" and that after this second instruction, Marom got up and walked on his own. (Id.). Eventually, Marom was loaded onto an MTA bus with along with other arrestees. (Marom Dep. at 42).

The record does not indicate which police officer or officers actually conducted Marom's arrest. After Marom was arrested, NYPD Lieutenant Frank Viviano informed Officer Michael Galgano that there had been "some kind of a mixup" such that "[s]omehow, some way, arrests were made but the arresting officers were either separated from the prisoners or did not realize that they were the arresting officers." (Pl. 56.1 ¶ 76; Def. 56.1. Resp. ¶ 76). Even though Galgano did not conduct Marom's arrest, Viviano instructed Galgano to go to the MTA bus and choose five arrestees to process. (Pl. 56.1 ¶¶ 74, 75, 78; Def. 56.1. Resp. ¶¶ 74, 75, 78). Galgano chose Marom and four other arrestees. (Pl. 56.1 ¶¶ 82, 86, 89; Def. 56.1. Resp. ¶¶ 82, 86, 89).

<u>Rocek's Arrest</u>

Rocek was also present in the Park when police officers entered and instructed the crowd to leave. (Def. 56.1 ¶¶ 68, 69; Pl. 56.1 Resp. ¶¶ 68, 69). After hearing the announcements, she sat down and linked arms with other individuals and did not leave the Park until she was arrested and escorted out by officers. (Def. 56.1 ¶¶ 70-74; Pl. 56.1 Resp. ¶¶ 70-74). Officer Cynthia Boyle processed Rocek's arrest, but the parties dispute whether she actually conducted Rocek's arrest.

According to Rocek version of events, two male officers arrested her by pulling her apart from the individuals linked to her. (Pl. 56.1 ¶ 34; Def. 56.1 Resp. ¶ 34; Def. 56.1 ¶ 72; Pl. 56.1 Resp. ¶ 72). After the officers pulled her from the others, one male officer threw her to the ground, put his full weight on her, and began to pull her arms behind her back, none of which she resisted. (Pl. 56.1 ¶¶ 36-38; Def. 56.1. Resp. ¶¶ 36-38). The male officer then told her to "Relax," to which she verbally responded "Fuck you, don't tell me to relax," while continuing to not physically resist. (Pl. 56.1 ¶¶ 39-40; Def. 56.1. Resp. ¶¶ 39-40). The officer then responded

"Okay, fuck you then," twisted her arm behind her back, placed flexicuffs on her, stood up, and ordered her to stand, which she could not do because she was facedown on the ground with her hands bound behind her back. (Pl. 56.1 ¶¶ 41-44; Def. 56.1. Resp. ¶¶ 41-44). The officer then pulled her to her feet by her hair and pushed her forward, at which point she voluntarily walked to the police van. (Id.). She testified that "at no point was I resisting what he was having me do, just—but was being pushed or controlled in all of those situations." (Rocek Dep. at 56).

Defendants claim that Boyle arrested Rocek. On this point, Boyle's testimony was ambiguous. At one point, she testified that she personally put handcuffs on Rocek. (Boyle Dep. at 62). At another point, she testified that she observed Rocek in the Park prior to her arrest and that she "believe[s]" that she physically placed Rocek under arrest, but that she "wouldn't remember if it was [Rocek] in particular because a lot of people were carried out." (Def. 56.1 ¶ 76; Pl. 56.1 Resp. ¶ 76; Pl. 56.1 ¶ 49; Def. 56.1. Resp. ¶ 49; Boyle Dep. at 18). Additionally, during her deposition, Boyle viewed one photograph of Rocek and three video clips depicting the protests. (Pl. 56.1 ¶¶ 55, 57, 59; Def. 56.1. Resp. ¶¶ 55, 57, 59). Boyle did not recognize the person in the photograph as Rocek and could not identify herself in the video segments that depicted Rocek being arrested. (Id.).

*Processing of Marom*

After making arrests in the Park, officers returned to the police precinct in Midtown South (the "Precinct") and created an Online Booking Sheet Report (OLBS Report) for each arrestee they were assigned to process. Officers conducted around 51 arrests in the Park that day and created 51 corresponding OLBS reports. (Oliver Decl., Exs. 24, 29, 32, 39, 43, 45, 47, 49, 51, 53, 56, 59, 62). Officer Galgano processed Marom's arrest along with four others.

(Pl. 56.1 ¶¶ 86, 89, 122; Def. 56.1. Resp. ¶¶ 86, 89, 122).  The details section of Galgano's five

OLBS Reports read:

> AT T/P/O BROOKFIELD PROPERTY DIRECTOR MIKE
> LARKIN AND LT. VIVIANO OF MSTF INFORMED THE
> CROWD THAT THEY HAD TO LEAVE ZUCOTTI PARK SO IT
> COULD BE CLEANED OF DEBRIS. ARRESTEE REFUSED TO
> LEAVE. ARRESTEE WAS INFORMED BY A/O THEY WERE
> UNDER ARREST. ARRESTEE RESISTED BY LYING ON THE
> GROUND, INTERLOCKING ARMS WITH OTHERS AND
> REFUSING TO PLACE HANDS BEHIND THEIR BACKS.

(Pl. 56.1 ¶ 128; Def. 56.1. Resp. ¶ 128).  Galgano provided this OLBS Report to the Office of the

District Attorney of New York County ("DANY").  (Pl. 56.1 ¶ 190; Def. 56.1. Resp. ¶ 190).

On March 18, Galgano swore out a Criminal Court accusatory instrument against

Marom and one other arrestee, stating the following:

> [D]eponent observed a male later identified as Mike Larkin yelling
> over a bullhorn to the crowd of individuals inside said park,
> including defendants, in substance: I AM MIKE LARKIN OF
> BROOKFIELD PROPERTIES THE PARK IS NOW CLOSED
> FOR CLEANING.  EVERYONE MUST EXIT.  Deponent further
> states that deponent observed Lieutenant Frank Viviano, of the
> Patrol Boro Manhattan South Task Force, then yell in substance
> over a bullhorn: THE PARK IS NOW CLOSED FOR CLEANING.
> EVERYONE MUST EXIT.
>      Deponent further states that deponent observed defendants
> refuse to leave.  Deponent states that deponent observed defendants
> resisting arrest in that defendants did: (i) sit down on the ground, (ii)
> interlock defendants' arms with several separately charged
> defendants, and (iii) refuse to place defendants' hands behind
> defendants' backs.

(Pl. 56.1 ¶ 201; Def. 56.1. Resp. ¶ 201; Robinson Decl., Ex. E).

Contrary to his representations in the OLBS Report and the accusatory

instrument, Galgano did not personally observe Marom engaging in all of the conduct described.

For instance, Galgano testified that he did not observe Marom refusing to leave the park or

resisting arrest by interlocking arms with others, lying on the ground, or refusing to place his arms behind his back. (Pl. 56.1 ¶¶ 134-37, 205; Def. 56.1. Resp. ¶¶ 134-37, 205).

Based on Galgano's allegations, Marom was detained for forty hours and was charged with two violations (Trespass under N.Y. Penal Law § 140.05 and Disorderly Conduct under N.Y. Penal Law § 240.20(6)) and two misdemeanors (Resisting Arrest under N.Y. Penal Law § 205.30 and Obstruction of Governmental Administration in the Second Degree under N.Y. Penal Law § 195.05). (Pl. 56.1 ¶ 207; Def. 56.1. Resp. ¶ 207; Def. 56.1 ¶¶ 53, 66; Pl. 56.1 Resp. ¶¶ 53, 66). At his arraignment, Marom was released on his own recognizance pursuant to NYCPL § 510.40 and required to appear one additional time before he accepted an Adjournment in Contemplation of Dismissal (ACD) on May 24, 2012, which led to the resolution of his case. (Pl. 56.1 ¶¶ 208-11; Def. 56.1. Resp. ¶¶ 208-11; Def. 56.1 ¶ 67; Pl. 56.1 Resp. ¶ 67). His case was dismissed and sealed on November 23, 2012. (Pl. 56.1 ¶ 211; Def. 56.1. Resp. ¶ 211).

*Processing of Rocek*

Boyle processed the arrests of Rocek and four others. (Pl. 56.1 ¶ 143; Def. 56.1. Resp. ¶ 143). All five of her OLBS Reports contained the following language in the details section:

> AT TPO ARRESTEES WERE TOLD BY BROOKFIELD DIRECTOR MIKE LARKIN AND LT. VIVIANO OF MSTF THAT THEY HAD TO LEAVE ZUCOTTI PARK SO IT COULD BE CLEANED OF DEBRIS. ARRESTEE REFUSED TO LEAVE. ARRESTEE WAS INFORMED BY A/O THEY WERE UNDER ARREST. ARRESTEEE RESOSTED [SIC] ARREST BY LYING ON THE GROUND, INTERLOCKING ARMS WITH OTHERS AND REFUSING TO PLACE HANDS BEHIND BACK.

(Pl. 56.1 ¶ 144; Def. 56.1. Resp. ¶ 144). All of Boyle's OLBS Reports were forwarded to DANY. (Pl. 56.1 ¶ 181; Def. 56.1. Resp. ¶ 181).

On March 18, Boyle swore out a Criminal Court accusatory instrument against Rocek and three other arrestees. (Pl. 56.1 ¶ 183; Def. 56.1. Resp. ¶ 183; Robinson Decl., Ex. F). In that accusatory instrument, she alleged the following:

> . . . Mike Larkin, a custodian of Zucotti park located at the above mentioned address, and Lieutenant Frank Viviano, of the Manhattan South Task Force tell defendants to leave said park and inform defendants that defendants did not have permission or authority to be inside of said park.
>
> Deponent further states that defendants refused to leave said park. Deponent further states that defendants interlocked arms with other individuals who refused to leave said park and defendants sat on the ground at the above mentioned address. Deponent further states that when defendants were being placed under arrest for the above described conduct defendants refused to put their arms behind their back, and refused to get into the police vehicle, thereby making arresting the defendants difficult.
>
> Deponent further states that defendants were removed from said location forcibly, in that defendants were carried or dragged from the above-mentioned location. Deponent further states that multiple police officers were required to remove each defendant from the above mentioned location.

(Id.).

At her deposition, Boyle could not recall if Rocek refused to leave the Park or resisted arrest by lying on the ground, interlocking her arms with others, and refusing to place her hands behind her back. (Pl. 56.1 ¶¶ 147-52; Def. 56.1. Resp. ¶¶ 147-52). Additionally, Boyle could not recall if Rocek voluntarily entered the police van or if officers had to carry her because Boyle was "involved in numerous escort/carry" arrests on March 17. (Pl. 56.1 ¶¶ 50, 184; Def. 56.1. Resp. ¶¶ 50, 184).

Based on Boyle's allegations, Rocek was detained for twenty-two hours and faced the same charges as Marom for Disorderly Conduct, Trespass, Obstruction of Governmental Administration, and Resisting Arrest. (Pl. 56.1 ¶¶ 184-85; Def. 56.1. Resp. ¶¶ 184-85; Def. 56.1 ¶¶ 84-85; Pl. 56.1 Resp. ¶¶ 84-85). At her arraignment, she was released on her own

recognizance pursuant to NYCPL § 510.40 and required to appear in court five times before she accepted an ACD that led to the resolution of her case. (Pl. 56.1 ¶¶ 186-89; Def. 56.1 Resp. ¶¶ 186-89; Def. 56.1 ¶ 86; Pl. 56.1 Resp. ¶ 86). The case was dismissed and sealed on May 13, 2013. (Id.).

_Blanco, Albano, and O'Donnell's Roles_

Three arresting officers, including Galgano and Boyle, testified that they did not themselves draft the language used in their OLBS Reports, which described the pre-arrest conduct of their arrestees. (Pl. 56.1 ¶¶ 114, 116-18, 123-25, 127, 146; Def. 56.1 Resp. ¶¶ 114, 116-18, 123-25, 127, 146). Instead, they testified that they used boilerplate language that they obtained from either Blanco or a Legal Bureau attorney. (Id.). For instance, Galgano testified in 2014 that a Legal Bureau attorney told him "word for word what to write down" in his OLBS Reports. (Pl. 56.1 ¶¶ 114, 123, Def. 56.1 Resp. ¶¶ 114, 123). In 2016, he testified that when he was filling out his OLBS Reports, Blanco approached him with "a piece of paper" and told him that "she spoke with someone from legal and . . . has the narrative portion of it, to put into the narrative section [of his OLBS Reports]." (Pl. 56.1 ¶¶ 114, 124-25, 127; Def. 56.1. Resp. ¶¶ 114, 124-25, 127). According to Galgano, the language on this piece of paper is "[t]he same thing that's written in the detail section of [his] [OLBS] report." (Id.).

Boyle also testified that she did not draft the language in her OLBS Reports, but was instead "instructed by the legal bureau." (Pl. 56.1 ¶¶ 114, 146; Def. 56.1 Resp. ¶¶ 114, 146). A non-party officer, Officer Steven Valentine, similarly testified that a Legal Bureau attorney provided him with a photocopy of a "little piece of paper" with handwritten language on it, which he used to fill out his OLBS Reports. (Pl. 56.1 ¶¶ 116-119; Def. 56.1. Resp. ¶¶ 116-119). The details sections of the 51 OLBS Reports created that day, including Galgano's and Boyle's,

are substantively identical to language on the photocopied piece of paper that Valentine testified he received from a Legal Bureau attorney. (Pl. 56.1 ¶ 119-20, 145; Def. 56.1. Resp. ¶ 119-20, 145; Oliver Decl. ¶¶ 71-77).

Blanco was the "main supervisor" who oversaw the processing of arrests made in the Park. (Pl. 56.1 ¶ 99; Def. 56.1. Resp. ¶ 99). Her duties included reading the officers' OLBS Reports to make sure that they "describe[d] the crimes that were committed" and "sign[ing] off on [them]." (Pl. 56.1 ¶¶ 99, 103; Def. 56.1. Resp. ¶¶ 99, 103; Blanco Dep. at 119). The OLBS Reports for Marom and Rocek's arrests both specifically list Blanco as the "Supervisor Approving" of the report. (Pl. 56.1 ¶ 102; Def. 56.1. Resp. ¶ 102; Oliver Decl., Exs. 24, 32).

NYPD Legal Bureau attorneys are typically assigned to large protests so they can ensure "the officer arresting actually saw" the alleged unlawful conduct, the officer fills out paperwork accurately, and probable cause exists to detain arrestees and forward their cases to DANY. (Pl. 56.1 ¶¶ 15, 16; Def. 56.1. Resp. ¶¶ 15, 16). Blanco testified that after mass-arrests, conferring with a Legal Bureau attorney is "what we did on every demonstration. . . . [the Legal Bureau] always respond[s] to the precinct and give[s] us advice." (Pl. 56.1 ¶¶ 111, 113; Def. 56.1. Resp. ¶¶ 111, 113). With respect to the March 17 arrests, Blanco testified that the role of the Legal Bureau attorney was to "confer or talk about everything that went on" and "go over the charges." (Pl. 56.1 ¶ 112; Def. 56.1. Resp. ¶ 112). Albano and O'Donnell were the Legal Bureau attorneys present at the Park on March 17 and "on duty during the time in which arrest processing took place." (Pl. 56.1 ¶¶ 160-61, 163-64; Def. 56.1. Resp. ¶¶ 160-61, 163-64; Def. 56.1 ¶ 104; Pl. 56.1 Resp. ¶ 104).

Blanco, Boyle, Valentine, and Galgano all testified that a Legal Bureau attorney was either present at the Precinct or spoke to officers over the phone during arrest processing,

but none have identified a specific Legal Bureau attorney. (Pl. 56.1 ¶¶ 110-15; Def. 56.1. Resp. ¶¶ 110-15; Def. 56.1 ¶ 111; Pl. 56.1 Resp. ¶ 111; Boyle Dep. at 87). Blanco, in particular, testified that she saw a Legal Bureau attorney speaking to all eleven arresting officers. (Id.).

Neither Albano nor O'Donnell believe that they were personally involved in processing the March 17 arrests. (Pl. 56.1 ¶¶ 170-77; Def. 56.1. Resp. ¶¶ 170-77; Def. 56.1 ¶¶ 105-09; Pl. 56.1 Resp. ¶¶ 105-09). However, O'Donnell testified that from 2011 to 2012 he went to precincts to assist with arrest-processing for somewhere between five and twenty mass arrests. (Pl. 56.1 ¶ 166; Def. 56.1. Resp. ¶ 166). Albano testified that if someone from the Legal Bureau went to the Precinct on March 17 to process arrests "more likely than not it would have been [him]" rather than O'Donnell because he preferred to "vet" the arrests, rather than stay at the scene of the protest. (Pl. 56.1 ¶¶ 179-80; Def. 56.1. Resp. ¶¶ 179-80). Albano testified that it was "very typical" for him to use "scraps of paper" containing boilerplate language to assist arresting officers in drafting their OLBS Reports. (Pl. 56.1 ¶ 178; Def. 56.1. Resp. ¶ 178; Albano Dep. at 20).

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all

ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

DISCUSSION

To establish a claim under 42 U.S.C. § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999).

A defendant becomes liable for damages under section 1983 only if he or she is "personal[ly] involve[d] . . . in [the] alleged constitutional deprivations." Colon v. Coughlin, 58

F.3d 865, 873 (2d Cir. 1995) (quoting <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994)). A

defendant is "personally involved" if, for example, he or she directly participates in the

constitutional deprivation. <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986). A defendant is

also considered "personally involved" if he or she fails to intervene despite having a realistic

opportunity to prevent the constitutional violation from occurring. <u>Harris v. City of New York</u>,

No. 15-cv-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017); <u>see</u> <u>Anderson v.</u>

<u>Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994).

   Plaintiffs Marom and Rocek each assert claims under section 1983 against certain

defendants for violating their right to a fair trial and against other defendants for failing to

intervene to protect those rights. The Court will address the fair trial claims first and the failure

to intervene claims thereafter.

I.  <u>Fair Trial Claims</u>

   Plaintiffs argue that defendants violated their right to a fair trial when the officers

included false information in plaintiffs' OLBS Reports and accusatory instruments and

forwarded those documents to DANY. "It is firmly established that a constitutional right exists

not to be deprived of liberty on the basis of false evidence fabricated by a government officer."

<u>Harris v. City of New York</u>, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (citing <u>Zahrey v.</u>

<u>Coffey</u>, 221 F.3d 342, 355 (2d Cir. 2000)). A person is deprived of his or her right to a fair trial

based on fabricated information if "(1) [an] investigating official (2) fabricates information (3)

that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5)

the plaintiff suffers a deprivation of life, liberty, or property as a result." <u>Garnett v. Undercover</u>

<u>Officer C0039</u>, 838 F.3d 265, 279 (2d Cir. 2016) (citing <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124

F.3d 123, 130 (2d Cir. 1997)).

"Such fabrication violates the right to a fair jury trial whether the officer fabricates tangible evidence or fabricates 'the officer's own account of his or her observations of alleged criminal activity.'" Collins v. City of New York, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2018) (citing Garnett, 838 F.3d at 274). The rationale for a fair trial cause of action is that "false evidence works an unacceptable corruption of the truth-seeking function of the trial process." Ricciuti, 124 F.3d at 130 (internal quotation marks omitted). A fair trial claim "accrues when the officer forwards the false information to the prosecutors." Collins, 295 F. Supp. 3d at 371 (citation omitted).

The fabrication of evidence alone does not deprive a plaintiff of his or her fair trial rights. Ashley v. City of New York, No. 14-cv-5559 (NGG)(SMG), 2018 WL 6419951, at *3 (E.D.N.Y. Dec. 6, 2018) (citing Zahrey, 221 F.3d at 348). One of the "limiting principles" that "restrict[s]" fair trial claims based on fabricated evidence is the requirement that the fabricated evidence be "likely to influence a jury's verdict." Garnett, 838 F.3d at 280. Even in light of this requirement, however, "a trial is not a prerequisite to a [fair trial] claim." Collins, 295 F. Supp. 3d at 371. The fabricated information need only be "material" such that it would "likely influence the jury if it arrived at a jury." Case v. City of New York, 233 F. Supp. 3d 372, 388 (S.D.N.Y. 2017) (citation omitted); see also Salazar v. City of New York, No. 15-cv-1989 (KBF), 2016 WL 3748499, at *4 (S.D.N.Y. July 11, 2016) ("[T]he issue is . . . whether, had plaintiff proceeded to trial, the fact of the falsification would have rendered the trial unfair to [the plaintiff]."); Cunningham v. City of New York, No. 17-cv-5124 (DLC), 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018) ("[T]he allegedly fabricated evidence [must], at the very least, be material to a viable claim or defense . . . .").

Another limiting principle requires that the fabricated information cause the plaintiff to suffer a "deprivation of liberty" that is not "'too remote a consequence' of the act of creating the false information." Garnett, 838 F.3d at 279; Collins, 295 F. Supp. 3d at 371 (citation omitted). Importantly, "[t]he fabricated evidence need not be the only cause of the deprivation of liberty." Collins v. City of New York, No. 14-cv-08815 (AJN), 2019 WL 1413999, at *2 (S.D.N.Y. Mar. 29, 2019) (citing Garnett, 838 F.3d at 277). Courts in this district have held that "[s]pending a number of hours in jail . . . constitute[s] a sufficient deprivation of liberty, as has the obligation to attend numerous follow-up court appearances." Collins, 295 F. Supp. 3d at 371 (citation omitted).

A. Marom's Fair Trial Claims Against Galgano, Blanco, O'Donnell, and Albano

Marom asserts fair trial claims against defendants Galgano, Blanco, O'Donnell, and Albano. He claims that Galgano violated his fair trial rights by forwarding to DANY an OLBS Report and a sworn accusatory instrument falsely stating that Galgano observed Marom engaging in certain pre-arrest conduct. Marom claims that the others participated in that violation by either preparing boilerplate language or instructing Galgano to use the language in his OLBS Reports.

To survive summary judgment on his fair trial claims, Marom must present sufficient evidence upon which a reasonable jury can conclude that the information contained in the OLBS Report and accusatory instrument was "material" such that it would "likely influence the jury if it arrived at a jury." See Case, 233 F. Supp. 3d at 388. When this Court reinstated Marom's fair trial claims in its Memorandum and Order on Reconsideration of July 29, 2016, it noted that "[f]acts may emerge in the course of pretrial discovery that tend to show that the allegedly false statements were not material . . . For example, the evidence may show that the

substance of the statements were true and accurate, even though they were based on information given to [Galgano] by other officers." Marom v. City of New York, No. 15-cv-2017 (PKC), 2016 WL 5900217, at *3 (S.D.N.Y. July 29, 2016).

Marom's claims fail because, even if the information in his OLBS Report and accusatory instrument was fabricated, discovery has indeed revealed that the substance of these documents accurately describe Marom's pre-arrest conduct and that any inaccuracies are unlikely to influence a jury. In Galgano's OLBS report and accusatory instrument, Galgano stated, in substance, that (1) Mike Larkin and Lieutenant Viviano instructed protesters to leave the Park; (2) Marom refused to leave the Park; and (3) Marom resisted arrest by sitting on the ground, lying on the ground, interlocking arms with others, and refusing to place his hands behind his back. (Pl. 56.1 ¶¶ 128, 201; Def. 56.1. Resp. ¶¶ 128, 201). Marom has conceded in his admissions and deposition that (1) he was present in the Park when officers instructed the crowd to leave; (2) he refused to leave the Park; and (3) after the instruction, he sat down on the ground, refused to get up and walk despite an officer's instruction, and interlocked arms with other individuals such that officers had to tear his arms apart from the others to effectuate arrest. (Def. 56.1 ¶¶ 28-35; Pl. 56.1 Resp. ¶¶ 28-35; Pl. 56.1 ¶ 67; Def. 56.1 Resp. ¶ 67; Marom Dep. at 37-41, 55).

In addition, Marom has not denied that he refused to place his hands behind his back or that he generally resisted arrest. However, he does argue in his motion papers that, contrary to the OLBS Report, he did not lie on the ground. (Pl. Br. at 9). Marom presents no evidence, in the form of testimony or otherwise, to support this bare assertion. Even crediting his assertion, Marom's precise posture (be it sitting down or lying down) is not a fact that is likely to influence a jury's decision as to whether Marom committed the charged offenses of

Trespass, Disorderly Conduct, Resisting Arrest, or Obstruction of Governmental Administration, especially in light of Marom's admitted and undisputed conduct.  Cf. Hoyos v. City of New York, 999 F. Supp. 2d 375, 394–95 (E.D.N.Y. 2013) ("The precise location of his arrest, standing alone . . . would not likely influence a reasonable jury's decision as to whether he had been driving while intoxicated."); Collins, 295 F. Supp. 3d at 373 (an officer's statement that "he saw Defendant Zielinski rather than Defendant Cooke give orders to disperse" and that he "observed [plaintiff] in front of 60 Centre Street when in fact he saw her closer to the front of the Thurgood Marshall U.S. Courthouse" are not facts likely to influence a jury's decision); Soomro v. City of New York, 739 F. App'x 51, 54 (2d Cir. 2018) (an officer's description that "'half of' Officer Kraus's body, as opposed to his left arm, was in the taxi is immaterial because . . . [h]owever characterized, these facts are sufficient to find Plaintiff guilty of assault in the second degree").

In sum, no reasonable jury could find that Galgano's OLBS Report and accusatory instrument are "likely to influence a jury's decision" because the material substance of those documents can be proven by other, more persuasive evidence, namely Marom's own admissions and testimony.  Marom's fair trial claims against Galgano, Blanco, O'Donnell, and Albano are thus dismissed.

### B.  Rocek's Fair Trial Claims Against Boyle, Blanco, O'Donnell, and Albano

Rocek claims that she was deprived of her fair trial rights when Boyle included fabricated information about Rocek's pre-arrest conduct in an OLBS Report and an accusatory instrument that Boyle forwarded to DANY.  She claims further that Blanco and either Albano or O'Donnell were personally involved in the violation of her fair trial rights by participating in the fabrication.  The parties do not dispute that the defendants were investigating officials or that

Boyle forwarded an OLBS Report and an accusatory instrument containing descriptions of Rocek's pre-arrest conduct to DANY. These two elements of Rocek's fair trial claim are deemed established for the purpose of the motion. For the reasons that follow, defendants' motion for summary judgment will be denied with respect to each of Rocek's fair trial claims.

i. <u>Rocek's Fair Trial Claim Against Boyle</u>

Rocek has presented evidence, which if believed, would be sufficient to permit a reasonable jury to find in her favor on her fair trial claim against Boyle. First, there is evidence that would permit the conclusion that the content of Rocek's OLBS Report and accusatory instrument was fabricated. For instance, Rocek has presented the 51 substantively identical OLBS Reports, including Boyle's five identical reports, and Boyle's testimony that she used boilerplate language from a Legal Bureau attorney in her reports rather than drafting the language herself. The evidence also includes Boyle's equivocal testimony regarding whether she ever arrested or observed Rocek prior to arrest, Boyle's inability to recognize Rocek in a photo, and Boyle's inability to identify herself in videos depicting Rocek's arrest.

Perhaps the strongest evidence of fabrication is Rocek's detailed testimony about her arrest, which contradicted Boyle's representations in the OLBS Report and accusatory instrument. Boyle's representations were, among other things, that Rocek was carried or dragged from the Park by officers and resisted arrest by sitting on the ground, lying on the ground, interlocking arms with others, refusing to place her hands behind her back, and refusing to get into the police vehicle. In contrast, Rocek testified that "at no point was [she] resisting." Specifically, she testified that she was arrested by two male officers, that she did not resist an officer pulling her arms behind her back, and that she voluntarily walked from the Park to the police vehicle. This testimony creates a triable issue with respect to the element of fabrication.

See Bellamy v. City of New York, 914 F.3d 727, 746 (2d Cir. 2019) ("[A] § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact."). Considering all of the evidence, a reasonable jury could conclude that the contents of Boyle's OLBS Report and accusatory instrument were fabricated.

Second, the alleged fabricated information would be "likely to influence a jury's verdict" because the information is material to Rocek's charged offenses, particularly the offenses of Resisting Arrest (N.Y. Penal Law § 205.30) and Obstruction of Governmental Administration (N.Y. Penal Law § 195.05). The crime of Resisting Arrest has two elements: "(1) the person charged must have intentionally attempted to prevent the arrest of [herself] or someone else, and (2) the arrest [she] attempted to prevent must itself have been supported by a warrant or by probable cause." Polanco v. City of New York, No. 14-cv-7986 (NRB), 2018 WL 1804702, at *5 (S.D.N.Y. Mar. 28, 2018) (citing Curry v. City of Syracuse, 316 F.3d 324, 336 (2d Cir. 2003)). The elements for the crime of Obstruction of Governmental Administration are "(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." Id. at *4 (citing Cameron v. City of New York, 598 F.3d 50, 68 (2d Cir. 2010)). "Activities such as refusing to obey orders, physically resisting arrest, interfering with the arrest of another, or assaulting a police officer are all typical acts that are properly charged as obstructing governmental administration." Id. (emphasis omitted). Evidence that Rocek resisted arrest in various ways and had to be carried or dragged from the Park by officers is directly relevant to both of these offenses and would, therefore, be likely to influence a jury deciding whether Rocek committed the offenses.

Third, there is sufficient evidence that the fabricated information caused Rocek to suffer a deprivation of liberty. A reasonable jury could conclude that Rocek suffered a

deprivation of liberty when she was arrested, detained for twenty-two hours, formally charged, released on her own recognizance subject to NYCPL § 510.40, and required to appear in court five times.  See Gogol v. City of New York, No. 15-cv-5703 (ER), 2017 WL 3449352, at *11 (S.D.N.Y. Aug. 10, 2017) ("[A]an arrestee is . . . deprived of liberty when subject to Section 510.40 restrictions."); Perez v. Duran, 962 F. Supp. 2d 533, 538, 542–44 (S.D.N.Y. 2013) (deprivation of liberty where plaintiff was released subject to NYCPL § 510.40 and required to appear in court on two occasions); Keller v. Sobolewski, No. 10-cv-5198 (FB)(RML), 2012 WL 4863228, at *1, 4-5 (E.D.N.Y. Oct. 12, 2012) (same where plaintiff was held for thirty-five hours, charged, and later released with an ACD); Dowling v. City of New York, No. 11-cv-4954 (NGG)(RML), 2013 WL 5502867, at *6-7 (E.D.N.Y. Sept. 30, 2013) (same where plaintiff was held for twenty-four hours before being released with an ACD).

With respect to causation, defendants argue that Rocek cannot demonstrate a causal connection between the fabricated evidence and her deprivations of liberty because officers had probable cause to arrest her for committing each charged offense.  Assuming that officers had such probable cause, defendants' argument still fails.  Generally, "probable cause for arrest is not a defense to a fabrication-of-evidence due process claim."  Ganek v. Leibowitz, 874 F.3d 73, 91 (2d Cir. 2017); see also Ricciuti, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.").  However, where there exists probable cause for an arrest, a plaintiff must establish that "the fabricated evidence cause[d] some further deprivation" beyond the arrest supported by probable cause.  Ganek, 874 F.3d at 91 (internal quotation marks omitted).

Defendants cite to this Circuit's summary order in <u>Caravalho v. City of New York</u>, 732 F. App'x 18 (2d Cir. 2018) to support its assertion that Rocek has not demonstrated the requisite "further deprivation." The <u>Caravalho</u> plaintiffs were arrested and detained after participating in the same protest that gives rise to the facts in this case. <u>Id.</u> at 19-22. The officers in that case had probable cause to arrest plaintiffs for Disorderly Conduct under N.Y. Penal Law § 240.20(6), but the plaintiffs were ultimately released without charges. <u>Id.</u> The plaintiffs asserted fair trial claims based on fabricated arrest paperwork. <u>Id.</u> at 21, 24. The Second Circuit held that the plaintiffs did not present sufficient evidence that the fabrication caused a deprivation of liberty because "[p]laintiffs failed to adduce any evidence demonstrating that they were detained as a result of the allegedly fabricated arrest paperwork, rather than their arrest for disorderly conduct." <u>Id.</u> (citing <u>Ganek</u>, 874 F.3d at 91).

As one post-<u>Caravalho</u> case has recognized, "<u>Caravalho</u> does not stand for the blanket proposition that so long as other, similar charges were brought alongside charges based on allegedly fabricated evidence, a plaintiff can never show that the fabrication proximately caused any further liberty deprivation." <u>Collins</u>, 2019 WL 1413999, at *2. <u>Caravalho</u> critically differs from the case at bar because the <u>Caravalho</u> plaintiffs were never prosecuted and, therefore, their only deprivations of liberty were the arrests and post-arrest detentions. As a result, their failure to present evidence that their arrests and corresponding detentions were "a result of the allegedly fabricated arrest paperwork, rather than their arrest for disorderly conduct" amounted to a failure to establish that the fabricated evidence caused any "further deprivation" beyond an arrest based on probable cause. Here, in contrast, Rocek was not merely arrested and detained. It is undisputed that, based on Boyle's OLBS Report and accusatory instrument, Rocek was also formally charged with Trespass, Disorderly Conduct, Resisting Arrest, and

Obstruction of Governmental Administration, released on her own recognizance subject to NYCPL § 510.40, and required to appear in court multiple times.

A reasonable jury could conclude that these post-arrest and detention deprivations were "further deprivation[s]" caused at least in part by the fabricated evidence, especially since DANY did not formally charge all 51 arrestees. (Def. 56.1 ¶ 52; Pl. 56.1 Resp. ¶ 52); see Ganek, 874 F.3d at 91 (noting that where there is probable cause for an arrest, a further deprivation exists when "the fabrication . . . inform[s] post-arrest charging and bail determinations," because "the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence"); Collins, 2019 WL 1413999, at *3 ("Adding an additional charge based on fabricated evidence could plainly result in a further deprivation.").

Lastly, a reasonable jury could conclude that Rocek has satisfied section 1983's "personal involvement" requirement with respect to Boyle because there is undisputed evidence that Boyle created Rocek's OLBS Report and accusatory instrument. See Colon 58 F.3d at 873 (requiring a defendant to be personally involved in violating a plaintiff's constitutional rights for section 1983 liability to attach). Thus, Rocek has presented sufficient evidence to defeat summary judgment on her fair trial claim against Boyle.

### ii. Rocek's Fair Trial Claim Against Blanco

A reasonable jury could also conclude that Blanco was "personally involved" in depriving Rocek of her fair trial rights. Blanco's testimony and the OLBS Reports reveal that Blanco was the "main supervisor" in charge during arrest processing and that she reviewed and approved the OLBS Reports before they were sent to DANY. Additionally, Galgano testified

that Blanco obtained boilerplate language from the Legal Bureau and instructed Galgano to insert the language into his OLBS Report, while Valentine testified that he received a photocopy of the same boilerplate language. That evidence, together with the fact that all 51 OLBS reports were substantively identical, allows the inference that Blanco gave similar instructions to her other subordinate officers (including Boyle) and that those officers complied. The evidence is, therefore, sufficient to allow a reasonable jury to conclude that Blanco was personally involved in violating Rocek's fair trial rights through "directly participating" in the creation of the false OLBS Reports. See Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (noting that "direct participation" includes "ordering or helping others to do the unlawful acts, rather than doing them [oneself]").

### iii. Rocek's Fair Trial Claims Against O'Donnell and Albano

A reasonable jury could also conclude that either or both O'Donnell and Albano "directly participated" in depriving Rocek of her fair trial rights. For one, defendants admit that Albano and O'Donnell were the Legal Bureau attorneys on duty during both the protest and the subsequent arrest processing. Additionally, Galgano, Boyle, and Valentine each testified that they obtained the language used in their OLBS Reports from an unidentified Legal Bureau attorney, while Officer Blanco confirmed that a Legal Bureau attorney spoke to each arresting officer during arrest processing. O'Donnell himself testified that between 2011 and 2012, he participated in arrest processing for five to twenty mass arrests, while Albano testified that it was "very typical" for him to use "scraps of paper" containing boilerplate language when assisting officers with arrest processing. A reasonable jury could infer based on this evidence that either or both Albano and O'Donnell "directly participated" in violating Rocek's fair trial rights by creating the boilerplate language or instructing arresting officers to use it in their OLBS Reports.

II.  Failure to Intervene Claims

Marom claims that Boyle failed to intervene to protect Marom from being deprived of his fair trial rights, while Rocek asserts an analogous claim against Galgano.  "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557.  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: . . . that any constitutional violation has been committed by a law enforcement official . . . ." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id.  "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Id.  "[A] failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim." Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012) (citation omitted); see Feinberg v. City of New York, 99-cv-12127 (RC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004).

A.  Marom's Failure to Intervene Claim Against Boyle

Marom's failure to intervene claim against Boyle is premised on his fair trial claims.  As discussed, Marom has not presented sufficient evidence from which a reasonable jury could conclude that he was deprived of his right to a fair trial.  Marom's failure to intervene claim is, therefore, dismissed.  See Matthews, 889 F. Supp. 2d at 443-44.

B.  Rocek's Failure to Intervene Claim Against Galgano

A reasonable jury could conclude based on the evidence that Galgano failed to intervene to protect Rocek's fair trial rights.  There is evidence that Galgano interacted with both Blanco and Boyle during arrest processing.  For instance, Galgano testified that Blanco directly instructed him to use the alleged fabricated information in his OLBS Reports and Boyle is listed on Galgano's OLBS Reports as the officer who filled out the report.  (Def. 56.1 ¶ 62; Pl. 56.1 Resp. ¶ 62; Oliver Decl., Exs. 32, 37, 39).  Additionally, Blanco testified that she and the arresting officers "all gather[ed] together and [] [went] over the charges . . . confer[red] with one another on the charges" before submitting OLBS Reports to DANY.  (Pl. 56.1 ¶ 109; Def. 56.1 Resp. ¶ 109).  A reasonable jury could infer from the evidence that Galgano, Boyle, Blanco and the other arresting officers conferred with each other while processing arrests such that Galgano had both "reason to know" that Blanco and Boyle were engaging in a constitutional violation and "a realistic opportunity to intervene" to prevent that violation from occurring.  See Anderson, 17 F.3d at 557.

III. Qualified Immunity

Defendants argue that they are entitled to qualified immunity on all claims.  Because Marom's claims are dismissed, the Court need only address defendants' qualified immunity argument with respect to Rocek's claims.  "Qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find."  Case, 233 F. Supp. 3d at 389 (citing Morse v. Fusto, 804 F.3d 538, 550 (2d Cir. 2015)).  Thus for the reasons discussed in detail above, defendants are not entitled to qualified immunity with respect to

Rocek's fair trial or failure to intervene claims, which are premised on proof that defendants knowingly fabricated evidence.

CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment (Doc. 139) is GRANTED with respect to all of Marom's claims and DENIED with respect to all of Rocek's claims.  The Clerk is directed to terminate the motion.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        July 25, 2019